IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OPEN TECHNOLOGY FUND,
 2101 L Street, NW, Suite 300
 Washington, DC 20036

AMBASSADOR RYAN CROCKER,
 13022 East Apache Pass Lane
 Spokane, Washington 99206

AMBASSADOR KAREN KORNBLUH,
 3209 Cleveland Avenue, NW
 Washington, DC 20008

BEN SCOTT,
 52 Lucknow Drive
 Nottingham NG3 5EU, United Kingdom

MICHAEL W. KEMPNER,
 2150 Broadway, Apt. 14A
 New York, New York 10023,
    *Plaintiffs*,
  v.

MICHAEL PACK, in his official capacity
as Chief Executive Officer and Director of the
U.S. AGENCY FOR GLOBAL MEDIA,
 330 Independence Avenue, SW,
 Washington, DC 20237,
    *Defendant*.

Case No. 20-cv-1710

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

**EMERGENCY TEMPORARY
RESTRAINING ORDER SOUGHT**

### INTRODUCTION

On June 17, 2020—within days of taking the reins as head of the U.S. Agency for Global Media—Michael Pack attempted the wholesale purge of the officers and directors of the Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks. Mr. Pack's actions, quickly dubbed the "Wednesday night massacre," came just two days after the resignations of Voice of America's director and deputy director, and have already prompted widespread, bipartisan concerns about their lawfulness.

Although funded by Congress through grants administered by the Agency, the four organizations targeted by Mr. Pack are not part of the government. Their employees are not government employees. They are private, nonprofit organizations with their own leadership and independent boards of directors. That is by design. Their mission, collectively, is to promote the free flow of information worldwide, especially in countries where authorities restrict freedom of expression. They do this through global efforts to combat online censorship and news broadcasts in 61 different languages, reaching 400 million people each day. But they can only be effective in countering disinformation and censorship if they are rightly perceived as independent, professional, and fact-driven—not as official mouthpieces for some partisan agenda. To ensure the integrity and credibility of this vital work, their independence from political interference is protected by a strict "firewall" embodied in statutes, regulations, and binding contract provisions. Mr. Pack's actions this past week constitute the most egregious breach of that firewall in history.

Mr. Pack's Senate confirmation was delayed for two years because critics across the political spectrum feared precisely this result—that Mr. Pack would breach the firewall and cause lasting damage to the organizations' professionalism and independence. In contrast with his predecessors, who had significant foreign policy experience and broad respect in the field of journalism, Mr. Pack is best known for making films with an ideological slant. He is a close ally of Steve Bannon— the former *Breitbart* publisher—who Mr. Pack describes as his "mentor" and who recommended Mr. Pack for the post: "He's my guy, and I pushed him hard," Bannon has said. Critics' concerns were only amplified by specific content-based criticisms of news coverage. In an official statement, for example, the White House attacked the content of one report, accusing it of "speak[ing] for America's adversaries—not its citizens"—and "amplif[ying] Beijing's propaganda." In fact, the targeted news story was an AP report. Nonetheless, President Trump remarked: "The things they say are disgusting toward our country. And Michael Pack would get in and do a great job."

2

Mr. Pack's short, tumultuous tenure has already vindicated his critics' worst fears. Representative Michael McCaul of Texas and Senator Marsha Blackburn of Tennessee, both Republicans, have stated in recent days that they are "troubled by the recent termination[s]" and are "concerned about the future of the organization." Just today, Senator Robert Menendez of New Jersey formally requested that the State Department's Acting Inspector General, Stephen Akard, review whether Mr. Pack's actions violated the firewall regulations, and noted that, "[o]n its face, the firing of [the] leadership of each network and dissolution of the boards appear to be entirely inconsistent with the highest standards of professional journalism."

Mr. Pack's actions are unlawful in at least two critical respects. *First*, with respect to Open Technology Fund—an independent nonprofit dedicated to advancing global Internet freedom—Pack lacks any legal authority whatsoever to remove its officers or directors. The statutory authority and bylaws on which Mr. Pack purported to rely do not remotely confer any such authority. *Second*, although Pack does have limited statutory authority with respect to personnel decisions at the other three organizations, that authority is strictly constrained by statute, regulation, and contract. With respect to all four organizations—Radio Free Europe, Radio Free Asia, the Middle East Broadcasting Networks, and Open Technology Fund—Mr. Pack's attempt to remove the organizations' officers and directors across the board constitutes an impermissible breach of the "firewall." So does his attempt to freeze funds. Indeed, in each of its grant agreements with these organizations, the Agency has pledged to honor these statutory and regulatory obligations and is prohibited from "tak[ing] any . . . action that may tend to undermine" the organizations' "journalistic credibility or independence." Mr. Pack's actions impermissibly breach the "firewall." It is hard to conceive of a more serious breach of the organizations' legally protected independence than the wholesale decapitation of their leadership by an ideologically-oriented maker of political films, installed by the President for the stated purpose of altering the organizations' content.

3

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action for declaratory and injunctive relief under 28 U.S.C. §§ 1331, 1651, 2201, and 2202, and under 5 U.S.C. § 702.

2.      Venue is proper in this district under 28 U.S.C. § 1391(e)(1).

## PARTIES

3.      Open Technology Fund is a private 501(c)(3) nonprofit organization incorporated in the District of Columbia. The Fund's mission is to advance Internet freedom in repressive environments by supporting research, development, implementation, and maintenance of technologies that provide secure and uncensored access to government-funded international broadcasting services. The Fund counters attempts by authoritarian governments to control the Internet and restrict freedom of information and association online by developing and deploying cutting-edge circumvention technologies.

4.      Ambassador Ryan Crocker is a member of the Boards of Directors of Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks. He has served as U.S. Ambassador six times: Afghanistan (2011–2012), Iraq (2007–2009), Pakistan (2004–2007), Syria (1998–2001), Kuwait (1994–1997), and Lebanon (1990–1993). Three of these appointments were under Republican administrations and three under Democratic administrations. During the first George W. Bush administration, Ambassador Crocker served in Baghdad as the first Director of Governance for the Coalition Provisional Authority in 2003 and as Deputy Assistant Secretary of State for Near Eastern Affairs from 2001 to 2003. He joined the Foreign Service in 1971 and has also had assignments in Iran, Qatar, Egypt, and Lebanon, where he was assigned to the American Embassy in Beirut during the Israeli invasion in 1982 and the bombings of the embassy and the Marine barracks in 1983. In 2009, he received the Presidential Medal of Freedom, the nation's highest civilian award.

5.      Ambassador Karen Kornbluh is a member of the Boards of Directors of Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks. After being confirmed unanimously by the Senate, she served as the U.S. Ambassador to the Organization for Economic Cooperation and Development (OECD) from 2009 to 2014. She is a Senior Fellow and Director of the Digital Innovation and Democracy Initiative at the German Marshall Fund of the United States, a think tank dedicated to promoting transatlantic cooperation. She was previously Executive Vice President of External Affairs at Nielsen, Senior Fellow for Digital Policy at the Council on Foreign Relations, and a presidentially-appointed member of the Broadcasting Board of Governors. She also served as a senior policy adviser to Barack Obama from the beginning of his Senate tenure throughout his 2008 presidential campaign.

6.      Ben Scott is a member of the Board of Directors of Open Technology Fund. He is Executive Director at Reset, an initiative focused on tackling digital threats to democracy. He was previously director of the European Digital Agenda program at the Stiftung Neue Verantwortung in Berlin and Senior Advisor to the Open Technology Institute at New America in Washington, DC, where he helped design the Public Interest Technology Initiative. Previously, he was Policy Adviser for Innovation at the U.S. Department of State, where he helped steward the 21st Century Statecraft agenda, with a focus on technology policy, social media, and development. Before this, Ben led the Washington office of Free Press, where he headed a team of lawyers, researchers, and advocates and directed a public interest policy agenda to expand affordable access to an open Internet and to foster more public service journalism.

7.      Michael W. Kempner is a member of the Boards of Directors of Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks. Mr. Kempner is the Founder and Chief Executive Officer of MWWPR, one of the world's leading independent public relations firms. He is a nationally recognized authority on public affairs,

reputation and crisis management, business-to-business and consumer marketing, and corporate social responsibility. He is also a Board Member of the New York Coalition for the Homeless, and Board Member of the PR Council, a Trustee of American University, and a former Board Member of Goodwill Industries International. Mr. Kempner served on the White House Council for Community Solutions from 2010 to 2012.

8.     Michael Pack is the Chief Executive Officer and Director of the U.S. Agency for Global Media. Although Mr. Pack has past experience in public broadcasting, he is best known for his more recent filmmaking work. Prior to his confirmation as CEO on June 4, 2020, Mr. Pack was President of Manifold Productions, Inc., a film and television production company that has attempted to combat the "left's monopoly on documentaries." Michael Pack, *Will Steve Bannon Help Break the Left's Monopoly on Documentaries*, The Federalist (Mar. 10, 2017).[1]

**BACKGROUND**

9.     Government-funded efforts to combat disinformation and censorship abroad have played a key role in U.S. diplomacy since World War II. The first such broadcasting network was Voice of America—established primarily to combat Nazi disinformation campaigns. This was followed by the creation of Radio Free Europe and Radio Liberty in 1949 and 1951: news organizations dedicated to broadcasting behind the Iron Curtain and in the former Soviet Union. This government-funded international broadcasting has since expanded its coverage, broadcasting in Asia, East Asia, Latin America, Africa, Cuba, and the Middle East. Most recently, in the wake of the 9/11 terrorist attacks, services were added to reach populations in the Middle East and Central and South Asia.

10.    Since the founding of Voice of America, the key objective behind these

---

[1] https://perma.cc/YML7-DW7D.

government-funded operations has been to counter disinformation from authoritarian regimes around the world and to promote democracy and freedom of the press. The organizations lead by example: by modeling journalistic integrity and independence, and showcasing our commitment to freedom of expression, these news outlets have been able to credibly provide news abroad.

11.     To ensure this essential credibility and independence, Congress passed the United States International Broadcasting Act, Pub. L. No. 103-236, 108 Stat. 432 (Apr. 30, 1994). The Act "reorganiz[ed] and consolidat[ed]" United States international broadcasting in order to "strengthen the capability of the United States to use broadcasting to support freedom and democracy in a rapidly changing international environment." 22 U.S.C. § 6201(5).

12.     As part of this reorganization, the Act created the Broadcasting Board of Governors: an independent government agency headed by a nine-member, bipartisan board tasked with overseeing the funding of the broadcasting services. Under the Act, all agency-funded services must adhere to the "highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5), in order to produce news that is "consistently reliable and authoritative, accurate, objective and comprehensive," *id.* § 6202(b)(1).

13.     To protect the independence and integrity of agency-funded entities, the Act establishes a statutory firewall between the Executive Branch and grantees. The firewall ensures that grantees enjoy full editorial independence under the Act by requiring the Executive Branch to "respect the professional independence and integrity of the Board, its broadcasting services, and [its] grantees." 22 U.S.C. § 6204(b). Because of this firewall, agency networks—and their employees—are "fully insulated" from any "political . . . pressures or processes" that would "be inconsistent with the highest standards of professional journalism." *Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36,150, 36,151 (June 11, 2020) (to be codified at 22 C.F.R. § 531). That independence furthers the Agency's mission of providing "a balanced and comprehensive

projection of United States thought and institutions" that "reflect[s] the diversity of United States culture and society." 22 U.S.C. § 6202(b)(2).

14.     This firewall is violated whenever "any person within the Executive Branch" attempts to "direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence" any of the Agency networks, including their employees, in the "performance of their journalistic and broadcasting duties." *Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36,150, 36,152 (June 11, 2020) (to be codified at 22 C.F.R. § 531.3).

15.     In 2017, Congress amended the Act to streamline operations and reduce inefficiencies by replacing the nine-member Board with a single CEO. 22 U.S.C. § 6203. As part of this reorganization, Congress gave the agency a new name: the United States Agency for Global Media. Upon the confirmation of a CEO by the Senate, the bipartisan board would be dissolved. Crucially, the amendments left the statutory firewall fully in place, even amending it to specifically provide that the new CEO must honor the independence and integrity of Agency grantees, just as the bipartisan board had done. *See* 22 U.S.C. § 6204(b).

16.     Under the Act as amended, the CEO has a set of limited powers, enumerated in 22 U.S.C. § 6204, to oversee the activities of Agency-funded entities. But the Act is clear: International broadcasting services and other grantees—even those that report to the CEO—are fundamentally private entities. Nothing in the Act "may be construed to make . . . any . . . entity provided funding by the agency a Federal agency or instrumentality." 22 U.S.C. § 6209(c).

## Open Technology Fund

17.     Open Technology Fund is a private, nonprofit organization whose mission is to advance Internet freedom in repressive environments by supporting the applied research, development, implementation, and maintenance of technologies that provide secure and uncensored access to the Agency's content and the broader Internet. The Fund counters attempts

by authoritarian governments to control the Internet and restrict freedom of information and association online by developing and deploying cutting-edge circumvention technologies to stay one step ahead of government censors. Open Technology Fund also supports projects to protect journalists, sources, and audiences from repressive surveillance and digital attacks to ensure that they can safely create and consume objective, unbiased reporting from Agency outlets. In an era where the Internet is vital to promoting a free press and access to unbiased, truthful information, the Fund is an essential component of the Agency's broader mission. Without the Fund's technologies, the ability of Agency-funded news outlets to reach their target audiences would be significantly diminished.

18.    Like the broadcasting networks, the Open Technology Fund's independence with regard to the funding and development of journalism-supporting technology is protected through the International Broadcasting Act's statutory firewall. The Fund's independence is further guaranteed through a provision in its grant agreement with the Agency, which "acknowledges and affirms the safeguards" of the Act that are "meant to preserve the journalistic independence and integrity of [Agency] programming" extend to the tools and technologies the Fund develops to support and defend the Agency's journalistic content and other internet freedom efforts. Under the agreement, "no U.S. Government official"—including the Agency's CEO—may "attempt to influence the content or editorial choices" of Open Technology Fund "in a manner that is not consistent with the highest standards of professional broadcast journalism." Nor may any U.S. Government official "take any other action that may tend to undermine the journalistic integrity, credibility, or independence" of the Agency or its broadcasters.

19.    Finally, Open Technology Fund's corporate design maintains its independence by fully insulating its officers and directors from political interference. Under the Fund's corporate bylaws, "[t]he business and affairs of the Corporation shall be managed under the general direction

9

of the Board of Directors." Directors are elected to the Board by a majority vote of the Board of Directors, or as may be authorized by the International Broadcasting Act. They serve for three-year terms but may be removed "for cause" by the vote of two-thirds of a quorum of directors. The Fund's corporate bylaws also provide that Directors may be removed as may be authorized by the International Broadcasting Act—but the Act does not authorize the Agency or its CEO to appoint or remove Open Technology Fund officers or directors.

### Radio Free Europe / Radio Liberty

20.     Radio Free Europe/Radio Liberty (Radio Free Europe) is a private nonprofit corporation incorporated in Delaware. Its mission is to promote democratic values by reporting the news in countries where a free press is banned by the government or not fully established. Radio Free Europe's journalists provide what people cannot get locally: uncensored news and open debate. In addition to its reporting, Radio Free Europe trains local journalists on professionalism and independence and develops partnerships with local media outlets. In short: Radio Free Europe is a model of an independent news organization in countries where a free press is lacking.

21.     The journalistic integrity and independence of Radio Free Europe is protected through the statutory firewall that prohibits the Executive Branch from interfering with the network's performance of its journalistic and broadcasting duties. Radio Free Europe's independence is further guaranteed through a provision in its grant contracts with the Agency, which "acknowledges and affirms the safeguards" of the Act that are "meant to preserve the journalistic independence and integrity of [Agency] programming." Under the contract, "no U.S. Government official"—including the CEO of the Agency—may "attempt to influence the content or editorial choices" of Radio Free Europe "in a manner that is not consistent with the highest standards of professional broadcast journalism." Nor may any U.S. Government official "take any action that may tend to undermine the journalistic credibility or independence of" the Agency or

its broadcasters.

22.    Before joining Radio Free Europe, its President and CEO, Jamie Fly, was a recognized foreign policy leader and proven manager, having served as a Senior Fellow at the German Marshall Fund of the United States, a nonpartisan think tank dedicated to promoting transatlantic cooperation.

**Radio Free Asia**

23.    Radio Free Asia is a private, nonprofit organization whose mission is to provide accurate and timely news and information to Asian countries whose governments prohibit access to a free press.

24.    The journalistic integrity and independence of Radio Free Asia is protected through the statutory firewall that prohibits the Executive Branch from interfering with Radio Free Asia's performance of its journalistic and broadcasting duties. Radio Free Asia's independence is further guaranteed through a provision in its grant contracts with the Agency, which "acknowledges and affirms the safeguards" of the Act that are "meant to preserve the journalistic independence and integrity of [Agency] programming." Under the contract, "no U.S. Government official"— including the CEO of the Agency—may "attempt to influence the content or editorial choices" of Radio Free Asia "in a manner that is not consistent with the highest standards of professional broadcast journalism." Nor may any U.S. Government official "take any other action that may tend to undermine the journalistic credibility or independence" of the Agency or its broadcasters.

25.    Before becoming President of Radio Free Asia in 2019, Bay Fang served as Radio Free Asia's Executive Editor and worked closely with Radio Free Asia and Agency leadership on the company's strategic journalistic initiatives. Prior to joining Radio Free Asia, Ms. Fang had an extensive career in journalism and diplomacy, including serving as a Deputy Assistant Secretary of State and Diplomatic Correspondent for the Chicago Tribune. During her twenty-plus-year career

in journalism, Ms. Fang covered the wars in Afghanistan and Iraq and won the Robert F. Kennedy

Journalism award for her story "China's Stolen Wives" in the U.S. News & World Report.

### Middle East Broadcasting Networks

26.     Middle East Broadcasting Networks is a private, nonprofit news organization whose

mission is to provide accurate and objective information on the Middle East and North Africa, as

well as to provide in-depth analysis on topics not covered in the local media. The Network is an

Arabic-language news organization with a weekly audience of more than 24.3 million people in 22

counties across the Middle East and North Africa.

27.     The journalistic integrity and independence of the Middle East Broadcasting

Networks is protected through the statutory firewall which prohibits the Executive Branch from

interfering with the Network's performance of its journalistic and broadcasting duties. The

Network's independence is further guaranteed through a provision in its grant contracts with the

Agency, which "acknowledges and affirms the safeguards" of the Act that are "meant to preserve

the journalistic independence and integrity of USAGM programming." Under the contract, "no

U.S. Government official"—including the Agency's CEO—may "attempt to influence the content

or editorial choices" of the Middle East Broadcasting Networks "in a manner that is not consistent

with the highest standards of professional broadcast journalism." Nor may any U.S. Government

official "take any action that may tend to undermine the journalistic credibility or independence

of [the Agency] or its broadcasters."

28.     Prior to joining the Network in 2017, Alberto Fernandez, Middle East Broadcasting

Networks' President, was Vice President of the Middle East Media Research Initiate. He is a

member of the board of directors at the Center for Cyber and Homeland Security at George

Washington University and serves as a non-resident Fellow in Middle East Politics and Media at

the TRENDS research advisory center in Abu Dhabi, United Arab Emirates. Mr. Fernandez has

had an extensive career in foreign service, serving as a Foreign Service Officer from 1983 to 2015 and as the State Department's Coordinator for the Center for Strategic Counterterrorism Communications from 2012 to 2015. He also served as the U.S. Ambassador to Equatorial Guinea and U.S. Charge d'Affaires to Sudan. In the Foreign Service, Mr. Fernandez was a recipient of a 2008 Presidential Meritorious Service Award, the 2006 Edward R. Murrow Award for Excellence in Public Diplomacy, and a 2003 Superior Honor Award for his work in Afghanistan, among other awards.

### FACTUAL ALLEGATIONS

### President Trump and his administration repeatedly criticize and threaten to interfere with the content of Agency-funded reporting, expressly linking Mr. Pack's nomination with those threats

29.    Since taking office, President Trump has repeatedly expressed his displeasure with the content of Agency-funded reporting. He has publicly expressed his desire to "start[] our own Worldwide Network to show the World the way we really are, GREAT!" @realDonaldTrump, Twitter (Nov. 26, 2018, 2:47 PM).[2]

30.    But Steve Bannon informed the President that he didn't need to start a new government network to realize his vision: "You got one," he argued. "It's called Voice of America." Noah Bierman, *Trump Says He Wants a Government-Run Media Outlet. He's Ignored the One He Has—So Far*, L.A. Times (Dec. 14, 2018, 3:00 AM).[3]

31.    Mr. Bannon, too, has expressed his displeasure with the content of Agency-funded reporting, once calling Voice of America, an Agency-funded broadcaster, a "rotten fish from top to bottom" that is "totally controlled by the deep-state apparatus." *Id.* Regarding the content of the organizations' broadcasts, Bannon believed that the reporting should be "on point" with the

---

[2] https://twitter.com/realdonaldtrump/status/1067142820388052993.
[3] https://perma.cc/UM8W-C4ZD.

administration's foreign policy, especially in confronting Chinese communist officials. Sarah Ellison, *How Trump's Obsessions with Media and Loyalty Coalesced in a Battle for Voice of America*, Wash. Post (June 19, 2020, 4:52 PM EDT).

32.     In 2018, at the urging of Steve Bannon, President Trump nominated Michael Pack for the position of CEO of the U.S. Agency of Global Media. Mr. Pack and Mr. Bannon had previously worked together on conservative documentaries produced by Mr. Pack's film production company, Manifold Productions. Bannon was involved with the selection of Mr. Pack for the role, previously stating that "He's my guy, and I pushed him hard." Sarah Ellison, *How Trump's Obsessions with Media and Loyalty Coalesced in a Battle for Voice of America*, Wash. Post (June 19, 2020, 4:52 PM EDT).

33.     As Mr. Pack's nomination languished, President Trump lamented the delay: "If you hear what's coming out of the Voice of America, it's disgusting. The things they say are disgusting toward our county. And Michael Pack would get in and do a great job." *Id.* At a news conference in April 2020, President Trump said that the Senate's failure to confirm Mr. Pack was "preventing us from managing Voice of America." Alex Ward, *Trump and Steve Bannon Want to Turn US-Funded Global Media Network into Breitbart 2.0*, Vox (June 18, 2020, 6:00 PM EDT).

34.     This month, Steve Bannon applauded the confirmation, commenting that "Pack's over there to clean house." Alex Ward, *Trump and Steve Bannon Want to Turn US-Funded Global Media Network into Breitbart 2.0*, Vox (June 18, 2020, 6:00 PM EDT).

### *Immediately upon his confirmation as CEO, Mr. Pack attempts to terminate the officers and directors of all government-funded international broadcasting networks and Open Technology Fund*

35.     Michael Pack was confirmed as CEO of the U.S. Agency for Global Media by a 53-38 party-line vote in the United States Senate on June 4, 2020.

36.     President Trump applauded his confirmation, tweeting "[t]hank you" to the "Great

14

Republican Senate" for confirming Mr. Pack after "a big battle in Congress for 25 years." @realDonaldTrump, Twitter (June 4, 2020).[4]

37.     Mr. Pack was sworn in as CEO of the Agency on June 8, 2020 and immediately began to redirect the efforts of Agency grantees.

38.     At approximately 12:15 p.m. on the afternoon of June 9, 2020, officers of Open Technology Fund, along with the other grantees, received an email stating that, "[e]ffective immediately" there was a "freeze" on: "(1) obligations for new contracts or extensions of any contract, (2) all personnel actions relating to hiring or promotion, and excluding retirements, and (3) all technical migrations."

39.     Immediately, and in the days that followed, the Fund sought clarification of the "freeze," including details about the reason for the freeze and its intended duration. Open Technology Fund's CEO and CFO emailed multiple senior staff members of the agency, as well as the agency's finance office, to explain the immediate negative impact that the freeze had on Open Technology Fund's operations as well as the long-term detrimental effects that the freeze would have if it continued beyond one week. The only responses they received to these inquiries were from the finance office, which stated that it also lacked information.

40.     On June 10, Open Technology Fund was invited by the Agency's finance office to provide specific financial information about finance priorities and the potential impact of the freeze. Open Technology Fund was informed that this information would be compiled with that of other grantees but was given no guidance on whether any exceptions to the freeze would be granted or when the freeze would be lifted.

41.     In the days that followed, Open Technology Fund learned of Mr. Pack's intention

---

[4] https://twitter.com/realDonaldTrump/status/1268676374501502977.

to rely on 22 U.S.C. § 6203 *et seq.* to fire and replace the Fund's Board of Directors and high-level officers.

42.     On June 13, the Fund's CEO Libby Liu submitted her resignation letter to the Board, effective July 13, 2020, in an attempt to preempt her firing and take the heat off of Open Technology Fund.

43.     On June 17, in what the press soon dubbed a "Wednesday night massacre," CEO Pack attempted to terminate the leadership of Open Technology Fund, Radio Free Asia, Radio Free Europe, the Middle East Broadcasting Networks, and the Office of Cuba Broadcasting. Mr. Pack also replaced the formerly bipartisan board members of these entities with political allies of the President.

a.     Mr. Pack sent a letter to Ms. Liu, notifying her that, "[e]ffective immediately," he was "removing [her] from [her] position as Chief Executive Officer (CEO) of OTF . . . . pursuant to [his] authorities as CEO of [the Agency], including under 22 USC 6209(d) and [OTF] bylaws."

b.     Mr. Pack additionally dismissed the heads of Radio Free Asia (Bay Fang); Radio Free Europe (Jamie Fly), Middle East Broadcasting Networks (Alberto M. Fernandez), and Office of Cuba Broadcasting (Emilio Vazquez).

c.     Mr. Pack notified Ms. Liu that "[e]ffective immediately," and "pursuant to [his] authorities" as CEO, including "under 22 USC 6209(d)" and [Open Technology Fund] bylaws": a) all "currently serving board members are hereby removed"; and b) "the following individuals are added to the Board of the OTF": Jonathan Alexandre (Senior Counsel, Liberty Counsel Action), Robert Bowes (Senior Advisor to the Secretary, HUD), Bethany Kozma (Deputy Chief of Staff, USAID), Rachel Semmel (Communications Director, OMB), Emily Newman (Chief of Staff, USAGM), and Michael Pack (CEO, USAGM) as Chairman.

d.     Mr. Pack has filled the "bipartisan" boards of all five organizations with these same

16

six Directors—five of whom are political appointees of the Trump administration. The remaining Director works for a conservative advocacy organization, Liberty Counsel Action.

44.    The next day, June 18, Mr. Pack sent a letter to Laura Cunningham, notifying her that "[e]ffective immediately," he was "removing [her] from [her] position as President of [Open Technology Fund] . . . . pursuant to [his] authorities as CEO of [the Agency], including under 22 USC 6209(d) and [Open Technology Fund's] bylaws."

45.    Members of Congress from both major political parties have expressed concern about Mr. Pack's actions.

a.    On June 19, Congressman Michael McCaul, Republican Leader on the Foreign Affairs Committee, and Republican Senator Marsha Blackburn issued a statement on the termination of Laura Cunningham, President of Open Technology Fund, and the Fund's Board of Directors. In the statement, they said that they were "troubled by the recent termination[s]" and were "concerned about the future of the organization." They also noted that they had been "impressed with the efforts of President Laura Cunningham and her team."

b.    On June 23, Robert Menendez, Democratic Senator from New Jersey and Ranking Member of the Senate Committee on Foreign Relations sent a letter to Acting Inspector General Stephen Akard about the attempted firings. Menendez asked Akard to "review whether Mr. Pack's wholesale firing of the leadership of [the Agency] networks violated a rule" promulgated by the Agency. *See Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36,150, 36,151 (June 11, 2020) (to be codified at 22 C.F.R. 531). Mr. Menendez noted that, "[o]n its face, the firing of the leadership of each network and dissolution of the boards appear to constitute an attempt to 'interfere with' and 'impermissibly influence'" the networks, in violation of the Rule. He further noted that Mr. Pack's actions "appear to be entirely inconsistent with the highest standards of professional journalism."

46.     As of the filing of this complaint, all funds continue to be "frozen," preventing Agency-funded organizations, including plaintiffs, from performing normal business operations and executing the mission that congressional appropriators intended.

## CLAIMS FOR RELIEF

### COUNT ONE
### (LACK OF ANY LEGAL AUTHORITY TO TERMINATE THE OFFICERS AND DIRECTORS OF THE OPEN TECHNOLOGY FUND; DECLARATORY JUDGMENT ACT)

47.     Mr. Pack lacks any legal authority to remove or appoint officers or directors of the Open Technology Fund. Under the International Broadcasting Act, officers and directors of "RFE/RL Inc., Radio Free Asia, and the Middle East Broadcasting Networks, or any organization that is established through the consolidation of such entities . . . shall serve at the pleasure of and may be named by the" CEO. 22 U.S.C. § 6209(d). Additionally, the CEO may appoint and remove officers and directors of "any organization . . . authorized under this chapter." *Id.* Open Technology Fund was not one of the entities specifically "authorized" by the Act. Nor was it "established through the consolidation" of Radio Free Europe, Radio Free Asia, or the Middle East Broadcasting Networks. Section 6209(d) thus does not grant the CEO any authority to appoint or remove officers or directors of Open Technology Fund.

48.     This plain reading is supported by the surrounding text. Section 6209(c) provides that "[n]othing in this chapter or any other Act . . . shall be construed to make such a consolidated grantee described in subsection (a) or Radio Free Europe, Radio Free Asia, or the Middle East Broadcasting Networks or any other grantee or entity provided funding by the agency a Federal agency or instrumentality." This language—notably broader than that in § 6209(d)—covers Open Technology Fund. The different statutory language used in §§ 6209(c) and (d) are indicative of congressional intent to cover different sets of entities between the provisions. The Open Technology Fund is included in the broader coverage of § 6209(c), but not § 6209(d).

18

49.     Nor did Mr. Pack have legal authority to remove or appoint officers or directors under Open Technology Fund's corporate bylaws. Under the Fund's bylaws, officers and directors are appointed to three-year terms via majority vote of the board of directors. Directors can be removed through a vote of two-thirds of a quorum of directors, and any vacancy resulting from such removal may be filled by a majority vote of the remaining directors.

50.     The Open Technology Fund's bylaws also provide that officers and directors may be appointed or removed "as may be authorized by" the International Broadcasting Act, 22 U.S.C. 6203 *et seq.* But since the Act does not grant Mr. Pack independent authority to appoint Open Technology Fund officers or directors, this provision does not authorize Mr. Pack's actions.

51.     Because Mr. Pack did not have authority under the International Broadcasting Act or Open Technology Fund's corporate bylaws, his actions removing the Fund's officers and replacing its directors were unlawful.

52.     There is a substantial and continuing controversy between Open Technology Fund, its officers and directors, and Mr. Pack, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that Mr. Pack does not have the ability to remove or appoint officers or directors of Open Technology Fund.

53.     Open Technology Fund and its officers and directors will be and are irreparably harmed by Mr. Pack's actions and are without any adequate remedy at law.

COUNT TWO
(UNLAWFUL ACTION TO UNDERMINE THE INDEPENDENCE OF RADIO FREE EUROPE, RADIO FREE ASIA, AND THE MIDDLE EAST BROADCASTING NETWORKS, AND OPEN TECHNOLOGY FUND; DECLARATORY JUDGMENT ACT)

54.     The International Broadcasting Act establishes a "statutory firewall" between the Executive Branch and the agency-funded networks. Section 6204(b) provides that the CEO, "in carrying out [his] functions, shall respect the professional independence and integrity of the Board,

its broadcasting services, and the grantees of the Board." § 6204(b). This firewall ensures that agency-funded networks enjoy full editorial independence under the Act; because of the firewall, grantees, and their employees, are "fully insulated from any political . . . pressures or processes" that would "be inconsistent with the highest standards of professional journalism." *Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36, 150, 36,151 (June 11, 2020) (to be codified at 22 C.F.R. 531).

55.     This "firewall" is violated when "any person within the Executive Branch . . . attempts to direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence any of the USAGM networks, including their leadership, officers, employees, or staff, in the performance of their journalistic and broadcasting duties and activities." *Id.* at 36,152.

56.     The grant agreements between the agency and the networks it funds reaffirm this statutory firewall. First, the grant agreements between the agency and Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks recognize that each grantee is a "private, nonprofit corporation" and that the agency's "oversight and supervision" of the grantee is "subject to limitations in the applicable law." Second, the grant agreements "acknowledge[] and affirm[] the safeguards contained in the United States International Broadcasting Act . . . meant to preserve the journalistic independence and integrity of USAGM programming." Under the grant, "no U.S. Government official"—including the CEO—may "attempt to influence the content or editorial choices" of the broadcasting entity "in a manner that is not consistent with the highest standards of professional broadcast journalism or take any other action that may tend to undermine the journalistic credibility or independence of USAGM or its broadcasters."

57.     By terminating the heads of Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks; replacing all members of the organizations'

respective boards in one fell swoop; and imposing a freeze on contracts, personnel actions, and technical migrations, Mr. Pack violated the statutory firewall and breached the grant contracts, violated applicable grant rules and guidance, and violated the statutory, regulatory, and contractual firewall.

## COUNT THREE
### (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

58.     The Administrative Procedure Act (APA) provides that a reviewing court may set aside final agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

59.     Mr. Pack's attempted appointment and removal of officers and directors of the Open Technology Fund, Radio Free Europe, Radio Free Asia, and Middle East Broadcasting Networks; his violation of the statutory firewall; and his freeze on contracts, personnel actions, and technical migrations are all agency actions that are arbitrary and capricious, abuses of discretion, and violations of law.

60.     The plaintiffs will be and are irreparably harmed by Mr. Pack's actions and are without any adequate remedy at law.

## PRAYER FOR RELIEF

The plaintiffs request that the Court:

a.   Declare that Mr. Pack lacks any legal authority to remove or appoint officers or directors of Open Technology Fund;

b.   Declare that any actions taken by Mr. Pack in excess of his legal authority with respect to Open Technology Fund are null and void;

c.   Declare that Mr. Pack's attempted wholesale terminations of the officers and directors of Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks, and his actions to freeze grant funds, were unlawful and therefore null and void;

d.   Enjoin Mr. Pack, or any of his agents or subordinates, from taking any unlawful action to terminate officers or directors of Open Technology Fund, Radio Free

Europe, Radio Free Asia, or the Middle East Broadcasting Networks, or freeze their grant funds;

e.  Award all other appropriate relief, including attorneys' fees and costs.

Respectfully submitted,

Dated: June 23, 2020

/s/ Deepak Gupta

DEEPAK GUPTA
GREGORY A. BECK
JONATHAN E. TAYLOR
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
Phone: (202) 888-1741
Fax: (202) 888-7792
*deepak@guptawessler.com*
*greg@guptawessler.com*
*jon@guptawessler.com*

*Counsel for Plaintiffs*