IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OPEN TECHNOLOGY FUND,
AMBASSADOR RYAN CROCKER,
AMBASSADOR KAREN KORNBLUH,
BEN SCOTT, MICHAEL W. KEMPNER,

*Plaintiffs*,

v.

MICHAEL PACK, in his official capacity
as Chief Executive Officer and Director of
the U.S. Agency for Global Media,

*Defendant*.

Case No. 1:20-cv-1710

The Honorable Beryl A. Howell,
Chief Judge

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

Deepak Gupta
Gupta Wessler PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

June 25, 2020

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Statutory and factual background ............................................................................. 5

Argument ................................................................................................................... 16

    I.      Open Technology Fund is likely to succeed on its claim that Pack lacks
           any legal authority whatsoever to remove its officers or directors. ........................ 16

    II.     The plaintiffs are likely to prevail on their claim that Pack's attempted
           "governmental takeover" of all four private organizations is unlawful. ................. 21

    III.    The plaintiffs are likely to succeed on their claim that Pack's actions—
           including his "freeze" of grant funds—were "not in accordance with
           law" and must be set aside under the APA. ........................................................... 24

    IV.    The plaintiffs will suffer irreparable harm without an injunction. ......................... 27

           A.      Open Technology Fund is already suffering—and will continue
                  to suffer—irreparable harm without an injunction. .................................... 27

           B.      The individual director plaintiffs will each suffer irreparable
                  harm without an injunction. ........................................................................ 31

    V.      The balance of the equities and the public interest weigh in favor of a
           temporary restraining order. ................................................................................. 32

Conclusion ................................................................................................................ 33

## TABLE OF AUTHORITIES

**Cases**

*Agency for International Development v. Alliance for Open Society International, Inc.,*
570 U.S. 205 (2013) ..................................................................................... 3, 26

*American Meat Institute v. United States Department of Agriculture,*
968 F. Supp. 2d 38 (D.D.C. 2013), *judgment reinstated,* 760 F.3d 18 (D.C. Cir. 2014) ...................... 33

*Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.,*
295 F. Supp. 2d 75 (D.D.C. 2003) ..................................................................... 32

*Atlas Air, Inc. v. International Brotherhood of Teamsters,*
928 F.3d 1102 (D.C. Cir. 2019) ......................................................................... 16

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ..................................................................... 4, 30

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ....................................................................................... 24

*Davis v. Rondina,*
741 F. Supp. 1115 (S.D.N.Y. 1990) ................................................................ 4, 31

*Department of Homeland Security v. Regents of the University of California,*
— U.S. —, 2020 WL 3271746 (2020) ................................................................ 3

*Forsham v. Harris,*
445 U.S. 169 (1980) ....................................................................................... 22

*Holiday CVS, L.L.C. v. Holder,*
2012 WL 10973832 (D.D.C. Feb. 7, 2012) ........................................................ 16

*League of Women Voters of United States v. Newby,*
838 F.3d 1 (D.C. Cir. 2016) ................................................................ 4, 27, 29, 30

*Nken v. Holder,*
556 U.S. 418 (2009) ....................................................................................... 32

*Pennsylvania Professional Liability Joint Underwriting Association v. Wolf,*
328 F.Supp.3d 400 (M.D. Pa. 2018) ................................................................ 32

*Ralis v. Radio Free Europe/Radio Liberty Inc.,*
770 F.2d 1121 (D.C. Cir. 1985) ................................................................. *passim*

*Ramirez v. United States Immigration & Customs Enforcement,*
310 F. Supp. 3d 7 (D.D.C. 2018) ..................................................................... 32

*Ross v. Blake,*
136 S. Ct. 1850 (2016) .................................................................................... 17

*Russello v. United States,*
  464 U.S. 16 (1983) ..........................................................................................................18

*Street v. Vitti,*
  685 F. Supp. 379 (S.D.N.Y. 1998) ..................................................................... 5, 31

*Suchodolski Associates, Inc. v. Cardell Financial Corp.,*
  2003 WL 22909149 (S.D.N.Y. 2003) ...................................................................31

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008) .............................................................................................16

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.,*
  339 F.3d 101 (2d Cir. 2003) ..............................................................................31

**Statutes**

5 U.S.C. § 706(2)(A) .............................................................................................. 3, 24

22 U.S.C § 6201(5) ....................................................................................................6

22 U.S.C. § 6202(a)(5) ...............................................................................................6

22 U.S.C. § 6202(b)(1) ...............................................................................................6

22 U.S.C. § 6202(b)(2) ...............................................................................................7

22 U.S.C. § 6203 ................................................................................................ 7, 12

22 U.S.C. § 6204(b) ........................................................................................ 2, 6, 7, 22

22 U.S.C. § 6207 ......................................................................................................17

22 U.S.C. § 6209(c) ............................................................................................. *passim*

22 U.S.C. § 6209(d) ............................................................................................. *passim*

22 U.S.C. § 6211 ......................................................................................................17

22 U.S.C. § 6215 ......................................................................................................17

2 C.F.R. § 200.100(a)(1) ....................................................................................... 3, 25, 34

2 C.F.R. § 200.338 .............................................................................................. 3, 25, 34

*Firewall and Highest Standards of Professional Journalism,*
  85 Fed. Reg. 36,150, 36,151 (June 11, 2020) (to be codified at 22 C.F.R. § 531) ................. 2, 7, 14, 22

Pub. L. No. 103-236, 108 Stat. 432 (Apr. 30, 1994).........................................................6

**Other Authorities**

@realDonaldTrump, Twitter (June 4, 2020) ................................................................. 11

Noah Bierman,
    *Trump Says He Wants a Government-Run Media Outlet. He's Ignored the One He Has—So*
    *Far*, L.A. Times (Dec. 14, 2018, 3:00 AM) ................................................................. 10

Sarah Ellison,
    *How Trump's Obsessions with Media and Loyalty Coalesced in a Battle for Voice of America*,
    Wash. Post (June 19, 2020, 4:52 PM EDT) ................................................................. 11

"GREAT!" @realDonaldTrump, Twitter (Nov. 26, 2018, 2:47 PM) ............................................ 10

Letter from Senator Robert Menendez to Acting Inspector General Stephen Akard
    (June 23, 2020)(on file with CNBC) ......................................................................... 15

Eloise Passachoff,
    *Agency Enforcement of Spending Clause Statutes*, 124 Yale L.J. 248 (2014) ............................. 26

Alex Ward,
    *Trump and Steve Bannon Want to Turn US-Funded Global Media Network into Breitbart 2.0*,
    Vox (June 18, 2020, 6:00 PM EDT) ....................................................................... 11, 12

## INTRODUCTION

On Wednesday, June 17—within days of taking power as CEO of the U.S. Agency for Global Media—Michael Pack ordered the wholesale purge of the directors and top officers of four private, non-profit 501(c)(3) organizations incorporated under state law: Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks. Pack's "Wednesday night massacre" has already provoked widespread, bipartisan outcry. And Pack didn't stop there. He also ordered an immediate "freeze" on the use of the federal grant funds on which these private organizations depend, effectively halting their ability to fulfill their missions. Worst of all, Pack purported to simultaneously replace all four organizations' independent boards with his own new board—which is composed almost entirely of *sitting federal-government officials*.

In this way, Pack seeks to accomplish the very "governmental takeover" that has long been "expressly prevent[ed]" by the statutes, regulations, and grant requirements—known collectively as the "firewall"—that protect the independence of these private nonprofits. *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C. Cir. 1985).

As the D.C. Circuit held three decades ago, the firewall's purpose is plain: "Congress's intent has been manifest that Radio Free Europe" and its sister organizations "are to enjoy independence." *Id.* "It was deemed important by Congress that institutional arrangements be such that the stations do not lose their 'non-official status'; to transform Radio Free Europe and Radio Liberty from independent broadcasters into house organs for the United States Government was seen as inimical to the fundamental mission of those stations." *Id.* Congress's "clear intent"—that each of the organizations be a "separate, *non-controlled* corporate entity"—"demand[s] judicial respect." *Id.* at 1123. Pack's brazen attempt to override that independence—by purporting to install a government-controlled board, impose a freeze on funds, and decapitate the organizations' entire executive leadership—cannot withstand judicial scrutiny.

1

The Open Technology Fund and existing directors of all four organizations urgently seek a temporary restraining order and a preliminary injunction to prevent Pack's unprecedented and unlawful actions from causing severe, ongoing damage to the organizations and their independence. They are highly likely to succeed on the merits for three reasons:

**First,** Pack lacks any legal authority whatsoever to remove or replace any officers or directors of the Open Technology Fund, a private nonprofit dedicated to global internet freedom. Before the government asserts the ability to control a private corporation's internal affairs, it must identify some valid authority for doing so. Pack has not, and cannot.

**Second,** Pack's attempted federal-government takeover of all four private corporations is utterly incompatible with the firewall mandating their independence, as recognized by the D.C. Circuit, *see Ralis*, 770 F.2d at 1125, and as embodied in statute, regulations, and grant requirements.

Under the grant requirements, "no U.S. Government official"—including Pack—may "take any . . . action that may tend to undermine" the grantees' "independence." Under the International Broadcasting Act, the CEO "shall respect" the organizations' "independence." 22 U.S.C. § 6204(b); *id.* § 6209(c) ("Nothing in [this] or any other Act . . . may be construed to make . . . any . . . grantee or entity provided funding by the agency a Federal agency or instrumentality."). And, under the firewall regulations, no "person within the Executive Branch"—including the CEO—may attempt to "direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence" the private organizations, "including their leadership, officers, employees, or staff," in the "performance of their journalistic and broadcasting duties." *Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36,150, 36,152 (2020).

Pack is flagrantly violating every one of these obligations. By any measure, his actions constitute the most egregious breach of the firewall in its history. If the firewall is to have any meaning, it must at least prohibit a *wholesale government takeover* of these "independent" private

corporations through a government-controlled board of directors. To be sure, Pack possesses authority under 22 U.S.C. § 6209(d) to appoint independent directors to Radio Free Europe, Radio Free Asia, and Middle East Broadcasting Networks: If he wants to name journalists or former diplomats of his choice to their independent boards, he may do so. But this power, "albeit substantial," cannot "rise to the level of *control* of operations. That pivotal function," the D.C. Circuit has held, "was left by Congress's clear design to the state-chartered corporation which Congress stated in the statute was to continue 'as an independent'" entity. *Ralis*, 770 F.2d at 1126.

In short: Pack seeks control. Congress mandated independence. They are incompatible.

***Third,*** Pack's challenged actions are "arbitrary, capricious," and "otherwise not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(A). Most obviously, the "freeze" of funds—via an unexplained email—is contrary to law. Applicable regulations forbid an agency from freezing grant funds absent noncompliance. Only if the agency identifies a specific legal deficiency may it "impose additional conditions." 2 C.F.R. § 200.338. If it further "determines that noncompliance cannot be remedied by imposing additional conditions," it may withhold payments "pending correction of the deficiency by the non-Federal entity." *Id.* § 200.338(a). But freezing funds that have already been distributed to the grantee isn't among the actions it may take. And "Federal awarding agencies *must not impose* additional or inconsistent requirements . . . unless *specifically required* by Federal statute, regulation, or executive order." *Id.* § 200.100(a)(1) (emphasis added). Pack hasn't even tried to comply with these rules.

"[W]hen so much is at stake," it is not too much to ask that an agency "turn square corners." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, — U.S. —, 2020 WL 3271746, at *11 (2020). That is especially so because the Constitution forbids an agency from imposing "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Intern. Dev. v. Alliance for Open Soc'y Intern., Inc.*, 570 U.S. 205, 214–15 (2013).

\*      \*      \*

The equitable considerations here are equally, if not more, compelling. Without warning or legal justification, Pack and the U.S. Agency on Global Media have imposed "new obstacles [that] unquestionably make it more difficult"—indeed, impossible—for the Open Technology Fund to "accomplish [its] primary mission." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). That alone is enough to show irreparable harm under D.C. Circuit precedent.

Make no mistake: The imminent threat here is existential. "The actions taken by Mr. Pack in the past few days imperil virtually every aspect of Open Technology Fund's operations and existence," including its ability "to chart [its] own course as an organization"; its ability "to stay true to [its] mission and principles"; its "essential day-to-day corporate functions, such as hiring and maintenance of [its] office space"; its "continued funding"; and its "ability to protect the vulnerable communities facing repressive regimes" that trust it "to safeguard their entities and enable their important work around the world." Declaration of J. Lauren Turner ¶ 15. All these harms are "beyond remediation" and constitute irreparable injury justifying a temporary restraining order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

This Circuit's precedent "requires only a likelihood of irreparable injury"—"Damocles's sword does not have to actually fall on the [movant] before the court will issue an injunction." *League of Women Voters*, 838 F.3d at 8–9. Here, the sword is already falling, and the harm absent an injunction is not merely likely but certain. The General Counsel explains: "Unless we are granted some measures of relief from the court, it is unclear how we will be able to function going forward." Turner Decl. ¶ 15. The individual members of the boards of directors are also suffering irreparable harm. "Money damages will not compensate for [their] loss of the opportunity to continue to manage" the organizations. *Davis v. Rondina*, 741 F. Supp. 1115, 1125 (S.D.N.Y. 1990). Pack's attempt

4

to "destroy [the plaintiffs'] voice in management" thus constitutes irreparable harm. *Street v. Vitti*, 685 F. Supp. 379, 384 (S.D.N.Y. 1998).

Because the plaintiffs have suffered and will continue to suffer irreparable harm absent this Court's intervention, the Court should exercise its traditional equitable powers and temporarily restrain Pack's actions from taking any effect until this Court has decided the merits.

## STATUTORY AND FACTUAL BACKGROUND

*1. Government-funded efforts to combat disinformation and censorship abroad have long played a key role in U.S. diplomacy.* The first U.S.-government-funded international broadcasting network was Voice of America—established in 1941 primarily to combat Nazi disinformation campaigns. This was followed by the creation of Radio Free Europe and Radio Liberty in 1949 and 1951: news organizations dedicated to broadcasting behind the Iron Curtain and in the former Soviet Union.[1] Government-funded international broadcasting has since expanded to encompass East Asia, Latin America, Africa, Cuba, and the Middle East. Most recently, in the wake of the 9/11 terrorist attacks, services were added to reach populations in the Middle East and Central and South Asia.

Since the founding of Voice of America, the key objective behind these government-funded operations has been to counter disinformation from authoritarian regimes around the world and to promote democracy and freedom of the press. The organizations lead by example: By modeling journalistic integrity and independence, and showcasing our commitment to freedom of expression, these news outlets have been able to credibly provide news abroad.

---

[1] Radio Free Europe and Radio Liberty combined to form a single, independent organization in 1976.

**2. Congress passes the United States International Broadcasting Act to ensure the continued ability of these organizations to operate independently.** The contemporary design of government-funded—but fundamentally private—international broadcasting entities has been in place since the 1970s. In 1973, Congress formally created an agency, the Board of International Broadcasting, to oversee and fund the existing international broadcasting organizations. The agency was run by a nine-member, independent bipartisan board that had the authority to administer and fund—but not control—the broadcasting organizations. Congress preserved the essential elements of this structure in 1994, when it passed the United States International Broadcasting Act, Pub. L. No. 103-236, 108 Stat. 432 (Apr. 30, 1994). The Act "reorganiz[ed] and consolidat[ed]" United States international broadcasting in order to "strengthen the capability of the United States to use broadcasting to support freedom and democracy in a rapidly changing international environment." 22 U.S.C § 6201(5).

As part of this reorganization, the Act created the Broadcasting Board of Governors: an independent government agency headed by a nine-member, bipartisan board tasked with overseeing the funding of the broadcasting services. Under the Act, all agency-funded services must adhere to the "highest professional standards of broadcast journalism," 22 U.S.C. § 6202(a)(5), in order to produce news that is "consistently reliable and authoritative, accurate, objective and comprehensive," *id.* § 6202(b)(1).

To protect the independence and integrity of agency-funded entities, the Act makes explicit the firewall between the Executive Branch and grantees. The firewall ensures that grantees enjoy full editorial independence under the Act by requiring the Executive Branch to "respect the professional independence and integrity of the Board, its broadcasting services, and [its] grantees." 22 U.S.C. § 6204(b). Because of this firewall, agency networks—and their employees—are "fully insulated" from any "political . . . pressures or processes" that would "be inconsistent with the

6

highest standards of professional journalism." *Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36,150, 36,151 (June 11, 2020) (to be codified at 22 C.F.R. § 531).[2] That independence furthers the Agency's mission of providing "a balanced and comprehensive projection of United States thought and institutions" that "reflect[s] the diversity of United States culture and society." 22 U.S.C. § 6202(b)(2).

This firewall is violated whenever "any person within the Executive Branch" attempts to "direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly influence" any of the Agency networks, including their employees, in the "performance of their journalistic and broadcasting duties." 85 Fed. Reg. at 36,152.

In 2017, Congress amended the Act to streamline operations and reduce inefficiencies by replacing the nine-member Board with a single CEO. 22 U.S.C. § 6203. As part of this reorganization, Congress gave the agency a new name: the United States Agency for Global Media. Upon the confirmation of a CEO by the Senate, the bipartisan board would be dissolved. Crucially, the amendments left the statutory firewall fully in place, even amending it to specifically provide that the new CEO "shall respect" the "independence" of Agency grantees, just as the bipartisan board had done. *See* 22 U.S.C. § 6204(b).

Under the Act as amended, the CEO has a set of limited powers, enumerated in 22 U.S.C. § 6204, to oversee the activities of Agency-funded entities. But the Act is clear: International broadcasting services and other grantees—even those that are overseen by the CEO—are fundamentally private entities. Nothing in the Act "may be construed to make . . . any . . . entity provided funding by the agency a Federal agency or instrumentality." 22 U.S.C. § 6209(c).

---

[2] This rule went into effect on June 11, 2020 and has the force of law. Publication in the Code of Federal Regulations is forthcoming.

**i. *Radio Free Europe/Radio Liberty*.** Radio Free Europe/Radio Liberty (Radio Free Europe) is a private, nonprofit corporation whose mission is to promote democratic values by reporting the news in countries where a free press is banned by the government or not fully established. Before joining Radio Free Europe, its President and CEO Jamie Fly served for four years as Counselor for Foreign and National Security Affairs to Senator Marco Rubio and served in the George W. Bush administration as Director for Counterproliferation Strategy at the National Security Council.

**ii. *Radio Free Asia*.** Radio Free Asia is a private, nonprofit organization whose mission is to provide accurate and timely news and information to Asian countries whose governments prohibit access to a free press. Prior to joining Radio Free Asia, President Bay Fang had an extensive career in journalism and diplomacy, including serving as a Deputy Assistant Secretary of State and Diplomatic Correspondent for the Chicago Tribune. During her twenty-plus-year career in journalism, Ms. Fang covered the wars in Afghanistan and Iraq and won the Robert F. Kennedy Journalism award for her story "China's Stolen Wives" in the U.S. News & World Report.

**iii. *Middle East Broadcasting Networks*.** The Middle East Broadcasting Networks is a private, nonprofit news organization whose mission is to provide accurate and objective information on the Middle East and North Africa. The Network is an Arabic-language news organization with a weekly audience of more than 24.3 million people in 22 counties across the Middle East and North Africa. Before joining the Network in 2017, Alberto Fernandez, Middle East Broadcasting Networks' President, was Vice President of the Middle East Media Research Initiate. Mr. Fernandez has had an extensive career in foreign service, serving as a Foreign Service Officer from 1983 to 2015 and as the State Department's Coordinator for the Center for Strategic Counterterrorism Communications from 2012 to 2015. He also served as the U.S. Ambassador to Equatorial Guinea and U.S. Charge d'Affaires to Sudan. In the Foreign Service, Mr. Fernandez

was a recipient of a 2008 Presidential Meritorious Service Award, the 2006 Edward R. Murrow Award for Excellence in Public Diplomacy, and a 2003 Superior Honor Award for his work in Afghanistan, among other awards.

     **iv. *Open Technology Fund*.** Open Technology Fund was incorporated in 2019 as a new nonprofit dedicated to advancing global internet freedom. Open Technology Fund is a private, nonprofit organization whose mission is to advance Internet freedom in repressive environments by supporting the applied research, development, implementation, and maintenance of technologies that provide secure and uncensored access to the Agency's content and the broader Internet. The Fund counters attempts by authoritarian governments to control the Internet and restrict freedom of information and association online by developing and deploying cutting-edge circumvention technologies to stay one step ahead of government censors. Open Technology Fund also supports projects to protect journalists, sources, and audiences from repressive surveillance and digital attacks to ensure that they can safely create and consume objective, unbiased reporting from Agency outlets. In an era where the Internet is vital to promoting a free press and access to unbiased, truthful information, the Fund is an essential component of the Agency's broader mission. Without the Fund's technologies, the ability of Agency-funded news outlets to reach their target audiences would be significantly diminished.

     ***3. The journalistic integrity and independence of the organizations is protected through the statutory firewall and binding contract provisions.*** The journalistic integrity and independence of Open Technology Fund, Radio Free Europe/Radio Liberty, Radio Free Asia, and the Middle East Broadcasting Networks is protected through the firewall—embodied in statute and regulation—which prohibits the Executive Branch from interfering with the organizations' performance of their journalistic and broadcasting duties. The organizations' independence is further guaranteed through a provision in each of their grant

contracts with the Agency, which "acknowledges and affirms the safeguards" of the Act that are "meant to preserve journalistic independence and integrity of [Agency] programming." Gupta Decl., Exhibits A, B, C, D at 11. Under the contracts, "no U.S. Government official"—including the CEO of the Agency—may "attempt to influence the content or editorial choices" of the organizations "in a manner that is not consistent with the highest standards of professional broadcast journalism." *Id.* Nor may any U.S. Government official "take any action that may tend to undermine the journalistic credibility or independence of" the Agency or its broadcasters. *Id.*

***4. President Trump and his administration repeatedly criticize and threaten to interfere with the content of Agency-funded reporting, expressly linking Mr. Pack's nomination with those threats.*** Since taking office, President Trump has repeatedly expressed his displeasure with the content of Agency-funded reporting. He has publicly expressed his desire to "start[] our own Worldwide Network to show the World the way we really are, "GREAT!" @realDonaldTrump, Twitter (Nov. 26, 2018, 2:47 PM).[3] But Steve Bannon informed the President that he didn't need to start a new government network to realize his vision: "You got one," he argued. "It's called Voice of America." Noah Bierman, *Trump Says He Wants a Government-Run Media Outlet. He's Ignored the One He Has—So Far*, L.A. Times (Dec. 14, 2018, 3:00 AM).[4]

Mr. Bannon, too, has expressed his displeasure with the content of Agency-funded reporting, once calling Voice of America, an Agency-funded broadcaster, a "rotten fish from top to bottom" that is "totally controlled by the deep-state apparatus." *Id.* Regarding the content of the organizations' broadcasts, Bannon believed that the reporting should be "on point" with the administration's foreign policy, especially in confronting Chinese communist officials. Sarah

---

[3] https://twitter.com/realdonaldtrump/status/1067142820388052993.

[4] https://perma.cc/UM8W-C4ZD.

Ellison, *How Trump's Obsessions with Media and Loyalty Coalesced in a Battle for Voice of America*, Wash. Post (June 19, 2020, 4:52 PM EDT).[5]

In 2018, at the urging of Steve Bannon, President Trump nominated Michael Pack for the position of CEO of the U.S. Agency of Global Media. Mr. Pack and Mr. Bannon had previously worked together on conservative documentaries produced by Mr. Pack's film production company, Manifold Productions. Bannon was involved with the selection of Mr. Pack for the role, previously stating that "He's my guy, and I pushed him hard." Ellison, *Battle for Voice of America*.[6]

As Mr. Pack's nomination languished, President Trump lamented the delay: "If you hear what's coming out of the Voice of America, it's disgusting. The things they say are disgusting toward our county. And Michael Pack would get in and do a great job." *Id.* At a news conference in April 2020, President Trump said that the Senate's failure to confirm Mr. Pack was "preventing us from managing Voice of America." Alex Ward, *Trump and Steve Bannon Want to Turn US-Funded Global Media Network into Breitbart 2.0*, Vox (June 18, 2020, 6:00 PM EDT).[7]

***5. Immediately upon his confirmation as CEO, Mr. Pack attempts to terminate the officers and directors of all government-funded international broadcasting networks and the Open Technology Fund.*** Mr. Pack was confirmed as CEO of the U.S. Agency for Global Media by a 53-38 party-line vote in the United States Senate on June 4, 2020. President Trump applauded his confirmation, tweeting "[t]hank you" to the "Great Republican Senate" for confirming Mr. Pack after "a big battle in Congress for 25 years." @realDonaldTrump, Twitter (June 4, 2020).[8] Steven Bannon, too, applauded the confirmation,

---

[5] https://perma.cc/EF5B-RAFL.

[6] https://perma.cc/EF5B-RAFL.

[7] https://perma.cc/3A4X-AXDC.

[8] https://twitter.com/realDonaldTrump/status/1268676374501502977.

commenting that "Pack's over there to clean house." Ward, *Trump and Steve Bannon Want to Turn US-Funded Global Media Network into Breitbart 2.0.*[9]

Mr. Pack was sworn in as CEO of the Agency on June 8, 2020, and immediately began to redirect the efforts of Agency grantees. At approximately 12:15 p.m. on the afternoon of June 9, 2020, officers of Open Technology Fund, along with the other grantees, received an email stating that, "[e]ffective immediately" there was a "freeze" on "(1) obligations for new contracts or extensions of any contract, (2) all personnel actions relating to hiring or promotion, and excluding retirements, and (3) all technical migrations." See Turner Decl., Exhibit A.

Immediately, and in the days that followed, the Fund sought clarification of the "freeze," including details about the reason for the freeze and its intended duration. Open Technology Fund's CEO and CFO emailed multiple senior staff members of the agency, as well as the agency's finance office, to explain the immediate negative impact that the freeze had on Open Technology Fund's operations as well as the long-term detrimental effects that the freeze would have if it continued beyond one week. The only responses they received to these inquiries were from the finance office, which stated that it also lacked information.

On June 10, Open Technology Fund was invited by the Agency's finance office to provide specific financial information about finance priorities and the potential impact of the freeze. Open Technology Fund was informed that this information would be compiled with that of other grantees but was given no guidance on whether any exceptions to the freeze would be granted or when the freeze would be lifted.

In the days that followed, Open Technology Fund learned of Mr. Pack's intention to rely on 22 U.S.C. § 6203 *et seq.* to fire and replace the Fund's Board of Directors and high-level officers.

---

[9] https://perma.cc/3A4X-AXDC.

12

On June 13, the Fund's CEO Libby Liu submitted her resignation letter to the Board, effective July 13, 2020, in an attempt to preempt her firing and take the heat off of Open Technology Fund. But her attempt was unsuccessful: On June 17, in what the press soon dubbed a "Wednesday night massacre," CEO Pack attempted to terminate the leadership of Open Technology Fund, Radio Free Asia, Radio Free Europe, the Middle East Broadcasting Networks, and the Office of Cuba Broadcasting. Mr. Pack also replaced the formerly bipartisan board members of these entities with political allies of the President—five of six of whom are acting government officials.

Mr. Pack notified CEO Liu that "[e]ffective immediately," he was "removing [her] from [her] position as Chief Executive Officer" of Open Technology Fund. Turner Decl., Exhibit C. He also notified Ms. Liu that "[e]ffective immediately," all "currently serving [Open Technology Fund] board members are hereby removed" and replaced with the following individuals: Jonathan Alexandre (Senior Counsel, Liberty Counsel Action), Robert Bowes (Senior Advisor to the Secretary, HUD), Bethany Kozma (Deputy Chief of Staff, USAID), Rachel Semmel (Communications Director, OMB), Emily Newman (Chief of Staff, USAGM), and Michael Pack (CEO, USAGM) as Chairman. Turner Decl., Exhibit B. Five of these six directors are appointees of the Trump administration. The remaining Director, Jonathan Alexandre, works for a right-wing Christian conservative advocacy organization, Liberty Counsel Action. Regarding both actions, Mr. Pack said that he was acting "pursuant to [his] authorities as CEO" and "under 22 USC 6209(d) and [Open Technology Fund] bylaws." *Id.*

On the same day, Mr. Pack additionally attempted to dismiss the heads of Radio Free Asia (Bay Fang); Radio Free Europe (Jamie Fly); Middle East Broadcasting Networks (Alberto M. Fernandez), and Office of Cuba Broadcasting (Emilio Vazquez). The next day, June 18, Mr. Pack sent a letter to Laura Cunningham, President of Open Technology Fund, notifying her that "[e]ffective immediately" he was "removing [her] from [her] position as President." Turner Decl.,

Exhibit D. Once again, Mr. Pack stated that he was acting "pursuant to [his] authorities as CEO" and "under 22 USC 6209(d) and [Open Technology Fund] bylaws." *Id.*

As of the filing of this motion, all funds continue to be "frozen," preventing Agency-funded organizations from performing normal business operations and executing the mission that congressional appropriators intended.

**6. *Members of Congress from both major political parties raise concerns about Mr. Pack's actions.*** On June 19, Congressman Michael McCaul, Republican Leader on the Foreign Affairs Committee, and Republican Senator Marsha Blackburn issued a statement on the termination of Laura Cunningham, President of Open Technology Fund, and the Fund's Board of Directors. *See* Press Release, Congressman Michael McCaul and Senator Marsha Blackburn, McCaul, Blackburn Statement on OTF Firings, Organization's Future (June 19, 2020) (on file with the Republican Foreign Affairs Committee).[10] In the statement, they said that they were "troubled by the recent terminations[s]" and were "concerned about the future of the organization." *Id.* They also noted that they had been "impressed with the efforts of President Laura Cunningham and her team."

On June 23, Robert Menendez, Democratic Senator from New Jersey and Ranking Member of the Senate Committee on Foreign Relations sent a letter to Acting Inspector General Stephen Akard about the attempted firings. *See* Letter from Senator Robert Menendez to Acting Inspector General Stephen Akard (June 23, 2020) (on file with the U.S. Senate Committee on Foreign Relations).[11] Menendez asked Akard to "review whether Mr. Pack's wholesale firing of the leadership of [the Agency] networks violated a rule" promulgated by the Agency. *Id.*; *see* 85 Fed. Reg. at 36,151. Mr. Menendez noted that, "[o]n its face, the firing of the leadership of each network

---

[10] https://perma.cc/TLR8-A36P.
[11] https://perma.cc/ZE9N-6XBD.

and dissolution of the boards appear to constitute an attempt to 'interfere with' and 'impermissibly influence'" the networks, in violation of the Rule. Letter from Senator Robert Menendez to Acting Inspector General Stephen Akard (June 23, 2020). He further noted that Mr. Pack's actions "appear to be entirely inconsistent with the highest standards of professional journalism." *Id.*

***7. Open Technology Fund and four directors of grantee organizations bring this action for injunctive relief.*** Plaintiffs Ambassador Ryan Crocker, Ambassador Karen Kornbluh, and Michael W. Kempner are all members of the Boards of Directors of Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks. Ben Scott is a member of the Board of Directors of Open Technology Fund. Mr. Pack attempted to remove all four directors on June 17.

Ambassador Ryan Crocker has served as U.S. Ambassador six times, under Republican and Democratic administrations, in Afghanistan, Iraq, Pakistan, Syria, Kuwait, and Lebanon. During the first George W. Bush administration, he served in Baghdad as the first Director of Governance for the Coalition Provisional Authority and as Deputy Assistant Secretary for Near Eastern Affairs. He is a recipient of the Presidential Medal of Freedom.

Ambassador Karen Kornbluh has served as the U.S. Ambassador to the Organization for Economic Cooperation and Development, Senior Fellow for Digital Policy at the Council on Foreign Relations, and senior policy advisor to Barack Obama from the beginning of his Senate tenure through his 2008 presidential campaign.

Ben Scott is Executive Director at Reset, an initiative focused on tackling digital threats to democracy. He was previously director of the European Digital Agenda program at the Stiftung Neue Verantwortung in Berlin, Senior Advisor to the Open Technology Institute at New America, and Policy Advisor for Innovation at the U.S. Department of State.

Michael W. Kempner is the Founder and CEO of MWWPR, one of the world's leading independent public relations firms, a board member of the New York Coalition for the Homeless, and former member of the White House Council for Community Solutions.

## ARGUMENT

"The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction." *Holiday CVS, L.L.C. v. Holder*, 2012 WL 10973832, at *1 (D.D.C. Feb. 7, 2012). A plaintiff seeking a temporary restraining order must show "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent such relief; (3) that the equities favor the plaintiff's position; and (4) that the injunction is in the public's interest." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102, 1112 (D.C. Cir. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Every one of these factors is satisfied here.

**I.     Open Technology Fund is likely to succeed on its claim that Pack lacks any legal authority whatsoever to remove its officers or directors.**

The CEO of the U.S. Agency for Global Media, Michael Pack, lacks any legal authority to remove or appoint officers or directors of the Open Technology Fund. Under the International Broadcasting Act's plain language, Pack only has authority to appoint or remove officers and directors of certain named organizations or an organization "established through the consolidation of such entities," of which Open Technology Fund is not one; or any organization "authorized under this chapter," which Open Technology Fund was not. 22 U.S.C. § 6209(d). Nor did Mr. Pack have legal authority to remove or appoint officers or directors under Open Technology Fund's corporate bylaws. In the absence of any legal authority, Pack's attempt to remove and replace the officers and directors of the Fund—a wholly private nonprofit corporation—was unlawful. Because the Fund has established a likelihood of success on the merits, a temporary restraining order or preliminary injunction is warranted.

16

### A. Under the International Broadcasting Act's plain language, Pack lacks authority to appoint or remove Open Technology Fund's officers or directors.

Statutory interpretation, as always, "begins with the text." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Here, it can end with the text too. Under the International Broadcasting Act, only officers and directors of "RFE/RL Inc., Radio Free Asia, and the Middle East Broadcasting Networks, or any organization that is established through the consolidation of such entities . . . shall serve at the pleasure of and may be named by the" CEO, who may appoint and remove officers and directors of "any organization . . . authorized under this chapter." 22 U.S.C. § 6209(d).

Neither category covers Open Technology Fund. To fall within the scope of section 6209(d), Open Technology Fund would need to have been specifically "authorized" under the Act. But Congress has not take the steps necessary to authorize Open Technology Fund by statute. Congress "authorizes" organizations under the International Broadcasting Act by officially recognizing them under Title 22, Chapter 71 of the United States Code. For example, Radio Free Asia was authorized by 22 U.S.C. § 6208, which states that funds shall be made available "for the purpose of carrying out radio broadcasting to Asia" by a broadcasting service that "shall be referred to as 'Radio Free Asia.'" 22 U.S.C. § 6208(a), (b). The provision goes on to outline Radio Free Asia's functions, detail requirements relating to its funding, provide for a method to assess its effectiveness, and establish notice requirements under certain conditions. *Id.* § 6208. Similar authorization provisions exist for Radio Free Europe, *see* §§ 6207, 6211, and Radio Free Afghanistan, *see* § 6215.

No such provision exists with respect to Open Technology Fund. In fact, the proposed "Open Technology Fund Authorization Act" was only recently introduced in the House. *See* H.R. 6621, 116th Cong. (2020). The purpose of this act would be "[t]o amend the United States International Broadcasting Act of 1994 *to authorize* the Open Technology Fund of the United States Agency for Global Media." *Id.* (emphasis added). The bill is structured analogously to the

17

provisions authorizing Radio Free Asia, Radio Free Europe, and Radio Free Afghanistan, outlining the functions of the organization, limitations on its funding, and reporting and audit requirements. If this bill were passed into law, Open Technology Fund would indeed be "authorized," and its officers and directors would indeed by covered by section 6209(d). But, until then, Open Technology Fund is just like any a private, nonprofit corporation that receives funds from the U.S. government—not an organization "authorized under" Title 22, Chapter 71. Since Open Technology Fund was not authorized under the Act nor "established through the consolidation" of Radio Free Europe, Radio Free Asia, or the Middle East Broadcasting Networks, section 6209(d) does not grant the CEO any authority to appoint or remove its officers or directors.

This plain reading is further supported by the text of the surrounding statutory provisions. Section 6209(c) provides in relevant part that "[n]othing in this chapter or any other Act . . . shall be construed to make . . . Radio Free Europe, Radio Free Asia, or the Middle East Broadcasting Networks *or any other grantee or entity provided funding by the agency* a Federal agency or instrumentality." 22 U.S.C. 6209(c) (emphasis added). This language—encompassing any organization that receives funding from the U.S. Agency on Global Media—is notably broader than the language in § 6209(d). As a recipient of funds from the Agency, Open Technology Fund falls within this broader category. But the distinct statutory language used between these provisions demonstrates congressional intent to cover a different set of entities by each. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). If Congress had wanted to include Open Technology Fund within the ambit of section 6209(d), it could have done so easily: by including the organization by name, as it did with Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks, or by including "any" Agency grantees, as it did in section 6209(c). Instead, it opted to

limit the CEO's authority with respect to officers and directors to a narrower category. Open Technology Fund is covered by the broader provision, § 6209(c), but does not fall within the narrower one, § 6209(d).

### B. Open Technology Fund's corporate bylaws do not confer any authority on Pack to remove its officers or directors.

Pack is claiming something quite unusual: the power of a federal government official to remove the officers and directors of a private corporation. Pack must therefore identify *some* source of legal authority: As a purely private entity that is expressly not "a Federal agency or instrumentality," the government simply has no implicit authority to exercise control over its leadership. No statute grants this authority to Pack. And Open Technology Fund's corporate bylaws do not do so either. Under Open Technology Fund's corporate bylaws, directors are "elected by the Board of Directors for three-year terms upon majority vote of the Board," with "notice to and in consultation with the USAGM Advisory Board." Gupta Decl., Exhibit E at 3. Officers, too, are elected "by majority vote of the Board of Directors at a duly called meeting at which a quorum is present" for three-year terms. Gupta Decl., Exhibit E at 7. Under the bylaws, directors may be removed "for cause" by the vote of two-thirds of a quorum of directors, "provided that all Directors, including the Director to be removed are provided no less than ten (10) days' notice of such meeting." Gupta Decl., Exhibit E at 6. Additionally, "[a]ny vacancy occurring on the Board of Directors due to removal . . . may be filled by a majority vote of the remaining Directors." Gupta Decl., Exhibit E at 3.

To be sure, Open Technology Fund's bylaws recognize the authority of the U.S. Agency for Global Media Advisory Board and CEO. The bylaws provide that officers and directors shall be appointed and removed "pursuant to and in compliance with the provisions of the [International Broadcasting] Act, as it may be amended from time to time." Gupta Decl., Exhibit

E at 2. And the bylaws further provide that officers and directors may be appointed or removed "as may be authorized by" the Act, in addition to the procedures spelled out, above. Gupta Decl., Exhibit E at 3, 8. But these provisions do not confer any additional authority upon Mr. Pack; since the Act does not grant Mr. Pack the authority to appoint or remove Open Technology Fund's officers or directors, these bylaw provisions do not enable him to do so, either.

**C.  There is no other source of authority for Mr. Pack's actions.**

In the letters purporting to terminate Open Technology Fund's CEO and President and replace its board members, Mr. Pack stated that he was acting pursuant to 22 U.S.C. § 6209(d) and the Open Technology Fund bylaws. Neither source grants Mr. Pack the authority to appoint or remove Open Technology Fund officers or directors. And there is no other source of authority for Mr. Pack's actions. Without explicit legal authority, Mr. Pack is a government employee attempting to appoint and remove officials of a private corporation—something he simply cannot do. And because Pack's terminations and replacements appear to be motivated by content-based criticism of Open Technology Fund's speech and association, this question has constitutional dimensions as well. The Court should therefore interpret the statute to avoid unnecessary constitutional problems.

*First*, the grant agreements between the Agency and Open Technology Fund do not confer this authority upon the Agency CEO. To the contrary, the grant agreements do the exact opposite, explicitly affirming the "independence and integrity" of Open Technology Fund as a "private, nonprofit corporation" that is not a "Federal agency or instrumentality." Gupta Decl., Exhibit A at 10.

*Second*, the Agency cannot argue that Mr. Pack possesses inherent or implied power to remove or appoint Open Technology Fund officers or directors. Under the International

Broadcasting Act, the legal authority of the U.S. Agency for Global Media CEO is limited to those powers explicitly enumerated under 22 U.S.C. §§ 6204 and 6209.

## II.    The plaintiffs are likely to prevail on their claim that Pack's attempted "governmental takeover" of all four private organizations is unlawful.

Although funded by Congress through grants administered by the Agency, the four organizations targeted by Mr. Pack—Radio Free Europe, Radio Free Asia, the Middle East Broadcasting Networks, and Open Technology Fund—are not part of the government. Their employees are not government employees. They are private, nonprofit organizations with their own leadership and independent boards of directors. That is by design. Their mission, collectively, is to promote the free flow of information worldwide, especially in countries where authorities restrict freedom of expression. They do this through global efforts to combat online censorship and news broadcasts in 61 different languages, reaching 400 million people each day. But they can only be effective in countering disinformation and censorship if they are rightly perceived as independent, professional, and fact-driven—not as official mouthpieces for a political agenda. To ensure the integrity and credibility of this vital work, their independence from political interference is protected by a strict firewall embodied in statutes, regulations, and binding contract provisions.

If this independence is to mean anything at all, it cannot permit a federal-government takeover. To transform these organizations "from independent broadcasters" into "house organs for the United States Government" would be "inimical to the fundamental missions" of these organizations, as recognized by Congress. *Ralis*, 770 F.2d at 1125. Under § 6209(d), CEO Pack may have the authority to choose independent directors for Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks. But he does not have the authority to replace their directors wholesale with a control group of sitting government officers—at least, not given the overriding statutory obligation of independence.

21

As this Circuit has recognized, "[t]he common post-New Deal practice of the National Government's funding private entities does not, as a general proposition, bring a private actor within the legal 'control of the Government.'" *Ralis*, 770 F.2d at 1125; *see Forsham v. Harris*, 445 U.S. 169, 180 (1980) ("Grants of federal funds generally do not . . . serve to convert the acts of the recipient from private acts to governmental acts absent extensive, detailed, and virtually day-to-day supervision."). Historically, congressional intent has been "manifest" that government-funded broadcasting services, such as "Radio Free Europe and Radio Liberty," are "to enjoy independence in programming and broadcasting decisions." *Ralis*, 770 F.2d at 1125.

The International Broadcasting Act of 1994 affirmatively preserved that independence. As before, Congress left "day-to-day control . . . to the stations themselves." *Id.* And to ensure that nothing in the Act upset the deep tradition of broadcaster independence, Congress explicitly provided that "[n]othing in [this] or any other Act . . . may be construed to make . . . any . . . grantee or entity provided funding by the agency a Federal agency or instrumentality." 22 U.S.C. § 6209(c). As if that wasn't enough, Congress added an explicit statutory firewall, specifying that the agency "shall respect the professional independence and integrity of the Board, its broadcasting services, and the grantees of the Board." *Id.* § 6204(b). The 2017 amendments did not undermine the independent status of agency-funded entities. Crucially, the amendments left the statutory firewall fully in place, even amending it to specifically provide that the Agency CEO must honor the independence and integrity of Agency grantees. *See id.*

This firewall ensures that Agency networks enjoy full editorial independence; because of the firewall, Agency networks, and their employees, are "fully insulated from any political . . . pressures or processes" that would "be inconsistent with the highest standards of professional journalism." 85 Fed. Reg. at 36,151. The firewall is violated when "any person within the Executive Branch" attempts to "direct, pressure, coerce, threaten, interfere with, or otherwise impermissibly

influence" any of the Agency networks, "including their leadership, officers, employees, or staff," in the "performance of their journalistic and broadcasting duties." *Id.* at 36,152.

The Agency reinforced this firewall in its grant contracts with Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks. First, the grant agreements each recognize that the grantees are "private, nonprofit corporation[s]" and that the Agency's "oversight and supervision" is "subject to limitations in the applicable law." Gupta Decl., Exhibits A, B, C, D at 11. Second, the grant agreements "acknowledge[] and affirm[] the safeguards contained in the United States International Broadcasting Act . . . meant to preserve journalistic independence and integrity of [Agency] programming." Gupta Decl., Exhibits A, B, C, D at 11. Under the grants, "no U.S. Government official"—including the CEO of the Agency—may "attempt to influence the content or editorial choices" of the broadcasting entity "in a manner that is not consistent with the highest standards of professional broadcast journalism *or take any other action that may tend to undermine the journalistic credibility or independence of [the Agency] or its broadcasters.*" Gupta Decl., Exhibits A, B, C, D at 11 (emphasis added).

Mr. Pack's actions were in direct contravention of the firewall as embodied in statute, regulation, precedent, and contract. Indeed, if the firewall is to have *any* meaning, it must prohibit the actions taken here. Not only did Mr. Pack attempt a wholesale decapitation of the leadership of these organizations, but he attempted to replace their corporate boards with government officials—a wholesale governmental takeover of private corporations. Five of the six directors that Mr. Pack attempted to place on the corporate boards are politically-appointed, government officials: Robert Bowes is Senior Advisory to the Secretary of the U.S. Department of Housing and Urban Development; Bethany Kozma is Deputy Chief of Staff for the U.S. Agency for International Development; Rachel Semmel is Communications Director for the Office of Management and Budget; Emily Newman is Chief of Staff for the U.S. Agency for Global Media;

and self-appointed Chairman Michael Pack is CEO of the U.S. Agency for Global Media.[12] The installation of a government-controlled board is a direct violation of the organizations' independence. "Indeed, [Agency] regulations expressly prevent a government takeover of the stations' operational control." *Ralis*, 770 F.2d 1125.

The bottom line is that D.C. Circuit precedent is clear: The firewall "expressly prevent[s] a governmental takeover of the [organizations'] operational control." Ralis, 770 F.2d at 1125. While the CEO of the U.S. Agency for Global Media may exercise his power to appoint directors under section 6209(d), his exercise of that power *may not*—consistent with the overriding mandate of independence—"rise to the level of control" because "[t]hat pivotal function was left by Congress's clear design to the state-chartered corporation," which must by statute remain "independent." *Id.* at 1126. Thus, the plaintiffs are likely to establish that Mr. Pack's attempted governmental takeover was an unlawful violation of the firewall.

## III.   The plaintiffs are likely to succeed on their claim that Pack's actions— including his "freeze" of grant funds—were "not in accordance with law" and must be set aside under the APA.

The Administrative Procedure Act (APA) provides that a reviewing court may set aside agency actions that are "arbitrary," "capricious," or "not in accordance with law." 5 U.S.C. § 706(2)(A); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971). Pack's challenged actions are contrary to the law for the reasons described above and should be set aside.

They are also unlawful for another reason: Pack's decision to freeze grant funds awarded to Open Technology Fund was contrary to applicable regulatory requirements and is therefore unlawful. The Office of Management and Budget provides uniform guidance governing all federal

---

[12] The sixth purported board member, Jonathan Alexendre, is Senior Counsel at Liberty Counsel Action, a far-right Christian conservative advocacy organization.

grants in 2 CFR § 200. The Agency and Open Technology Fund explicitly "acknowleg[ed] and agree[d]" that they "are subject to all Federal rules and regulations pertaining to federal grants, including . . . 2 CFR § 200." Gupta Decl., Exhibit A at 9. These regulations do not permit a federal agency to "freeze" grant funds absent noncompliance.

The OMB grant regulations permit agencies to take specific, limited actions with respect to their grantees. Only if a non-federal recipient of grant funds "fails to comply with Federal statutes, regulations or the terms and conditions of a Federal award" may the Federal awarding agency "impose additional conditions" on the grantee. 2 C.F.R. § 200.338. If the agency further "determines that noncompliance cannot be remedied by imposing additional conditions," the agency then has three options. It can "[t]emporarily withhold cash payments pending correction of the deficiency by the non-Federal entity"; "[w]holly or partly suspend or terminate the Federal award"; or "[w]ithhold further Federal awards for the project or program." 2 C.F.R §§ 200.338(a), (c), (e). Freezing funds that have already been distributed to the grantee is not among the available actions that the awarding agency may take. And absent noncompliance, the regulation does not permit the awarding agency to take *any* action regarding the grantee's funds. These limited actions are the only ones that the agency may take with respect to Open Technology Fund's grant award: "Federal awarding agencies must not impose additional or inconsistent requirements . . . unless *specifically required* by Federal statute, regulation, or executive order." 2 C.F.R. § 200.100(a)(1) (emphasis added).

Pack's decision to freeze Open Technology Fund's spending was "not in accordance with" these federal regulations. Mr. Pack does not point to any noncompliance on the part of Open Technology Fund prompting the freeze—because there was none. *See* Turner Decl., Exhibit A. And even if he had identified some noncompliance, that would still not make the freeze lawful, as the OMB's uniform regulations only permit withholding, suspending, or terminating the award.

Nowhere do the OMB regulations permit the freezing of funds that have already been awarded to a grantee. Further, the procedure that Mr. Pack instituted—where Open Technology Fund was required to "bring [] matter[s] to the attention of the grants team in the [Agency] CFO's shop with a written justification for the basis of such action" where funds were necessary immediately—is not contemplated or authorized under OMB regulations.

To the contrary, if anything, the obligation was on Pack to provide a written justification for the freeze, which he has not done. An agency cannot freeze funds "by fiat." Eloise Passachoff, *Agency Enforcement of Spending Clause Statutes*, 124 Yale L.J. 248, 281-83 (2014). "The processes typically require formal written notice of the preliminary departmental decision and provide an opportunity for the grantee to respond in writing or to request a hearing before an agency hearing officer or board." *Id.* None of those procedural requirements were met here.

Finally, under the unconstitutional-conditions doctrine, the First Amendment forbids an agency from imposing "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Intern. Dev.*, 570 U.S. at 214–15. There are disturbing indications already that this is precisely what Pack is doing. "Open Technology Fund is now being squeezed by Pack and the U.S. Agency for Global Media," according to the Fund's General Counsel. Turner Decl. ¶ 16. "Through their purported terminations and installation of a government-controlled board and their ominous directives to freeze activities—without further context or reasoning—they are effectively using the power of the purse to control our funding and hiring decisions, which is beyond the scope and conditions of our grant agreement and is indeed even contrary to it." *Id.* Worse still, the agency has now "imposed conditions on our spending . . . in ways that seem designed to shut our organization down entirely or have us espouse principles that are antithetical to our organizational mission." *Id.* The Court should interpret the applicable statutes and regulations to avoid this unconstitutional result.

**IV.    The plaintiffs will suffer irreparable harm without an injunction.**

### A.    Open Technology Fund is already suffering—and will continue to suffer—irreparable harm without an injunction.

Pack's attempted termination of Open Technology Fund's leadership and board members and its freeze on grant funds has already caused the Fund to suffer irreparable harm. Absent a temporary restraining order or preliminary injunction, this harm will be greatly magnified. Pack has imperiled the Fund's ability to achieve its mission by placing its operations under a cloud of legal uncertainty and attempting to fill its board with political allies who have publicly aligned themselves with causes in direct conflict to the Fund's mission. *League of Women Voters of United States*, 838 F.3d at 8. And Pack has frozen the organization's funds without any guidance as to when they will be released—effectively preventing it from acting in furtherance of its mission. With legal uncertainty over its leadership—and without funds necessary to fulfill its mission—the Fund "faces grave, existential risk as an organization." Turner Decl. ¶ 7.

Open Technology Fund began to suffer this irreparable harm immediately after Pack's decision to freeze grant funds on June 9. The Fund operates by "distribut[ing] money to the internet freedom community via contracts." *Id.* ¶ 3. Pack's freeze, then, "immediately halted Open Technology Fund's ability to perform its mission" by preventing it from distributing $1.5 million dollars currently in the Fund's bank account and intended for use in the field. *Id.* Specifically, Pack has frozen approximately $11 million of fiscal year 2020 funds appropriated by Congress to the Fund in support of internet freedom. *Id.* The Fund was planning to use this money to support requests from the field; during its last call for applications, it received requests for nearly $20 million in support from organizations working towards Internet freedom. *Id.* Fulfilling these requests would "benefit people in multiple repressive regimes, many of which are adversaries of the United States." *Id.* But, due to the freeze, the Fund is now unable to execute contracts related to these requests. *Id.*

In fact, if the freeze persists for 30 days, "approximately 30 contracts worth approximately $5 million that are currently in the application review, negotiation, and award process will not be executed as planned." *Id.* ¶ 9. The irreparable harm is thus manifest and severe. As a result of the freeze, Open Technology Fund—and the field organizations that it supports—are unable to continue their vital work.

And the irreparable harm goes beyond Open Technology Fund's inability to distribute money in furtherance of its mission. The freeze also prevents the Fund from performing the day-to-day functions of any independent, new nonprofit. For example, the Fund is in the process of building out staff to support the distribution of the approximately $20 million designated to it for internet-freedom efforts. *Id.* ¶ 11. Due to the freeze, the Fund is now unable to continue this hiring process. *Id.* Further, the Fund is facing an expiring lease for its office space, which it cannot renew or extend due to the freeze. *Id.*

Pack's actions on June 17—purportedly firing the Fund's top executive management and firing and replacing all of its board members with a government-controlled board—"pose an immediate, ongoing, and serious threat to Open Technology Fund's ability to properly operate and fulfill its mission." Turner Decl. ¶ 7. Due to Pack's actions, the Fund has been operating under a "legal cloud" causing "uncertainty and paralysis" that "impedes [the Fund's] ability to perform [its] important anti-censorship work across the globe." *Id.* Indeed, Pack's legal position—claiming that the organization's funding agency is able to completely replace its leadership—"completely eliminat[es] . . . any semblance of organization independence." *Id.* ¶ 6. This threat to Open Technology Fund's independence poses a "grave, existential risk" to the organization. *Id.* ¶ 7.

Pack's rash actions will have lasting consequences to the Fund's reputation, and harsh effects around the world. Open Technology Fund's work is made possible because of its reputation as wholly independent from the government. The individuals and organizations that apply to the

Fund for money work on behalf of, and often themselves are, citizens of repressive regimes. *Id.* ¶ 12. To apply to the Fund, a U.S. government grantee, is itself "great risk" to these individuals. *Id.* Those who take this risk do so because the Fund has "earned their trust as the leading funder of open source internet freedom efforts globally," *id.*, and because the Fund, as a private, nonprofit organization, is independent from, and not controlled by, the U.S. government. But by purporting to fire the Fund's CEO and President and replace its Board of Directors, Pack has irreparably harmed Open Technology Fund's reputation as independent.

Since the news of Pack's actions became public, the Fund has been "inundated" with emails from past, current, and prospective recipients—"all expressing grave concern over the safety of their identities and their work in the hands of Open Technology Fund's purported new leadership." *Id.* Open Technology Fund is now "in the uniquely challenging position" of trying to "safeguard sensitive information" about fund applications and the work they perform "out of the well-founded fear that this information could be used adversely against the internet freedom community" by the Agency's selected leadership for the Fund. *Id.*

All of these consequences, absent an injunction, will have "perceptibly impaired the [organization's] programs," "made the organization's activities more difficult," and "directly conflict[ed] with the organization's mission." *League of Women Voters of United States*, 838 F.3d at 8. Further, due to this reputational damage and the legal uncertainty surrounding Open Technology Fund's leadership, the Fund is at "imminent risk" of losing expert staff who have "expressed fear and concern about the organization's future" and its ability "to maintain a safe and suitable work environment." Turner Decl. ¶ 14. Losing these members would cause particular harm to the Fund because its "reputation in the community rests largely on the unique expertise and community alignment of its team." *Id.* The irreparable harm caused by Mr. Pack's actions has already begun, and will only become more severe as time goes on: "Each hour and day that this state of affairs

persists causes lasting, irreversible damage to [the] organization, its reputation, and its effectiveness in performing its vital mission in service of global internet freedom." *Id.* ¶ 12.

In summary, "the actions taken by Mr. Pack in the past few days imperil virtually every aspect of Open Technology Fund's operations and existence," including its ability "to chart [its] own course as an organization"; its ability "to stay true to [its] mission and principles"; its "essential day-to-day corporate functions, such as hiring and maintenance of [its] office space"; its "continued funding"; and its "ability to protect the vulnerable communities facing repressive regimes" that trust it "to safeguard their entities and enable their important work around the world." *Id.* ¶ 15. Mr. Pack's actions additionally imperil Open Technology Fund's "reputation and goodwill" and its "ability to retain [its] valued staff"—ultimately imperiling its "continued existence as an independent organization. *Id.* All of these harms are "beyond remediation" and therefore constitute irreparable injury justifying a temporary restraining order. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. That Mr. Pack's actions will "unquestionably make it more difficult for [Open Technology Fund] to accomplish [its] primary mission," and irreparably so, is sufficient to show irreparable harm. *League of Women Voters*, 838 F.3d at 9.

This Circuit's precedent "requires only a likelihood of irreparable injury." *League of Women Voters*, 838 F.3d at 8–9. Here, the harm absent an injunction is not merely likely but certain. As the General Counsel explains, "Unless we are granted some measures of relief from the court, it is unclear how we will be able to function going forward." Turner Decl. ¶ 15. Because Open Technology Fund has suffered and will continue to suffer irreparable harm absent this Court's intervention, the Court should exercise its traditional equitable power and temporarily restrain the Mr. Pack's actions from taking any effect until this Court has decided the pending preliminary-injunction motion.

B. **The individual director plaintiffs will each suffer irreparable harm without an injunction.**

Absent a temporary restraining order or preliminary injunction, plaintiffs Ambassador Ryan Crocker, Ambassador Karen Kornbluh, Ben Scott, and Michael Kempner will all continue to suffer irreparable harm due to Pack's attempt to remove them from the boards of directors of Radio Free Europe, Radio Free Asia, the Middle East Broadcasting Networks, and the Open Technology Fund. These directors' "right to participate in the management of" the organizations "has intrinsic value." *Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 114 (2d Cir. 2003). "Money damages will not compensate for [their] loss of the opportunity to continue to manage" the organizations. *Davis v. Rondina*, 741 F. Supp. 1115, 1125 (S.D.N.Y. 1990). Pack's attempt to "destroy [the plaintiffs'] voice in management" thus constitutes irreparable harm. *Street v. Vitti*, 685 F. Supp. 379, 384 (S.D.N.Y. 1998); *see also Wisdom Import Sales Co.*, 339 F.3d at 114-15 ("Conduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company many also constitute irreparable harm."); *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, 2003 WL 22909149, at *4 (S.D.N.Y. Dec. 10, 2003) ("[A] party's loss of control" of a corporation "constitutes irreparable harm.").

This irreparable harm is even more severe because Pack's attempted removal of the directors causes immediate and ongoing harm to the organizations themselves. By attempting to make a sudden, drastic change in the management of these organizations—including an attempt to install five government officials on the board, and thereby effectively transform an *independent* corporation into a *government-controlled* corporation—Mr. Pack has damaged the reputation of these organizations. As Open Technology Fund's General Counsel notes, "Mr. Pack's decision to attempt to replace a largely independent board with a board dominated by government officials appears calculated to . . . further erode the trust we have built with the global community we serve."

Turner Decl. ¶ 15. Even if "the specific members of the [] Board[s] could be restored . . ., if preliminary relief were denied at this point and [plaintiffs] later won on the merits, there is no retrospective relief that would be able to cure the harm." *Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F. Supp. 2d 75, 96 (D.D.C. 2003). Not surprisingly, the few courts that have faced the unusual sort of circumstance presented here—an attempt by the government to "shift control of [a nonprofit organization] from its current member-led board to a board comprised of political appointees" and to "oust" the organization's independent leadership "in favor of" the government's chosen leadership—have had "little difficulty" finding "imminent and irreparable harm" for preliminary-injunction purposes. *Pa. Prof'l Liab. Joint Underwriting Ass'n v. Wolf*, 328 F.Supp.3d 400, 402, 403 (M.D. Pa. 2018).

## V. The balance of the equities and the public interest weigh in favor of a temporary restraining order.

Finally, the balance of the equities and the public interest also favor an injunction. These inquiries typically "merge into one factor when the government is the non-movant," as here. *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As just shown, Open Technology Fund and the individual board members of all four organizations are already suffering irreparable harm as a result of Pack's challenged actions, and that harm will continue absent a temporary restraining order or preliminary injunction. The harm is also experienced by the public, which suffers from the loss in integrity and public confidence that comes from diminished independence for the grantee organizations and their broadcasting and anti-censorship operations. And that harm is global—including harm to

vulnerable groups in repressive and authoritarian societies that were relying on vital support that they are now being unlawfully denied as a result of Pack's brash actions.

By contrast, the requested relief will not cause any injury to Mr. Pack or to the U.S. Agency for Global Media. Far from it—a temporary restraining order or preliminary injunction would bring the U.S. Agency for Global Media into compliance with the law, including a critical structural safeguard designed by Congress to protect the integrity and independence of the international broadcasting and anti-censorship efforts that it funds around the world.

In this sense, the balance of the equities and the public interest here are "essentially derivative of the parties' arguments on the merits of the case"—thus, "it follows that the public interest factor of the preliminary injunction test should weigh in favor of whoever has the stronger arguments on the merits." *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 83 (D.D.C. 2013), *judgment reinstated*, 760 F.3d 18 (D.C. Cir. 2014). Here, that is unquestionably the plaintiffs. In short, the public interest is not served by permitting a rogue government official to wield sweeping, unchecked, and unlawful power over private nonprofit organizations that Congress sought to keep independent from precisely such overreaching control—especially where, as here, that overreach is causing irreparable harm to the plaintiffs each day. A temporary restraining order and preliminary injunction is therefore warranted.

## CONCLUSION

The plaintiffs' motion for a temporary restraining order and preliminary injunction should be granted. Specifically, until such time as the Court disposes of this case on the merits, the defendant should be temporarily and preliminarily enjoined as follows:

    a.    The Chief Executive Officer of the U.S. Agency for Global Media—and his agents, officers, subordinates, successors, or any persons acting in concert with them—shall refrain from taking any action or giving effect to any action purporting to exercise

authority on behalf of the federal government or the U.S. Agency for Global Media to remove any officers or directors of the Open Technology Fund, a private non-profit corporation incorporated in the District of Columbia.

b.   The Chief Executive Officer of the U.S. Agency for Global Media—and his agents, officers, subordinates, successors, or any persons acting in concert with them—shall refrain from taking any action or giving effect to any action purporting to exercise authority on behalf of the federal government or the U.S. Agency for Global Media to replace the boards of directors of Open Technology Fund, Radio Free Europe/Radio Free Liberty (RFE/RL, Inc.), Radio Free Asia, or the Middle East Broadcasting Networks with a board effectively controlled by the federal government, or to give effect to any personnel decisions (such as removal of corporate officers) that must be taken by the organization's board of directors.

c.    The Chief Executive Officer of the U.S. Agency for Global Media—and his agents, officers, subordinates, successors, or any persons acting in concert with them—shall refrain from taking any action or giving effect to any action to "freeze" grant funds to Open Technology Fund, Radio Free Europe/Radio Free Liberty (RFE/RL, Inc.), Radio Free Asia, or the Middle East Broadcasting Networks unless and until the U.S. Agency for Global Media identifies a specific legal deficiency as required by 2 C.F.R. § 200.338 and 2 C.F.R. § 200.100.

June 25, 2020

Respectfully submitted,

_/s/ Deepak Gupta_
DEEPAK GUPTA
GUPTA WESSLER PLLC
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
_deepak@guptawessler.com_

_Counsel for Plaintiffs_

## CERTIFICATE UNDER LOCAL RULE 65.1(a)

To ensure that the defendant received notice of this application for a temporary restraining order and preliminary injunction, Local Rule 65.1(a) requires counsel for the movant to certify that "actual notice of the time of making the application, and copies of all pleadings and papers filed in the action to date or to be presented to the Court at the hearing, have been furnished to the adverse party." In this case, I served counsel for the defendant with the complaint via email within an hour of filing it, served the U.S. Department of Justice and the U.S. Attorney General the next day, and attempted personal service on the defendant that day as well. I further served counsel for the defendant with this motion and all supporting papers by email upon their filing today.

June 25, 2020                                                    */s/ Deepak Gupta*
                                                                Deepak Gupta