# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OPEN TECHNOLOGY FUND, *et al.*,

       Plaintiffs,

     v.

MICHAEL PACK, in his official capacity
as Chief Executive Officer and Director of
the U.S. Agency for Global Media,

      Defendant.

No. 1:20-cv-1710-BAH

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR
## <u>A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

LEGAL STANDARDS ................................................................................................................2

ARGUMENT ................................................................................................................................3

I.  Plaintiffs are Unlikely to Succeed on the Merits.......................................................................3

    A. Plaintiffs' Claims under the International Broadcasting Act Should Fail...............................3

        1. The International Broadcasting Act gives the CEO broad authority to
distribute grantee funds and remove grantees' officers and directors..............................3

        2. Plaintiffs have not adequately alleged that Defendant has compromised the
independence of any organization....................................................................................8

        3. Plaintiffs lack a private right of action under the International Broadcasting Act...........10

    B. Plaintiffs' APA Claims are Unavailing ............................................................................11

        1. The CEO's removal determinations and grant reprograming are unreviewable
because they are committed to agency discretion by law. ................................................11

        2. The CEO's grant reprogramming is also unreviewable because it is not final. ..............13

        3. Defendant acted in accordance with law in reprograming funds. ...................................14

II.  Plaintiffs Have Failed To Establish That A Temporary Restraining Order Is Necessary
To Prevent Irreparable Harm.........................................................................................................15

    A. Open Technology Fund Has Failed To Establish That A Temporary Restraining
Order Is Necessary To Prevent Irreparable Harm ................................................................15

    B. Individual Plaintiffs Have Failed To Establish That A Temporary Restraining
Order Is Necessary To Prevent Irreparable Harm ................................................................17

III. The Public Interest Weighs in Defendant's Favor ....................................................................23

IV. Any Injunction Should be Limited to the Parties......................................................................25

CONCLUSION .........................................................................................................................27

## INTRODUCTION

The Chief Executive Officer of the U.S. Agency for Global Media is responsible for "promot[ing] the right of freedom of opinion and expression" across the world, ensuring "[o]pen communication of information and ideas among the peoples of the world," and "us[ing] broadcasting to support freedom and democracy in a rapidly changing international environment."  22 U.S.C. § 6201.  After a two-year wait, Defendant Michael Pack was confirmed as CEO earlier this month, and he immediately set to work advancing the goals of the Agency.  Using the extraordinarily broad discretion vested in the CEO under the International Broadcasting Act, Defendant immediately froze all contracts, personnel actions, and technical migrations as a temporary measure to review pending expenditures and ensure they align with the Agency's goals.  Nevertheless, Defendant made clear that if it was "necessary to move on" any contracts, personnel actions, or technical migrations, then he would work with the relevant individuals to "clear" those activities.  Turner Decl. Ex. A, ECF No. 4-13.  In order to ensure that the Agency's grantees were appropriately advancing the goals of the International Broadcasting Act, Defendant also used his statutory authority to replace the directors and officers of certain organizations that receive grants from the Agency.

One week later, Plaintiffs—one of the Agency's grantees and four former members of its board of directors—filed this action.  While they allege that the CEO cannot replace officers and directors or freeze certain activity, their real quarrel is a matter of policy: Plaintiffs simply dislike the CEO's day-to-day handling of the Agency's business.  That dispute provides no basis for this lawsuit, much less the "extraordinary and drastic remedy" of a temporary restraining order or preliminary injunction managing day-to-day Agency operations, which Plaintiffs also seek to cover non-party grantees.  Because Plaintiffs are unlikely to succeed on the merits of their self-styled International Broadcasting Act, Declaratory Judgment Act, and Administrative Procedure Act claims; because they will suffer no cognizable harm in the absence of an injunction; and because the public interest weighs against the sweeping injunction Plaintiffs seek, the Court should reject Plaintiffs' motion.

## LEGAL STANDARDS

To secure a temporary restraining order, a plaintiff must establish the same elements necessary for a preliminary injunction. *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) ("The same standards apply for both temporary restraining orders and preliminary injunctions."). Preliminary relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted); *see Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in in the public interest." *Id.* at 20, 24. "In this context, the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015). Moreover, a plaintiff cannot prevail without some showing on each of those factors. *See id.* at 23–24, 31–32 (holding that "proper consideration of" balance of equities and public interest "alone requires denial of the requested injunctive relief" and thus finding no need to address likelihood of success).

## ARGUMENT

I. **PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS**

    A. **Plaintiffs' Claims under the International Broadcasting Act Should Fail**

        1. **The International Broadcasting Act gives the CEO broad authority to distribute grantee funds and remove grantees' officers and directors.**[1]

The International Broadcasting Act vests the CEO with extraordinarily broad powers to manage the United States' broadcasting activity abroad. These include the power to "direct and supervise all broadcasting activities conducted [under the International Broadcasting Act], the Radio Broadcasting to Cuba Act, the Television Broadcasting to Cuba Act, and Worldnet Television," 22 U.S.C. § 6204(a)(1); to "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such activities within the context of the broad foreign policy objectives of the United States," *id.* § 6204(a)(2); to "allocate funds appropriated for international broadcasting activities among the various elements of the Board and grantees," *id.* § 6204(a)(6); and to "procure, rent, or lease supplies, services, and other property for journalism, media, production, and broadcasting, and related support services," *id.* § 6204(a)(10).

Most relevant here, the CEO "shall have the . . . authorit[y]" to "make and supervise grants and cooperative agreements for broadcasting and related activities in furtherance of the purposes of this chapter and on behalf of other agencies." *Id.* § 6204(a)(5). And the CEO enjoys broad appointment and removal authority when using that power: "Officers and directors of RFE/RL Inc., Radio Free Asia, and the Middle East Broadcasting Networks or any organization that is established through the consolidation

---

[1] Plaintiffs do not dispute that Defendant had the power to replace the officers and directors of Radio Free Europe/Radio Liberty, Radio Free Asia, and the Middle East Broadcasting Networks. *See* Pls.' Mot. at 16 (acknowledging that the CEO "has authority to appoint or remove officers and directors" of these entities).

of such entities, or authorized under this chapter, shall serve at the pleasure of and may be named by the [CEO]."  *Id.* § 6209(d).

The Open Technology Fund falls within § 6209(d), which was added in December 2016.  *Id.*  To begin, the Open Technology Fund is an organization that is funded as "authorized under this chapter"—that is, under § 6204(a)(5), which gives the CEO the "authorit[y]" to "make and supervise grants and cooperative agreements."  The parallel language employed in both provisions—"authorized" in § 6209(d) and "authorit[y]" in § 6204(a)(5)—confirms that an organization falls within § 6209(d)'s appointment-and-removal provision when it is authorized to receive funding under the CEO's grant-making authority.[2]

For at least three reasons, § 6209(d) cannot mean (as Plaintiffs argue) that Congress must expressly "authorize" an organization in Title 22, Chapter 71 of the U.S. Code to fall within § 6209(d)'s appoint-ment-and-removal provision, as with Radio Free Asia (§ 6208) or Radio Free Europe (§ 6207).  *See* Pls.' Mot. at 17, ECF No. 4.  First, "authorize" means to "give legal authority; to empower."  Black's Law Dictionary, "Authorize" (11th ed. 2019); *see* Merriam-Webster Online Dictionary, "Authorize" (2020) (defining "authorize" as "to invest especially with legal authority").  But the provisions of Chapter 71 do not "give legal authority" to any organization.[3]  Instead, Chapter 71 "give[s]" *the CEO* "legal authority" to make grants under § 6204(a)(5), and it only identifies certain organizations in order to dictate how the CEO must exercise his § 6204 grant-making authority when dealing with those organizations.  *See, e.g.*, 22 U.S.C. § 6207(f) ("Grants authorized under section 6204 of this title for [Radio Free Europe], shall be

---

[2] Plaintiffs' citation to the proposed "Open Technology Fund Authorization Act" is irrelevant.  *See* Pls.' Mot. at 17–18.  As the Supreme Court just recently explained, "speculation about why a later Con-gress" introduced or "declined to adopt new legislation offers a particularly dangerous basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt."  *Bostock v. Clayton Cty.*, --- S.Ct. ---, 2020 WL 3146686, at *12 (U.S. June 15, 2020) (quotation marks and citations omitted).

[3] As Plaintiffs themselves point out, the organizations specifically identified in Chapter 71 (like Radio Free Asia and Radio Free Europe) are "private, non-profit 501(c)(3) organizations incorporated under state law."  Pls.' Mot. at 1.

available to make annual grants for the purpose of carrying out similar functions as were carried out by [Radio Free Europe], on the day before April 30, 1994."); 22 U.S.C. § 6208(a)(1) ("Grants authorized under section 6204 of this title shall be available to make annual grants for the purpose of carrying out radio broadcasting to Asia.").

There is otherwise nothing special about those particular organizations.  In the specific provisions Plaintiffs tout as evidence of congressional "authorization," Congress gave the CEO discretion to disregard those organizations altogether if they do not perform as expected.  *See, e.g.*, 22 U.S.C.A. § 6207(d) ("If the [CEO] determines at any time that [Radio Free Europe] is not carrying out the functions described in this section in an effective and economical manner, the [CEO] may award the grant to carry out such functions to another entity."); *Id.* § 6208(g) ("If the [CEO] determines at any time that Radio Free Asia is not carrying out the functions described in this section in an effective and economical manner, the [CEO] may award the grant to carry out such functions to another entity.").  By Plaintiffs' logic, if the CEO were to exercise this power to renounce Radio Free Asia and Radio Free Europe in favor of new, better-performing grantees, he could not name the officers and directors of those new grantees because they are not specifically identified in Chapter 71.  That would certainly be an odd result, as it would strip the CEO of his ability to determine the leadership of organizations broadcasting for the United States in Asia and Europe, even when he switches to a *more capable* organization.

Second, § 6209(d)'s reference to organizations "authorized under this chapter" would be largely useless if it only captured organizations expressly and specifically identified in Chapter 71.  If Congress passed a statute recognizing a new organization in Chapter 71, it could just as easily amend § 6209(d)'s appointment-and-removal provision to explicitly mention the new organization.[4]  *See id.* § 6902(d) (ref-

---

[4] Congress has arguably failed to do this only once, with Radio Free Afghanistan.  *See* 22 U.S.C. § 6215.  But even there, § 6209(d)'s reference to organizations "authorized under this chapter" was likely

erencing "RFE/RL Inc." and "Radio Free Asia").  Conversely, Congress can (and has) explicitly mentioned organizations in § 6209(d) *without* codifying a standalone provision in Chapter 71.  *See id.* (referencing "the Middle East Broadcasting Networks").  So § 6209(d)'s "authorized under this chapter" clause is mostly superfluous unless it captures organizations that Congress does not specifically contemplate, such as those funded as "authorized under" the CEO's § 6204 grant-making power.  *See Clark v. Rameker*, 573 U.S. 122, 131 (2014) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." (citations omitted)).

Third, it is significant that Congress used the term "under" in § 6209(d)'s catchall provision for organizations "authorized under this chapter."  The use of "under" strongly implies that Congress intended to capture organizations funded pursuant to (*i.e.*, "under") the CEO's § 6204 grant-making "authorit[y]." If Congress had meant to capture only organizations specifically identified in Chapter 71 (as Plaintiffs suggest), it could have used "in" rather than "under."  Then § 6209(d) would have read: "Officers and directors of RFE/RL Inc., Radio Free Asia, and the Middle East Broadcasting Networks or any organization that is established through the consolidation of such entities, or authorized [in] this chapter, shall serve at the pleasure of and may be named by the [CEO]." *Id.* § 6209(d) (altered).  But Congress chose not to do so.

If there were any doubt that the Open Technology Fund falls within § 6209(d)'s appointment-and-removal provision,[5] it should be easily dispelled by the fact that the Open Technology Fund was part of

---

superfluous because Radio Free Afghanistan was "subject to the same oversight mechanisms[] as other services of RFE/RL, Incorporated." *Id.* § 6215(d).  So it was probably included in § 6209(d)'s explicit reference to "RFE/RL Inc." anyway.

[5] It is true that Congress could have removed all doubt about the reach of § 6209(d) by using the same language ("any other grantee or entity provided funding by the agency") as it used in § 6209(c).  But "merely because a statute contains 'examples of inartful drafting' does not mean courts are incapable of discerning its meaning, particularly with the aid of broader statutory context." *United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016) (citing *King v. Burwell*, 135 S. Ct. 2480, 2492 (2015)).  And here, the

Radio Free Asia when § 6209(d) was added in December 2016.  "[T]he Open Technology Fund [ ] was created in 2012 as a program of Radio Free Asia," and it "operated as a program of [Radio Free Asia] for seven years" until it was spun off in 2019 to make Open Technology Fund "an independent Internet free-dom non-profit organization."[6]  Congress was well aware of that relationship and appropriated funds to Radio Free Asia for use by the Open Technology Fund.  *See* Department of State, Foreign Operations, and Related Programs Appropriations Act, 2019, Division F, Consolidated Appropriations Act, 2019, P.L. 116-6 (February 15, 2019).  So when Congress added § 6209(d) and mandated that "[o]fficers and direc-tors of . . . Radio Free Asia . . . shall serve at the pleasure of and may be named by the [CEO]," it expected that provision to include the Open Technology Fund.

This conclusion is reinforced by the Open Technology Fund's bylaws, which expressly contem-plate removal under the International Broadcasting Act.  *See, e.g.*, Gupta Decl. Ex. E at 2 ("The Corpora-tion . . . shall at all times select and provide for the election, resignation or removal of the members of its Board of Directors, and appoint and provide for the resignation or removal of its Officers, pursuant to and in compliance with the provisions of the [International Broadcasting] Act, as it may be amended from time to time."); *id.* at 3 ("Individuals shall be elected by the Board of Directors for three-year terms upon majority vote of the Board of Directors, *or as may be authorized by [the International Broadcasting Act]*." (emphasis added)); *id.* at 7 ("All other Officers shall be elected by majority vote of the Board of Directors at a duly called meeting at which a quorum is present *or as may be authorized by [the International Broadcasting Act]*." (emphasis added)).  Plaintiffs admit as much.  *See* Pls.' Mot. at 20 ("[T]he bylaws

---

broader statutory context indicates that the officers and directors on the Open Technology Fund "serve at the pleasure of and may be named by the [CEO]."  *Id.* § 6209(d).

[6] Open Technology Fund, Our History (last visited June 26, 2020), *available at* https://www.open-tech.fund/about/our-history/.

further provide that officers and directors may be appointed or removed 'as may be authorized by' the [International Broadcasting] Act, in addition to the procedures spelled out, above.").

The text of § 6209(d), along with the broader statutory context, indicates that the CEO had authority to remove and appoint the Open Technology Fund's officers and directors. Plaintiffs are thus unlikely to succeed on their claim that Defendant "lacks any legal authority to remove or appoint officers or directors of the Open Technology Fund." Pls.' Mot. at 16.

### 2. <u>Plaintiffs have not adequately alleged that Defendant has compromised the independence of any organization.</u>

Plaintiffs are similarly unlikely to succeed on their amorphous claim that Defendant has breached the so-called "firewall" of organizational independence. That claim—to the extent it exists—is based entirely on the idea that Defendant has somehow destroyed the organizations' journalistic integrity simply by replacing their officers and directors. *See* Pls.' Mot. at 23–24. But that is a non sequitur.

For starters, replacing the organizations' leadership with other officers and directors does not automatically degrade the organizations' ability to maintain acceptable broadcasting standards. In fact, Plaintiffs admit that Defendant—who now chairs the respective organizational boards—has "past experience in public broadcasting" and "filmmaking." Compl. ¶ 8, ECF No. 1. Beyond that, however, Plaintiffs do not advance *any* allegations about the replacement board members, let alone any allegations about how those board members will manage the organizations. There are no allegations that the new organizational leadership cannot, for example, provide "news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(b)(1); provide "information about developments in each significant region of the world," *id.* § 6202(b)(6); provide "adequate transmitter and relay capacity to support [broadcasting] activities," *id.* § 6202(b)(9); or provide "training and technical support for independent indigenous media," *id.* § 6202(b)(10). And, of course, there are no plausible allegations that the new board members have "overrid[den] [a] statutory obligation of independence" or "impermissibly influence[d]" the broadcasting of any organization. Pls.' Mot. at 21–23. Any such allegations would be

clairvoyant, as the new board members have taken no action in the mere nine days since they were installed, and the previous board members seem to think they were never terminated at all.[7] *See, e.g.*, Compl. ¶¶ 4–7 (describing individual Plaintiffs as current board members).

Nor does it matter that some of the new board members are government officials. Indeed, the International Broadcasting Act specifically commands that international broadcasting must include "clear and effective presentation of the *policies of the United States Government* and responsible discussion and opinion on those policies . . . which *present the views of the United States Government*." 22 U.S.C. § 6202(b)(3) (emphasis added). Who better to oversee international broadcasting that "present[s] the views of the United States Government" than government officials? At the very least, there is nothing inherently nefarious about board members that also happen to work for the government. Plaintiffs repeatedly tout the government experience of the organizations' prior leadership. *See, e.g.*, Pls.' Mot. at 8–9; Compl. at 2, ¶¶ 4–7. And, again, Plaintiffs advance no allegation suggesting that the new board members—whether government officials or not—will breach the "firewall" in any way.[8]

If Plaintiffs are correct that the mere replacement of board members is enough to violate the "firewall," then presumably *every* board-member replacement would violate the International Broadcasting Act. That cannot be, and is not, the law. The Court should find that Plaintiffs are unlikely to succeed on their self-styled breach-of-firewall claim.

---

[7] For this same reason, Plaintiffs lack standing to assert any claim based on a purported breach of the so-called "firewall" because any injury arising from such a breach—if cognizable at all—is pure conjecture. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (explaining that "threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient" (citations omitted)).

[8] To the extent Plaintiffs rely on Defendant's "freeze on contracts, personnel actions, and technical migrations" to support their breach-of-firewall claim, they are misguided. *See* Compl. ¶ 57. Plaintiffs' own evidence demonstrates that if it was "necessary to move on any of these matters immediately," personnel could "bring the matter to the attention of the [ ] grants team in the CFO's shop with a written justification for the basis for such action and we will work with the CEO to clear." Turner Decl. Ex. A., ECF No. 4-13.

### 3.  **Plaintiffs lack a private right of action under the International Broadcasting Act.**

In any event, Plaintiffs identify no cause of action to bring their improper-removal and breach-of-firewall claims.  To raise a claim in federal court, a plaintiff must demonstrate both jurisdiction and a right of action to initiate that claim.  *See Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 455–56 (1974) (recognizing that whether a private right of action exists and whether a federal court has jurisdiction are two separate threshold questions).  Here, Plaintiffs do not invoke a right of action under the International Broadcasting Act.  Nor could they; that statute lacks a mechanism for private enforcement.  Rather, Plaintiffs premise their first two claims on the Declaratory Judgment Act alone. Compl. ¶¶ 47–57.  But that statute does not provide a right of action where one is otherwise lacking. Therefore, Plaintiffs are unlikely to succeed on the merits of their non-APA claims and not entitled to preliminary injunctive relief.

"In evaluating whether a statute creates a private right of action," the "judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  *Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 37 (D.D.C. 2019) [hereinafter "*EPIC*"] (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)).  "A plaintiff bears a relatively heavy burden to show congressional intent, as he must demonstrate that Congress affirmatively or specifically contemplated private enforcement when it passed the relevant statute." *Aishat v. U.S. Dep't of Homeland Sec.*, 288 F. Supp. 3d 261, 267 (D.D.C. 2018) (quoting *Samuels v. Dist. of Columbia*, 770 F.2d 184, 193 (D.C. Cir. 1985)).  "Absent statutory intent to create a cause of action, courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *EPIC*, 369 F. Supp. 3d at 37 (quoting *Int'l Union, Security, Police & Fire Professionals of Am. v. Faye*, 828 F.3d 969, 972 (D.C. Cir. 2016)); *see Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018) ("[T]his Court has recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." (alterations and citation omitted)).

10

Nothing in the International Broadcasting Act indicates that Plaintiffs have a private right of action to enforce its provisions.  With the International Broadcasting Act, Congress "reorganize[ed] and consolidate[ed] [the] United States['] international broadcasting" to "achieve important economies and strengthen the capability of the United States to use broadcasting to support freedom and democracy in a rapidly changing international environment."  22 U.S.C. § 6201(5).  In doing so, Congress created a comprehensive statutory scheme that, among other things, laid out the applicable standards and principles, *id.* § 6202, streamlined operations under the CEO, *id.* § 6203, enumerated the many broad "authorities" to be exercised by the CEO, *id.* § 6204, and provided oversight through an Inspector General, *id.* § 6209a.  Nowhere in this statutory scheme did Congress contemplate a private right or a private remedy, much less both.  *See EPIC*, 369 F. Supp. 3d at 37.

Nor can Plaintiffs rely on the Declaratory Judgment Act for a cause of action.  The Declaratory Judgment Act "enlarged the range of remedies available in the federal courts," but it did not create a new cause of action to seek those remedies.  *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671 (1950); *EPIC*, 369 F. Supp. 3d at 38 (dismissing a claim because the Declaratory Judgment Act "does not provide a private right of action"); *see Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011).  Here, the lion's share of Plaintiffs' claims are brought under the Declaratory Judgment Act.  *See* Compl. ¶¶ 47–57 (Counts One and Two).  Because those claims lack a private right of action, Plaintiffs are unlikely to succeed on the merits.

## B.  Plaintiffs' APA Claims are Unavailing

### 1.  <u>The CEO's removal determinations and grant reprograming are unreviewable because they are committed to agency discretion by law.</u>

Under 5 U.S.C. § 701(a)(2), "[a]gency action is committed to agency discretion by law when the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion [rendering] meaningful judicial review [] impossible."  *Steenholdt v. FAA*, 314 F.3d

633, 638 (D.C. Cir. 2003) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).  This is true "even where Congress has not affirmatively precluded review."  *Heckler*, 470 U.S. at 830.

To determine whether a decision is committed to agency discretion, courts "consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action."  *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006) (quoting *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002)).  Hallmarks of a decision committed to agency discretion include: a statute that puts the onus on the agency, not the courts, to apply a standard, *see Webster v. Doe*, 486 U.S. 592, 600 (1988); and general criteria that make it difficult for courts to meaningfully second-guess an agency's determination, *see id.* ("advisable in the interests of the United States" is unreviewable).

The relevant provisions in the International Banking Act plainly commit both classes of actions at issue here to the discretion of the CEO.  The International Broadcasting Act does not specify the factors the CEO must consider in removing and replacing grantees' directors and officers.  On the contrary, it states that such individuals "shall serve *at the pleasure of* and may be named by *the [CEO]*."  22 U.S.C. § 6209(d) (emphasis added).  Nor does the International Broadcasting Act specify required factors for reprograming funds.  Quite the opposite: the CEO is authorized to "reprogram funds within the scope of any grant or cooperative agreement, or between grantees, *as necessary*."  *Id.* § 6204(a)(21).  As these solitary statutory references to the relevant CEO authorities suggest, the statute provides no standard— much less a meaningful one—for determining the propriety of such CEO actions.  *Cf. Lincoln v. Vigil*, 508 U.S. 182, 196 (1993) (statutory standard's "generality . . . underscores the administrative discretion inherent in the determination").  The statute, in short, contemplates discretion at every turn, without supplying any judicially manageable standard to guide it; and the breadth of that statutory discretion forecloses finding the meaningful standard required for judicial review.

**2.  The CEO's grant reprogramming is also unreviewable because it is not final.**

For a court to review an agency's actions under the APA, the action also must be "final agency action."  5 U.S.C. § 704.  "[T]wo conditions must be satisfied for agency action to be 'final'": (1) "the action must mark the consummation of the agency's decisionmaking process" and "not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation and internal quotation marks omitted); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.").  Thus, courts interpret "finality" in a "pragmatic way."  *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967).  And this approach ensures that courts are neither pressed into service as "day-to-day agency management," *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004), nor forced to undertake "general judicial review of [an agency's] day-to-day operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).

By Plaintiffs' own description, the alleged funding "freeze" is not a reviewable final agency action.  It neither marks the consummation of the agency's decisionmaking process, nor determines rights or obligations.  Rather, the CEO's reprograming represents an "interlocutory" measure while the agency reevaluates grant making priorities.  *Bennett*, 520 U.S. at 178.  Moreover, in the interim, grantees may still seek funding as "necessary," meaning the freeze is not the final, rights-determining word for either the agency or grantees.  Turner Decl. Ex. A.  At bottom, Plaintiffs simply disagree with the CEO's decision to review pending expenditures to ensure they align with the Agency's goals.  The Court should not countenance Plaintiffs' plea for this Court to administer, by injunction, the agency's day-to-day funding decisions.  *See Lujan*, 497 U.S. at 899.

### 3.  **Defendant acted in accordance with law in reprograming funds.**

Under the broad grant making and reprograming authority described above, the CEO may "make and supervise grants," "allocate funds," and "reprogram funds within the scope of *any* grant or cooperative agreement . . . *as necessary*."  22 U.S.C. § 6209(a)(5)–(6), (21) (emphases added).  In other words, at his discretion, the CEO may begin, amend, end, or condition grants authorized by the International Banking Act and under relevant appropriations by Congress.

Plaintiffs' arguments regarding Defendant's alleged "freeze" of grant funds are misleading for several reasons.  To begin with, Plaintiffs exclusively invoke Office of Management and Budget (OMB) regulations that do not apply here.  *See* Pls.' Mot. at 24–26 (citing 2 C.F.R. §§ 200.100, 200.338).  The regulation Plaintiffs identify as the basis for this purported APA claim, entitled "Remedies for noncompliance," addresses options for a "Federal awarding agency or pass-through entity" "*[i]f* a non-Federal entity fails to comply with Federal statutes, regulations or the terms and conditions of a Federal award." 2 C.F.R. § 200.338 (emphasis added).[9]  Here, though, the CEO has not premised reprograming of funds on Open Technology Fund or individual Plaintiffs' noncompliance with any statute, regulation, term, or condition; nor do Plaintiffs even allege that he has added conditions to grants.  Rather, the CEO has exercised his broad discretion to temporarily halt, evaluate, and reprogram grant funds in accordance with the Agency's mission.  *See* 22 U.S.C. § 6204(5)–(6), (21); *see also id.* § 6201 (including achieving "economies" among the agency reorganization's purposes).  At bottom, Plaintiffs have a policy disagreement

---

[9] Thus, contrary to Plaintiffs' characterization, the regulation does not provide the exclusive means for placing conditions on grants.  *Contra* Pls.' Mot. at 25 ("Only if a non-federal recipient of grant funds 'fails to comply with Federal statutes, regulations or the terms and conditions of a Federal award' may the Federal awarding agency "impose additional conditions" on the grantee.").  On the contrary, the International Banking Act provides the CEO explicit, exclusive authority to place conditions on USAGM grants, regardless of grantees' compliance with legal or contractual obligations.  *E.g.*, 22 U.S.C. § 6204(a)(20)–(21) (authorizing the CEO to place certain conditions on grants "[n]otwithstanding any other provision of law").

with Defendant's actions as CEO. That disagreement, however, does not justify enjoining Defendant's lawful exercise of his grant supervision authority.[10]

## II. PLAINTIFFS HAVE FAILED TO ESTABLISH THAT A TEMPORARY RESTRAINING ORDER IS NECESSARY TO PREVENT IRREPARABLE HARM

Plaintiffs have also failed to establish that they "[are] likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. The "high standard for irreparable injury" requires a two-fold showing by Plaintiffs: First, and because an irreparable injury "must be both certain and great," they "must show 'the injury complained of is of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.'" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). And second, "the injury must be beyond remediation." *Id.* Neither the Open Technology Fund nor the individual Plaintiffs can make that two-fold showing.

### A. Open Technology Fund Has Failed To Establish That A Temporary Restraining Order Is Necessary To Prevent Irreparable Harm

In its attempt to establish irreparable harm, the Open Technology Fund points to one alleged injury purportedly stemming from two distinct actions by Defendant: "a 'legal cloud' causing 'uncertainty and paralysis'" traceable to an alleged "freeze" in funding under its grant from Defendant and the loss of its executive management and board members. Pls.' Mot. at 28. But vague terms like "uncertainty" and "paralysis" do not suggest the kind of harm that courts find irreparable. And even the somewhat more

---

[10] Plaintiffs' Motion also alludes to an argument regarding the First Amendment, which is not mentioned in their Complaint—let alone stated as a ground for injunctive relief. Pls.' Mot. at 26. Moreover, this argument cannot withstand scrutiny. Plaintiffs maintain that the Agency may not impose "[c]onditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id.* (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215 (2013)). But the Agency's programs primarily exist for free speech, and the Open Technology Fund exists entirely by virtue of the Agency's funding. Plaintiffs have not identified "speech outside the contours of the program itself" that USAGM has sought to regulate, and their argument thus boils down to a subjective disagreement with Defendant's discretionary actions as CEO.

concrete actions to which the Open Technology Fund points as the cause of its uncertainty—a funding freeze and the removal of its executive management and board members—both fall short of meeting the legal requirements of irreparable harm as well.

To begin with, the Open Technology Fund's alleged funding "freeze"—at least as characterized by the Open Technology Fund (more on that below)—is simply economic loss, and economic loss without more cannot constitute irreparable harm. *See, e.g.*, *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 114-15 (D.D.C. 2015); *Air Transp. Ass'n of Am., Inc. v. Exp.–Imp. Bank of the U.S.,* 840 F. Supp. 2d 327 (D.D.C.2012).  Rather, the Open Technology Fund must establish that its economic loss "would significantly damage its business above and beyond a simple diminution in profits, or demon-strate[] that the loss would cause extreme hardship to the business, or even threaten destruction of the business[.]"  *Save Jobs USA*, 105 F. Supp. 3d at 114 (internal citations and quotations omitted).  And the Open Technology Fund must "adequately describe and quantify the level of harm" it faces.  *Id.* at 114-15. the Open Technology Fund has provided some detail about the number of downstream contracts it may not be able to award, but that does not begin to describe the "extreme hardship" or threat of destruction to its business required to show irreparable harm, much less adequately quantify the level of that harm.

And perhaps more fundamentally, the Open Technology Fund cannot even show that its funding is in fact truly "frozen."  Quite conspicuously, Plaintiffs' opening brief omits any mention of the actual language of the email from Defendant informing the Open Technology Fund, shortly after Defendant Pack was confirmed as CEO, of the alleged temporary freeze.  Had Plaintiffs done so, it would have laid bare the fact that the alleged freeze was presumptive, rather than set in stone.  As the author of that email explained to the Open Technology Fund, "[i]f you believe it is necessary to move on any of these matters immediately, please bring the matter to the attention of the [ ] grants team in the CFO's shop with a written justification for the basis for such action and we will work with the CEO to clear."  Turner Decl., Ex. A.

Indeed, just as conspicuous in its absence from Plaintiffs' opening brief is any indication that the Open Technology Fund ever made the request that Defendant specifically invited it to make: that any "frozen" action or funding obligation be "cleared," should the Open Technology Fund "believe it necessary to move on any of these matters immediately." *Id.* Having failed to show in its opening brief that it ever even made such a request—much less had it denied—the Open Technology Fund can hardly claim now to be suffering irreparable harm caused by Defendant's funding "freeze." If the Open Technology Fund wishes this Court to believe that the alleged economic harm it has suffered from Defendant's funding freeze approaches the "extreme hardship" or existential-threat level required by courts within the D.C. Circuit to establish irreparable harm, it presumably would have taken up Defendant's invitation to request that some portion of that funding, at least, be unfrozen.

The same must be said for Plaintiffs' argument that the Open Technology Fund is suffering irreparable harm from the removal of its senior management and board members. This argument fails for the same reasons as those set forth above: Plaintiffs simply fail to show that any uncertainty created by the removal of those personnel cannot be remedied at the end of this litigation by an order reinstating them, should Plaintiffs prevail. Further, there is no indication that the loss of those personnel would prevent the Open Technology Fund from fulfilling its organizational mandate in the first instance. Even if the entire board of directors were replaced, there is no reason to believe that the Open Technology Fund would not be able to continue operating in a manner consistent with its articles of incorporation and by-laws. *See English v. Trump*, 279 F. Supp. 3d 307, 333-36 (D.D.C. 2018).

**B. Individual Plaintiffs Have Failed To Establish That A Temporary Restraining Order Is Necessary To Prevent Irreparable Harm**

For their part, the individual Plaintiffs cannot establish irreparable harm because the injuries they challenge are the loss of their positions as directors, and the loss of a position by itself does not constitute irreparable harm as a matter of law. Likewise as to the Open Technology Fund, which seeks to temporarily restrain Defendant from "taking any action or giving effect to any action . . . to remove any [of its] officers

17

or directors[.]"  Pls.' [Proposed] Temporary Restraining Order at 1.  And because both the individual Plaintiffs and the non-plaintiff officers of the Open Technology Fund have already been removed, Plaintiffs' burden is even higher here as they seek a mandatory injunction that would alter the status quo.  *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997).

Whether viewed as a status quo or a mandatory injunction, Plaintiffs' argument fails to meet their burden of establishing either portion of the two-fold showing required under *Chaplaincy*.  Only in a "genuinely extraordinary situation" may loss of employment constitute irreparable harm.  *Sampson v. Murray*, 415 U.S. 61, 92 & n.68 (1974). Loss of income, face, and reputation are not such extraordinary situations.  *See id.* at 89-92.  And this is not such a situation.  Indeed, court after court in this Circuit and others have concluded that loss of employment does not constitute irreparable harm.  *See, e.g.*, *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998); *English v. Trump*, 279 F. Supp. 3d at 333-36; *Davis v. Billington*, 76 F. Supp. 3d 59, 65-66 (D.D.C. 2014) (collecting cases); *Farris v. Rice*, 453 F. Supp. 2d 76, 79-80 (D.D.C. 2006) ("cases are legion holding that loss of employment does not constitute irreparable injury").

Plaintiffs ignore all of this authority, omitting any mention of the Supreme Court's seminal decision in *Sampson v. Murray* altogether and mostly ignoring any other decision issued by any court within the D.C. Circuit.  Instead, Plaintiffs cite a handful of out-of-circuit decisions for the tenuous proposition that directors of organizations have a right to participate in the management of those organizations, a right that has "intrinsic value."  Pls.' Mot. at 31 (quoting *Wisdom Import Sales Co. LLC v. Labatt Brewing Co. Ltd.*, 339 F.3d 101, 114 (2d Cir. 2003)).  But suggestions of intrinsic value do not constitute evidence of irreparable harm, and Plaintiffs' cited cases offer nothing else to counsel against the axiomatic rule of *Sampson v. Murray* that loss of employment does not constitute irreparable harm without extraordinary circumstances to go along with it.

And there are no such extraordinary circumstances here.  Despite what Plaintiffs would have the Court believe, the challenge they have raised to their removals constitutes a textbook employment case: a

new CEO took office at the Agency for Global Media, assessed the situations at Radio Free Europe, Radio Free Asia, the Middle East Broadcasting Networks, and the Open Technology Fund, and determined that he needed to remove several members of those entities' respective boards of directors. Plaintiffs can argue, as they have, that the new CEO did not have the legal authority to remove them, or that their removals were otherwise improper. But that is just what it sounds like: a standard employment case much like *Sampson v. Murray*, that can and should be resolved at final judgment rather than through emergency injunctive relief.

If Plaintiffs attempt *sub silentio* to evade *Sampson v. Murray*'s control over their removal challenge by relying on the high level or singular nature of the director positions into which they seek temporary reinstatement, they are wrong there too. Courts have repeatedly rejected the notion that the deprivation of a unique, singular, or high-level position is any more of an irreparable injury than the loss of what Plaintiffs might describe as "run-of-the-mill," rank-and-file positions. *See English*, 279 F. Supp. 3d at 333-36 (inability to serve as Acting Director of Consumer Financial Protection Bureau not irreparable injury); *see also Hetreed*, 135 F.3d at 1158 (loss of position as senior manager leading audit department not irreparable injury); *Marxe v. Jackson*, 833 F.2d 1121, 1122 (3d Cir. 1987) (division manager); *Rubino v. City of Mount Vernon*, 707 F.2d 53 (2d Cir. 1983) (mayoral-appointed City Assessor); *Franks v. Nimmo*, 683 F.2d 1290, 1291 (10th Cir. 1982) (Associate Chief of Staff for Research and Development position at Department of Veterans Affairs Medical Center); *EEOC v. City of Janesville*, 630 F.2d 1254, 1256 (7th Cir. 1980) (Chief of Police); *Levesque v. State of Me.*, 587 F.2d 78, 79 (1st Cir. 1978) (Maine Commissioner of Manpower); *Nichols v. Agency of Int'l Dev.*, 18 F. Supp. 2d 1, 2, 4 (D.D.C. 1998) (Chief of Information Management Systems, Office of Inspector General); *Burns v. GAO Empl. Fed. Credit Union*, No. 88-3424, 1988 WL 134925, at *1–2 (D.D.C. Dec. 2, 1988) (President of Credit Union Board of Directors).

19

Against that authority, Plaintiffs muster little more than a single district court decision from the Southern District of New York: *Davis v. Rodina*, 741 F. Supp. 1115 (S.D.N.Y. 1990).  That single out-of-circuit decision is not enough to warrant departure from the *Sampson v. Murray* rule.  But even on its own merits, *Davis* is distinguishable for at least two reasons that Plaintiffs leave entirely unmentioned in their opening brief.  The plaintiff in *Davis* was found to have shown a likelihood of irreparable harm because, the district court determined, "money damages will not compensate her for the loss of the opportunity to continue to manage the company which she had helped to build and for which she has guaranteed sub-stantial loans."  741 F. Supp. at 1125.  Here, by contrast, neither factor is present.  Despite their distin-guished credentials and public-service records, no individual Plaintiff can be said to have "helped to build" Radio Free Europe, Radio Free Asia, the Middle Eastern Broadcasting Networks, or the Open Technology Fund; these entities existed before their service and will continue to exist after their service.  Likewise, no individual Plaintiff has any financial stake in any of these entities, much less the sort of "substantial" loan guarantees the plaintiff in *Davis* had in her company.  At bottom, none of the extraordinary circumstances that permitted the plaintiff in *Davis* to show irreparable harm from the loss of her position with the com-pany she helped build, and maintained a "substantial" financial stake in, exist here.

The same distinctions hold as to the few other cases cited by Plaintiffs.  They rely on three other cases decided under Second Circuit law—one from the Second Circuit and two from the Southern District of New York.  But all three arose in the context of private shareholder or other corporate disputes and involved the rights of minority shareholders or partners, and thus were not analogous to the asserted injury to the individual Plaintiffs here: removal from unpaid positions as directors of several non-profit entities where they hold no financial interest or equity.

In *Wisdom Import Sales Co. v. Labatt Brewing Co.*, for instance, the Second Circuit examined the irreparable-harm question in a joint venture dispute in which the minority partner had been deprived of its right to exercise its minority veto.  339 F.3d 101 (2d Cir. 2003).  The court concluded only that the breach

of the joint-venture agreement constituted irreparable harm, and only on a narrow basis specific to that context. *Id.* at 114-15.  "This is not to say that all bargained-for contractual provisions provide a basis for injunctive relief upon breach or threatened breach; such a broad holding would eviscerate the essential distinction between compensable and non-compensable harm," the court emphasized.  "We hold only that the denial of bargained-for minority rights, standing alone, may constitute irreparable harm for purposes of obtaining preliminary injunctive relief where such rights are central to preserving an agreed-upon balance of power (*e.g.,* preserving the management role of the minority directors) in corporate management." *Id.* at 115.

The other two such cases relied on by Plaintiffs both involved shareholder disputes in which the minority shareholder faced a risk of losing any degree of control or influence over their company against majority shareholder actions.  In *Suchodolski Associates v. Cardell Financial Corp.*, the minority shareholder in a shareholder dispute sought a preliminary injunction pending arbitration.  No. 03 Civ. 4148 (WHP), 2003 WL 22909149, *4 (S.D.N.Y. Dec. 10, 2013).  To preserve the minority shareholder's rights pending arbitration, the district court found that "the dilution of a party's stake in, or a party's loss of control of, a business constitutes irreparable harm."  *Id.*  Similarly, in *Street v. Vitti*, the district court found irreparable harm in another shareholder dispute in which the minority shareholder sought to block the majority shareholder from improperly taking certain funds from the corporation and otherwise preventing it from exercising its minority rights.  685 F. Supp. 379, 384 (S.D.N.Y. 1998).

Taken together, these cases stand only for the narrow proposition that persons or entities with equity stakes in for-profit corporations—minority shareholders or minority joint-venture partners—can in rare circumstances establish irreparable harm by showing an actual or threatened loss in their ability to protect their equity stakes or voice in executive management decision-making.  What they do not stand for is the much broader proposition suggested by Plaintiffs—that anyone with a management or oversight

role in an incorporated entity can demonstrate irreparable harm simply from losing that role. That proposition would eviscerate the default rule long ago announced by *Sampson v. Murray* that the loss of a position, absent truly exceptional circumstances, cannot constitute irreparable harm.

The remaining two cases cited by Plaintiffs can be dismissed on a similar basis. In *Atlantic Coast Airlines Holdings v. Mesa Air Group*—the only District of Columbia decision cited by Plaintiffs—the district court found irreparable harm in the distinct context of an alleged antitrust violation under the Sherman Act. 295 F. Supp. 2d 75, 96 (D.D.C. 2003). Even there, the court emphasized, the irreparable harm was not to the members of the plaintiff company's board of directors themselves, but to competition itself: "What matters is the realistic chance of harm to competition"—rather than to a particular competitor—if the challenged action were to proceed. *Id.* And in *Pennsylvania Professional Liability Joint Underwriting Association v. Wolf*, the Middle District of Pennsylvania found that the plaintiff—a state-created nonprofit association being absorbed into Pennsylvania's insurance department—had established irreparable harm not simply because it was losing its independent management, but because the state action was "forcing it to transfer *all* of its assets to the Commonwealth," including hundreds of millions of dollars of its own funding. 328 F. Supp. 3d 400, 411 (M.D. Pa. 2018) (emphasis in original). These two decisions are thus plainly distinguishable from this case.

Having failed to show that the loss of their director positions can amount to irreparable harm, Plaintiffs pivot to an attempt to show that their removal "causes immediate and ongoing harm to the organizations themselves[,]" suggesting that Defendant has thereby "damaged the reputation of these organizations." Pls.' Mot. at 31. But Plaintiffs cannot establish the required irreparable harm to them by bootstrapping onto alleged harm to the organizations they formerly served. In that sense, Plaintiffs are making much the same argument as that rejected in *English v. Trump*, where the district court denied the plaintiff's preliminary injunction request that she be instated as Acting Director of the Consumer Finance Protection Bureau. 279 F. Supp. 3d at 333-36. In *English*, the plaintiff based her alleged injury "solely on 'the loss

of a "statutory right to function" in a position directly related to a federal agency's 'ability to fulfill its

mandate.'" *Id.* at 334.  That was not enough, the court held, because the plaintiff could not show that her

inability to lead the CFPB as its Acting Director in fact prevented the CFPB from fulfilling its statutory

mandate; rather, the CFPB continued to do just that, albeit under a different Acting Director who had

different enforcement priorities than the plaintiff might have had.  Plaintiffs here cannot show that their

absence as directors for their former organizations leaves those organizations any worse off in terms of

fulfilling their organizational mandates than the CFPB in *English*.  So they cannot premise their request

for a temporary restraining order on some irreparable harm to their former organizations.

And in any event, even if Plaintiffs could credibly show some loss of position, status, or remuner-

ation amounting to an actual or threatened injury, they could not make the corollary showing that it is

"beyond remediation." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  As the D.C. Circuit has

often repeated, "[t]he key word in this consideration is *irreparable*. Mere injuries, however substantial, in

terms of money, time and energy necessarily expended in the absence of a stay are not enough. The pos-

sibility that adequate compensatory or other corrective relief will be available at a later date, in the ordi-

nary course of litigation weighs heavily against a claim of irreparable harm." *Id.* (quoting *Wisc. Gas Co.*,

758 F.2d at 674).  Thus, even if Plaintiffs could show some ongoing loss of anything of tangible value

during the pendency of this litigation, they cannot show that such loss is irreparable. And without such a

showing, they cannot satisfy the irreparable-harm element.

## III.   THE PUBLIC INTEREST WEIGHS IN DEFENDANT'S FAVOR[11]

Finally, to obtain preliminary injunctive relief in a case against the Government, a plaintiff must

show that the sweeping injunction they seek would be in the public interest.  *Nken v. Holder*, 556 U.S.

418, 435 (2009).  Plaintiffs cannot make that showing here for at least three reasons: (1) the resolution of

---

[11] As Plaintiffs acknowledge, the balance of the equities and the public interest "merge into one factor when the government is the non-movant."  Pls.' Mot. at 32.

complex and competing policy interests at stake in the Agency's administration of grantees and grants is best left to the agency and Congress; (2) Congress has already determined that the authority to remove or retain grantee officers and directors and the authority to administer grants lies with the CEO, not with Plaintiffs; and (3) the relief Plaintiffs seek has potentially unknowable effects.

First, if granted, Plaintiffs' proposed injunction would short-circuit the evolving political and administrative landscape surrounding the international broadcasting efforts of the United States. The Agency's duly-appointed CEO has set out new priorities regarding the agency's work to inform, engage, and connect people around the world in support of freedom and democracy, pursuant to his statutory authorities. If the CEO is unable to appoint the officials he believes will best effectuate policy priorities or to direct the use of funds in the manner he deems necessary to implement those priorities, if both personnel and funding are frozen in time, the Agency will be unable to evolve and adapt according to its lawful prerogatives. Indeed, forcing the CEO to retain individuals he has determined will not best meet the agency's mission, or expend funds about which he has yet to make a final determination, will irreparably harm the agency's efforts to carry out its mission in accordance with the CEO's operational vision. In other words, Plaintiffs' plea for preliminary relief seeks to obstruct the CEO's ability to set policy goals and, by extension, the agency's ability to carry out its mission. That relief would be contrary to the public interest.

Second, as explained above, the CEO has broad authority to administer grants and oversee grantee officers and directors. *See supra* Part I.A.1.. Enjoining the CEO to retain or rehire individuals or to expend funds that he has determined do not best serve the agency's critical mission circumvents the structure Congress created for administering the Agency. That structure, enacted by Congress, is "a declaration of public interest and policy which should be persuasive." *Virginian Ry. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937). Permitting Plaintiffs to usurp that structure through judicial administration of the agency would not serve that Congressionally-prescribed public interest.

24

Third, as with any plea for the courts to get involved in day-to-day agency operations, the injunction Plaintiffs seek would have potentially unknowable effects.  By wading into personnel decisions that Congress has entrusted to the CEO, the Court could thrust the agency and the Open Technology Fund itself into operational chaos.  Compelling grant disbursements—the necessity of which the new CEO has not had an opportunity to determine—would make it very difficult for the agency to later recover that money, should it prevail in this litigation, and ultimately determine those funds should not have been expended.

Plaintiffs' arguments to the contrary collapse into their merits arguments and, in any event, are unconvincing.  As discussed above, on the other side of the ledger from grave harms and risks for Defendant, Plaintiffs stand to suffer no immediate harm from the denial of preliminary injunctive relief.  *See supra* Part II.  And there is no "loss in integrity and public confidence . . . from diminished independence for the grantee organizations," let alone a judicially remediable one.  Pls.' Mot. at 32; *see supra* Part I.A.2.  At bottom, Plaintiffs profess that their policy preferences embody the public interest; but Congress has entrusted the CEO—not a lone grantee or some of its individual board members—with authority to make that determination for the Agency.  An order upending that structure and halting the agency's critical efforts at change would not serve the public interest and should therefore be denied.

## IV.  ANY INJUNCTION SHOULD BE LIMITED TO THE PARTIES

Even if the Court were to award injunctive relief, that relief must be limited to redress only established injuries to Plaintiffs.  *See Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of stay) (detailing the costs of overbroad injunctions).  Likewise, traditional equitable principles require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Here, Plaintiffs' Proposed Temporary Restraining Order seeks injunctive relief directing how Defendant must act toward entities that are not parties to this case, which is improper and contrary to statute. *See* Proposed TRO, ECF No. 4-1 at 2.  First, Radio Free Europe/Radio Free Liberty, Radio Free Asia, and the Middle East Broadcasting Networks are not Plaintiffs.  *See* Compl. ¶¶ 3–7.  Nor have they requested the injunctive relief that Open Technology Fund seeks here on their behalf.  And the individual Plaintiffs nowhere claim they are authorized to litigate on the non-party entities' behalves.

Moreover, Plaintiffs concede that the Agency's authorizing statute provides the CEO with authority to take the actions regarding the non-party organizations that Plaintiffs simultaneously ask this Court to enjoin.  *See* Pls.' Mot. at 16 (acknowledging, by reference to 22 U.S.C. § 6209(d), the CEO "has authority to appoint or remove officers and directors" of RFE/RL Inc., Radio Free Asia, and the Middle East Broadcasting Networks).  Plaintiffs' bid to block Defendant from either "replac[ing] the boards or directors" or "giv[ing] effect to any personnel decisions (such as removal of corporate officers) that must be taken by the organizations board of directors," directly contradicts § 6209(d)'s plain text: "Officers and directors of RFE/RL Inc., Radio Free Asia, and the Middle East Broadcasting Networks . . . shall serve at the pleasure of and may be named by the Chief Executive Officer of the Board."  Similarly, Plaintiffs' bid to block "any action or giving effect to any action that purports to 'freeze' grant funds" to the non-party organizations directly contradicts 22 U.S.C. § 6204(a), because it vests discretion in the CEO to "make and supervise grants cooperative agreements" and "allocate funds" among grantees, as well as "to reprogram funds within the scope of any grant or cooperative agreement . . . as necessary."  *Id.* at (5)–(6), (21).

So even if the Court were to determine that Defendant's actions concerning Open Technology Fund must be enjoined, any such injunction may not appropriately extend to the non-party entities, which have not sought any such relief, and with respect to which the CEO is explicitly authorized to take such actions by law.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiffs' motion for a temporary restraining order and preliminary injunction.

DATED: June 26, 2020                      Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

CHRISTOPHER HALL
Assistant Director, Federal Programs Branch

*/s/ Stephen Ehrlich*
STEPHEN EHRLICH (NY Bar # 5264171)
CHARLES E.T. ROBERTS (PA Bar # 326539)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel.: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Counsel for Defendants*