```
                   UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
OPEN TECHNOLOGY FUND, et al.,        )   Civil Action
              Plaintiffs,            )   No. 20-1710
vs.                                  )
                                     )
MICHAEL PACK,                        )   June 26, 2020
                                     )   2:36 p.m.
              Defendant.             )   Washington, D.C.
                                     )
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES**</u>**: (via video teleconference)**

```
FOR THE PLAINTIFFS: DEEPAK GUPTA
                    Gupta Wessler PLLC
                    1900 L Sreet, NW
                    Suite 312
                    Washington, DC 20036
                    (202) 888-1741
                    Email: Deepak@guptawessler.com


FOR THE DEFENSE:    STEPHEN EHRLICH
                    CHARLES ROBERTS
                    U.S. Department of Justice
                    Civil Division, Federal Programs Branch
                    1100 L Street, NW
                    Washington, DC 20005
                    202-305-9803
                    Email: Stephen.Ehrlich@usdoj.gov


Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter
                    U.S. Courthouse
                    Washington, D.C.  20001


          Proceedings reported by machine shorthand,
      transcript produced by computer-aided transcription.
```

1                        **P R O C E E D I N G S**

2              THE COURT:  This Honorable Court is now in

3     session.  Chief Judge Beryl A. Howell presiding.

4              Matter before the Court, Civil Case No. 20-1710,

5     Open Technology Fund, et al., versus Michael Pack.

6              Counsel, please state your names for the record,

7     starting with the plaintiff.

8              MR. GUTPA:  Thank you.

9              This is Deepak Gupta for the plaintiffs, Open

10    Technology Fund, Ryan Crocker, Karen Kornbluh, Ben Scott,

11    and Michael Kempner.

12             THE COURT:  Yes.  Good afternoon, Mr. Gupta.

13             MR. GUTPA:  Good afternoon.

14             THE COURT:  And for the defendant?

15             Mr. Roberts, are you on the line?

16             THE DEPUTY:  He is waving.

17             MR. GUPTA:  I think my video is frozen.  I can

18    hear the judge, but I can't see her.

19             THE COURT:  Okay.  Mr. Roberts, you need to

20    unmute.

21             MR. ROBERTS:  Your Honor, this is Charles Roberts

22    for the defendant.

23             Mr. Ehrlich I think is going to be presenting our

24    argument; and I don't think that his microphone is

25    connecting with the system at the moment.

1          THE COURT:  That's unfortunate.

2          Is that Mr. Ehrlich who is waving?

3          MR. EHRLICH:  Yes.  I apologize, Your Honor.

4          THE COURT:  Okay.  I finally hear you.  Thank you.

5          MR. EHRLICH:  Okay.

6          THE COURT:  Welcome.

7          All right.  So let me just begin by asking a

8    couple of questions -- I am hearing a very annoying echo.

9          Are you all hearing that?

10         Mr. Ehrlich, are you hearing that?

11         MR. EHRLICH:  I don't hear that, Your Honor, which

12   leads me to believe it might be me.

13         THE COURT:  Okay.  Before I turn to Mr. Gupta to

14   begin the argument, I just want to make sure that we're all

15   on the same page as to one aspect of the relief requested by

16   the plaintiffs in the case.  And earlier this afternoon,

17   about an hour ago, the defendant filed -- well, both sides

18   filed supplemental materials.  And what the defendant filed

19   was a notice that the freeze is no longer in effect, and

20   that's the freeze on the grant funds.

21         Is that correct, Mr. Roberts or Mr. Ehrlich?

22         MR. ROBERTS:  That's correct, Your Honor.

23         THE COURT:  So, Mr. Gupta, just to begin -- so

24   that we can make this argument as efficient as possible

25   about matters that are at issue, would you agree that the

```
 1   aspect of the plaintiffs' requested relief regarding the

 2   unfreezing of funds is now moot?

 3             MR. GUTPA:  Well, Your Honor, I think, in terms of

 4   the motion that's currently before you -- the TRO and PI

 5   motion -- I think that's probably largely true; I am

 6   processing this information.  I did have a chance to speak

 7   with our clients.

 8             And the only issue -- and maybe it's just a

 9   question of clarification for the Government -- is that

10   there is a 2020 grant application that's been signed and

11   executed.  And so we are unsure whether the lifting of the

12   freeze applies to that; and that's the most important thing

13   from our clients' perspective because it's the operational

14   funds for this year.

15             So, I mean, if the Government can clarify for us

16   that that grant is going to be active and will not be

17   frozen, then I think we are not pressing the claim regarding

18   the freeze for purposes of this motion; that's right.

19             THE COURT:  Okay.  Well, I think that's a pretty

20   straightforward question.

21             Mr. Ehrlich, can you respond to that?

22             MR. EHRLICH:  Your Honor, I believe that that's

23   correct; the signed and executed version would be operative

24   and, therefore, the email that was sent out today would

25   apply to that.
```

1          THE COURT:  Okay.  Well, it seemed a fairly

2     straightforward, complete -- any freeze in effect is gone;

3     so I would expect that that would be the answer.

4          So, Mr. Gupta, I think that gives you the

5     assurance that --

6          MR. GUTPA:  Yes.

7          THE COURT:  -- you need.

8          Okay.  So now let's turn to what is and remains at

9     issue.  But before I do that, let me begin by asking you,

10    Mr. Gupta, about the two declarations that were also

11    recently -- within the last hour or so -- submitted --

12         MR. GUTPA:  Yes.

13         THE COURT:  -- from the general counsel and the

14    president of Open Technology Fund.  And I just want to make

15    sure I am not missing anything.

16         So could you explain what the specific point of

17    those two declarations is?  I mean, are they supposed to

18    bolster the irreparable harm showing -- for the TRO and PI,

19    or for some other reason that eludes me?

20         MR. GUTPA:  Well, basically, we anticipated that

21    the Court would have questions about what the status quo is

22    on the ground, so just who is running things, who are we

23    reporting to, who is our client.  So we were trying to

24    provide the Court with just information about who is running

25    the organization, who the general counsel is reporting to.

1          It also has the 2020 grant which we anticipated

2     might have been a problem which now I think that has been

3     clarified.  And it also indicates some squabbling about the

4     board.  So there was a board meeting that had been

5     rescheduled by Mr. Pack, and then an emergency board meeting

6     was held.  So I don't think it's central, but we just wanted

7     to update the Court.

8          And in the spirit of updating the Court, one other

9     thing that I just want to make sure I mention is that I

10    learned this morning that Radio Free Europe's board has

11    authorized it to join as a plaintiff.  Now, obviously, I am

12    not amending the complaint from the podium; I would need to

13    file something.  But I just want to mention that because it

14    will be joining in the requested relief.

15          THE COURT:  Okay.  Well, you know, putting aside

16    the merits of the arguments either way, this fairly abrupt

17    transition of replacing entire boards -- perhaps because

18    Mr. Pack is a brand new CEO -- is, for want of a better

19    word, clumsy, and not providing clarity to everybody as to

20    what precisely is going on.

21          So let me start with the Open Technology Fund,

22    which I am just calling "OTF."  You sometimes call it "the

23    Fund," but, if you don't mind, I am just going to call it

24    "OTF."

25          MR. GUTPA:  That's fine.

 1            THE COURT:  OTF, in your moving papers, has made

 2    it clear that it views itself at least as being in a

 3    different position than the broadcasters like Radio Free

 4    Europe or Radio Free Asia or Middle East Broadcasting

 5    Networks.  And, as I understand it, that's because OTF is

 6    not expressly mentioned anywhere in Section 6209(d), which

 7    is the provision -- main provision at issue here -- that

 8    grants the CEO of the agency, USAGM, the authority to remove

 9    and replace officers and directors.

10            So, as I have reviewed the defendant's papers, the

11    defendant takes the position that that's neither here nor

12    there, the fact that OTF isn't expressly established or even

13    referenced in the IBA.  But it nonetheless falls under

14    Section 6209(d) because this is an entity or an organization

15    authorized under this chapter -- that key phrase.  And the

16    defendant emphasizes the "authorized under this chapter" --

17    and particularly the word "under" rather than the use of the

18    word "in" as evidence that OTF, whether it's mentioned or

19    not, is covered and the CEO has authority to remove and

20    replace officers in its board.

21            So how do you respond to that statutory

22    construction argument?

23            MR. GUTPA:  So I think Your Honor has

24    characterized the argument exactly correctly.

25            So the relevant question is that when we look at

1    the statute, we need to ask ourselves:  What is an

2    organization that is authorized under this chapter?

3            And I think the critical distinction between our

4    position and the Government's is that we don't think that

5    this statute means merely that funding to the organization

6    was authorized.  We think it means that the entity itself

7    and its establishment needs to be authorized by the statute;

8    and it's easy to see why, because the Government makes

9    grants to all sorts of organizations.  But the mere ability

10   to provide grants does not include the ability to remove the

11   officers.

12           So this is an unusual provision; and it requires

13   us to ask, What does it mean to be an entity, an

14   organization, that is authorized under this chapter?

15           And for all of the other organizations -- the

16   organizations that are specifically listed, as well as an

17   organization like Radio Free Afghanistan, which was created

18   after this, that, in our view, has the requisite

19   authorization.  What you have there and what you lack here

20   is an indication from Congress that it is authorizing the

21   establishment of the entities.

22           So I will point you to the Radio Free Afghanistan

23   statute because I think it's very helpful.  It's Public Law

24   No. 107148, and that was enacted in 2020.  And it says, It's

25   an act to authorize the establishment of Radio Free

1    Afghanistan; and it uses that term.  That the authority --

2    sorry --

3              THE COURT:  Mr. Gupta.  Mr. Gupta, I am losing

4    you.  Could you slow down?

5              MR. GUTPA:  Sure.

6              THE COURT:  And speak more clearly?

7              I can't hear you very clearly when you are saying

8    that.  If you could back up.  I was missing what you were

9    saying.  If I was missing what you were saying, I fear that

10   my court reporter was also missing what you were saying.

11             MR. GUTPA:  I was going way too fast.

12             THE COURT:  Yes.

13             MR. GUTPA:  Okay.  So I think I was speaking

14   slowly and carefully when I talked about what the statute

15   said; it's an organization that's authorized.  We're asking

16   ourselves, What does that mean?

17             I think what you see in the Government's papers

18   they filed this morning is they're effectively equating

19   authorization with authorization for funding.  They would

20   like you to read into the statute the word "funding," where

21   funding is authorized.  But there are all sorts of entities

22   that the Government funds that don't meet this description.

23   For example --

24             THE COURT:  Well, let's not talk about all of the

25   organizations that the Government at large might fund.

```
1        Let's focus only on organizations funded by the USGM -- is

2        that what's -- GM --

3               MR. GUTPA:  Yes.

4               THE COURT:  -- USGM (sic).

5               MR. GUTPA:  Yes.  So what I think the statute is

6        saying is if you -- if we list you here in this provision,

7        obviously the provision applies, right; so there are certain

8        named entities.

9               Now we're trying to figure out what is this

10       additional language doing there, right?  Any other -- any

11       organization that is authorized.  And I think the most

12       straightforward understanding of it is when Congress takes

13       steps to authorize the creation of an entity, then it will

14       be regarded -- and does so under this chapter, it will be

15       regarded as an entity authorized under this chapter; so

16       Radio Free Afghanistan is an example.

17              The problem for the Government's argument is that

18       there is no such authorization for Open Technology Fund;

19       this is just the District of Columbia --

20              THE COURT:  But doesn't the defendant also

21       specifically point to Section 6209(a)(1)?

22              And if you look at 6209(a)(1), it does give the

23       CEO the authority to -- (a)(1), right -- it gives the CEO --

24       am I looking at the right one?  Let's see.

25              It gives the CEO authority to consolidate
```

```
1    grantees --

2              MR. GUTPA:  Yes.

3              THE COURT:  -- into a single consolidated private

4    nonprofit corporation.

5              MR. GUTPA:  Yes.

6              THE COURT:  And the CEO can select any name for

7    such a consolidated grantee.  And doesn't the CEO also have

8    the authority to incorporate other grantees --

9              MR. GUTPA:  Well, even if the CEO --

10             THE COURT:  -- if not in 69 -- 6209(a)(1), but in

11   other provisions?

12             MR. GUTPA:  We don't -- sorry.

13             THE COURT:  -- and in that case, couldn't

14   "authorized under this chapter" actually be broader than

15   ones that are either established or expressly referenced to

16   also include the ones that the CEO has decided to

17   incorporate as a new grantee because -- I mean, it sometimes

18   takes a while for Congress to catch up --

19             MR. GUTPA:  Right.

20             THE COURT:  -- with agencies and what they're

21   doing; and that language was -- "authorized under this

22   chapter" was intended to cover the other entities that the

23   CEO might have incorporated.

24             So, I think, if I'm understanding the defendant's

25   argument correctly, that was the intent of that
```

1    "authorized under this chapter" language; and that's not an

2    unreasonable understanding of what it means.

3                MR. GUTPA:  So --

4                THE COURT:  So why would that be incorrect?

5                MR. GUTPA:  A couple of responses, Your Honor.

6                First, even granting that the CEO may have the

7    authority to create some entity, that's not what happened

8    here.  This is not an entity created by the CFO (sic).  It's

9    an independent, private, nonprofit organization chartered

10   under D.C. law.  If it wanted to stop getting money from the

11   Government tomorrow and get another benefactor as, in fact,

12   it has been contemplating in recent days, it has the ability

13   to do that; nothing in the law, nothing in the statute

14   precludes that.  So it is not an entity created by the CEO.

15   And moreover --

16                THE COURT:  But can I just stop you there for a

17   second.  Because I actually looked at OTF's website that was

18   brought to the Court's attention by the defendant's citation

19   to it, at ECF 7, page 7, at note 6 --

20                MR. GUTPA:  Right.

21                THE COURT:  -- and that website says:  In 2019,

22   the USAGM, the agency, with the help of Congress --

23                MR. GUTPA:  Yes.

24                THE COURT:  -- created a new reinstructed OTF

25   making OTF an independent Internet freedom nonprofit

1    organization.

2         So is it correct that the agency incorporated OTF

3    or certainly had a hand in incorporating OTF?

4         MR. GUTPA:  Yes, it supported -- at the time

5    nobody was disagreeing.  So it supported the decision it was

6    funding all of these entities.  But, as a legal matter, this

7    is a private, independent nonprofit organization; and it

8    can, tomorrow, get funding from someone else.

9         Moreover, what the statute is asking is what did

10   the statute establish or authorize, not what the --

11        THE COURT:  And if OTF -- excuse me, Mr. Gupta.

12        If OTF got funding from some entity other than

13   USAGM, would that be in violation of any of the grant terms

14   that OTF has with the USAGM, with the agency?

15        MR. GUTPA:  Yes.  Yes.  The current grant which --

16   right now -- the 2020 grant that we were concerned about,

17   one of the concerns we had is that we had to make a

18   decision; either take that grant and be certain that we'll

19   get the operating funds for 2020 or have clarity that that

20   grant is not forthcoming, and then there will be private

21   funds; but the grant doesn't allow us to do both.

22        Because -- you are correct.  There is a provision

23   of the grant that says, if you are going to take this money,

24   you can't be funded by anyone else; but that's a matter of

25   private ordering, Your Honor.  That's a matter of the

1    agreement between the private entity and with the U.S.

2    Government; it's not a matter of statutory positive law.

3           And so I think what the statute is doing is it's

4    asking did Congress -- not the CEO, but did Congress

5    authorize the establishment of this entity.  And that makes

6    sense because, when Congress creates an entity, it's a

7    federally created entity; then you can have the unusual

8    circumstance where its board members or officers are in some

9    ways answerable to or replaceable by the federal government,

10   but that didn't happen here.

11          And, in fact, there is proposed legislation that

12   mirrors what happened with Radio Free Afghanistan that, if

13   passed, would provide that authorization; but it hasn't been

14   passed.  And I think that's an indication that Congress

15   understands that that kind of authorization would be

16   required for this to be considered an organization that's

17   established under this law and not simply an organization

18   that is receiving funds from USAGM.

19          THE COURT:  So you believe -- you're positing that

20   the reason for this pending legislation to authorize OTF is

21   to fill this gap, so to speak, and make it clear that OTF is

22   authorized under this chapter --

23          MR. GUTPA:  Yes.

24          THE COURT:  -- but otherwise there would be no

25   reason for that legislation?

1           MR. GUTPA:  Correct, because there is an important

2      distinction between congressionally chartered corporations,

3      like Amtrak or something, where there is some federal

4      control; although, of course, it's still subject to the

5      independence requirements which I hope we will get to.

6           But this is not a congressionally chartered

7      corporation.  Congress has not yet, with the exception of

8      proposing legislation, done anything to charter this

9      corporation or to establish it; and so that statutory

10     provision, in our view, is not triggered yet.  And it's not

11     surplusage either under our reading because we know that

12     what it contemplates is newly-created entities not like

13     Radio Free Europe, but like Radio Free Afghanistan that,

14     when they are created, meet the requisite establishment

15     language from Congress for this provision to apply.

16          THE COURT:  Okay.  So, Mr. Gupta, let's say I

17     agree with the plaintiffs that OTF is not included, it's not

18     expressly covered by the text of Section 6209(d).  But you

19     would have to agree that that wouldn't end my analysis here

20     as to the merits of whether or not the CEO exceeded his

21     authority by -- to use your words -- decapitating the board

22     and the officers of the OTF because I then just have to look

23     at OTF's by-laws; isn't that right?

24          MR. GUTPA:  Well, I think if the by-laws said

25     anything contrary we would be in trouble; but the by-laws

```
 1   don't say anything contrary --

 2          THE COURT:  Well, let me -- I want to slow down on

 3   that one --

 4          MR. GUTPA:  Okay.

 5          THE COURT:  -- because clearly your briefing says

 6   that the OTF's by-laws authorize the removal and election of

 7   officers and directors, certainly by the OTF's board of

 8   directors.  But the by-laws go on and say that, Officers and

 9   directors shall be appointed and removed pursuant to and in

10   compliance with the provisions of the International

11   Broadcasting Act --

12          MR. GUTPA:  Yes.

13          THE COURT:  -- as it may be amended from time to

14   time and as may be authorized by the IBA.

15          MR. GUTPA:  Right.  Correct.

16          THE COURT:  So what you are -- as I understand

17   your argument, sure, by-laws reference the IBA; but those

18   references to the IBA, with respect to appointment and

19   removal of officers and directors, are essentially empty

20   words because -- since the IBA gives no authority to the CEO

21   to appoint or remove officers and directors, and the by-laws

22   don't either.  Is that essentially your argument?

23          MR. GUTPA:  Well, I think it's a little better for

24   us than that, Your Honor.

25          I don't think they're empty words because there
```

1     are other provisions of the International Broadcasting Act

2     that may come into play for grantees.  And I realize --

3               Am I -- are you still hearing me?  Because the

4     video is frozen --

5               THE COURT:  Yes.

6               MR. GUTPA:  Okay.

7               THE COURT:  I can hear you fine, and you are not

8     frozen for me.

9               MR. GUTPA:  That's good.  Okay.  Thank you.

10              So there are -- hopefully, we can unfreeze you.

11              There are other reasons why that incorporation

12    matters because, for example, to ensure independence the

13    advisory boards of USAGM sign off on board members to ensure

14    that they're maintaining professional journalistic

15    standards, or maintaining -- they're suitable for

16    maintaining the independence of the organization.  So there

17    are other reasons to incorporate the statute with respect to

18    the officers and board members of the entity besides

19    6209(d).

20              And I will just say, if you look at the -- if you

21    compare our by-laws to the by-laws of the organizations that

22    are subject to 6209(d), their incorporation by reference is

23    very different.  They are not uniformly -- they are not

24    exactly the same, but they incorporate 6209(d).  And there

25    is a recognition that because those are congressionally

```
 1    established corporations their by-laws are different and the

 2    legal authorities are different.  So it's not surplusage.

 3    It's not just empty words.

 4           But what it doesn't have is any specific reference

 5    to 6209(d); so it can't do the work that the statute fails

 6    to perform for the Government.

 7           THE COURT:  Could you just tell me what that

 8    reference is supposed to mean then?

 9           MR. GUTPA:  Well, I think --

10           THE COURT:  Because the by-laws say that it

11    provides that, Officers and directors shall be appointed and

12    removed pursuant to and in compliance with the provisions of

13    the IBA --

14           MR. GUTPA:  Right.  Yes.  Exactly.

15           THE COURT:  -- as an independent -- and may be

16    authorized by the IBA.

17           MR. GUTPA:  Yes.  Let me give you a very concrete

18    example, Your Honor.

19           So somebody is appointed to that board.  They then

20    have to be signed off on pursuant to the International

21    Broadcasting Act by the advisory board that says, okay, this

22    person is a good, suitable board member; they meet the

23    journalistic professional standards, so that's one reason

24    why that language is there.  And so those appointments have

25    to be in compliance with the act, but it has nothing to do
```

1    with 6209(d).

2              THE COURT:  Okay.  So if the CEO has no authority

3    to appoint or remove any of OTF's officers and directors

4    under the by-laws or the statute, then is the only way that

5    the Government or the agency exercise any power over OTF is

6    by basically conditioning, stopping or redirecting the

7    funds -- the grant funds to OTF?

8              MR. GUTPA:  Yes.  And that is -- I mean, I will

9    concede, considerable power.  They have the power over us

10   for now while -- so as long as the United States Government

11   continues to fund anticensorship operations around the

12   world, and that's considerable power.

13             But the power to fund nonprofit organizations is

14   not the power to effect an operational takeover of them.

15   There are lots of organizations, from Planned Parenthood to

16   Amnesty International, that receive federal funds, and the

17   Government can demand things in exchange for those funds

18   appropriately; but it can't -- that does not extend to the

19   ability to take over the board of the entity.

20             THE COURT:  Okay.  Well, you used the word

21   "operational control," and that's from the D.C. Circuit's

22   case of *Ralis* or *Ralis*, however you want to pronounce it.

23   So let me turn to that a little bit now because -- you know,

24   the authority under 6209(d) to appoint -- remove and appoint

25   officers and directors at the CEO's pleasure -- words

1    straight from the statute -- seems very broad, in terms of

2    the discretion that can be exercised there by the CEO.

3                MR. GUTPA:  Right.

4                THE COURT:  And I really am -- and I appreciate

5    that the plaintiffs are concerned about the raw exercise of

6    this appointment and removal power by the CEO.  And I do

7    think that that power is a little bit different than the

8    general public has been accustomed to, I think, because for

9    so long the agency was run with a bipartisan group of nine

10   people who -- I am sure because of that -- moderated each

11   other.  But due to congressional amendments, that bipartisan

12   board of nine people gone -- they're gone.

13               MR. GUTPA:  Yes.

14               THE COURT:  We now have a single CEO with the

15   authority to select all of the boards and all of the

16   officers of the broadcasters funded by the agency; and so

17   this has empowered every administration that comes into

18   power to reconstitute the leadership of all of the

19   agency-funded organizations.

20               MR. GUTPA:  Uh-huh.

21               THE COURT:  And, you know, it might be a little

22   bit of a surprise to people who aren't aware of amendments

23   like this but who I think are part of a much bigger package

24   of legislation but, at the same time, there it is.

25               MR. GUTPA:  Yes.

1       THE COURT:  You know, the defendants make this

2    assertion that what's really going on here is that the

3    plaintiffs are really just disappointed and -- on policy

4    issues here.

5       MR. GUTPA:  Right.

6       THE COURT:  They have got a quarrel with policy,

7    and that's all that this is about.

8       MR. GUTPA:  Right.

9       THE COURT:  This is not a quarrel -- because the

10   CEO has this power.  And there is a certain -- you know, I,

11   too, have a concern that if people are concerned about a

12   single CEO who has been authorized to exercise this broad

13   power to pick people at his or her pleasure to run these

14   internationals broadcasters fully funded by the taxpayers of

15   this country is the remedy here or is the remedy in Congress

16   to rethink that because Congress -- they're there every year

17   to fix things that may have some unintended consequences --

18   which is sort of a long-winded way to get to my question

19   about -- given this uncabined authority that the CEO has,

20   what is the role I am supposed to play here?

21       MR. GUTPA:  Right.  So I want to clarify what our

22   argument is because there are -- maybe there are a lot of

23   people who are talking about this case who are concerned

24   about bipartisan balance or policy disagreements, or

25   whatever; but the legal arguments that we are making to you

1      do not depend on any of those things.  And the legal

2      arguments that we are making to you are not a quarrel with

3      what Congress did when it created a CEO and conferred

4      authority under 6209(d).  I think this is really a case

5      where the role for -- the question for the Court is:  How do

6      you harmonize the statutory understandings?

7              On the one hand, you have 6209(d); and we have no

8      quarrel with the idea that that would allow Mr. Pack to

9      select his own people, there isn't a partisan balance

10     requirement; and so we're not quarrelling with that.

11             The problem here is that what has happened is a

12     government takeover.  And so that --

13             THE COURT:  Well, you know, you have used this

14     term, Mr. Gupta.  And I know that in your papers you

15     complained that the new board is composed almost entirely --

16     it's a government takeover composed of almost entirely

17     sitting federal government officials.

18             MR. GUTPA:  Correct.

19             THE COURT:  And I read that, and I was trying to

20     figure out what is wrong with that?

21             6204(a)(21) provides -- Section 6204(a)(21)

22     provides that the CEO may condition grants or cooperative

23     agreements as appropriate on such grants or cooperative

24     agreements, including authority to name and replace the

25     board of any grantee authorized under this chapter,

 1     including with federal officials.

 2               MR. GUTPA:  Right.

 3               THE COURT:  It specifically sanctions filling

 4     boards --

 5               MR. GUTPA:  Yes, it does.

 6               THE COURT:  -- with federal officials --

 7               MR. GUTPA:  And there is --

 8               THE COURT:  -- so what difference does it make

 9     that the replacing board members selected by this CEO happen

10     to be members of the Trump administration?

11               MR. GUTPA:  No, it's not.  It is not the

12     administration that they're a part of or whether they are

13     political appointees.  It's what -- and there would be no

14     problem with having some -- seeing governmental officials on

15     the board; in fact, there were under the previous board.

16               The problem is that what has happened here is an

17     exercise of the 6209(d) authority that is in irreconcilable

18     conflict with the firewall with all of the statutory and

19     regulatory understandings that protect the independence of

20     this organization.  And what the D.C. Circuit said in *Ralis*

21     remains true of all of the independence requirements because

22     they were reaffirmed in the International Broadcasting Act.

23               THE COURT:  Well, I have to say -- I mean, I have

24     read *Ralis.*  You don't have to read parts of it to me;

25     please don't do that.  And there were parts of *Ralis* that

1    you didn't talk about in your briefing that -- you know,

2    about the -- you know, the judge -- courts being very

3    cautious about interfering in any way --

4              MR. GUTPA:  Right.

5              THE COURT:  -- with the structures and powers that

6    Congress in this arena and in this specific context have set

7    up.  And it was a different context when Judges Bork, Starr,

8    and Scalia were looking at this issue in *Ralis*; but some of

9    their cautionary remarks about cautiously trying to

10   interfere with the structure that Congress set up for these

11   international broadcasters funded by American taxpayers,

12   that's a caution that I understand.

13             But let me go back to your reconciling issue --

14             MR. GUTPA:  Sure.  Yes.

15             THE COURT:  -- because among the complaints that

16   the plaintiffs have about the replacement of board members

17   with Trump administration officials, you know, that I am

18   trying to figure out what's wrong with that even under the

19   IBA is:  One of the provisions of the IBA requires that all

20   of these international broadcasters fully funded by the

21   agency and taxpayers are required under Section 6202(a)(1),

22   6202(b)(3) --

23             MR. GUTPA:  Right.

24             THE COURT:  -- of ensuring that they reflect and

25   are consistent with U.S. policy and current U.S. policies.

1          So having, you know, government officials, and

2     based on the credentials that I have seen from the Trump

3     administration people selected to be put on these boards, a

4     lot of them are communications officials, so -- whose job it

5     is to communicate the agency's policies and U.S. -- current

6     U.S. policy; so they seem like they might be perfectly

7     appropriate to do what the standards and principles require

8     under the IBA.

9          MR. GUTPA:  Right.  And I want to be clear that

10    our argument is not about suitability of these particular

11    people.

12         Our argument is about trying to understand how do

13    we give effect to the congressional mandate for

14    independence.  At the very same time that Congress enacted

15    6209(d) it also imposed on the CEO an obligation that he

16    shall respect the independence of these entities; and the

17    latest iteration of the regulations make it unlawful to --

18         THE COURT:  Well, let me just ask you -- I mean,

19    you know, the defendants, are you saying that -- you can't

20    be saying this; but the exercise of the CEO -- by the CEO of

21    his or her authority to replace and appoint directors and

22    officers of these fully-funded broadcasters could amount to

23    a breach of the statutory firewall of independence --

24         MR. GUTPA:  Yes.

25         THE COURT:  -- and how can that be?

1            How can that be within one statute --

2            MR. GUTPA:  Right.

3            THE COURT:  -- that the CEO was given this

4    enormously broad appointment power and, at the same time,

5    you know, a statutory firewall that you say will be violated

6    if the CEO actually exercises it?

7            MR. GUTPA:  No, it's not violated.  I want to be

8    very, very clear about our argument.

9            We are not making the kind of extreme argument

10   that the Government is attributing to us.  There is nothing

11   wrong with the CEO exercising the power given to him by

12   Congress.

13           I do think Congress contemplated that these boards

14   would mostly be people like journalists and diplomats

15   because that's what they've always been and that's who have

16   run these organizations.  If you want to be consistent with

17   the firewall standards, that's how you do it.

18           The important thing here is that -- what the CEO

19   here did here was sort of the one thing that you very, very

20   clearly cannot do under the D.C. Circuit's interpretation of

21   the word "independence," which is to install not just some

22   government members but a board that is majority controlled.

23   In fact, it's all government members except for one

24   person --

25           THE COURT:  There is nothing in the -- I mean, I

1    have to -- I really want to see how you are reading that

2    into it.

3              So you are -- there is nothing expressly in this

4    statute that says that there is any limit on the numbers of

5    people --

6              MR. GUTPA:  That's right.

7              THE COURT:  -- or even the qualifications of the

8    people who can be removed or appointed.

9              But you are saying that read implicitly into the

10   statutory firewall in order to bolster the independence of

11   these organizations is some form of limit?

12             MR. GUTPA:  Yes.  So let me -- I don't --

13             THE COURT:  And where am I as a Court supposed to

14   draw the line?

15             MR. GUTPA:  Right.  So --

16             THE COURT:  Because I have to micromanage the

17   CEO's exercise of discretion in picking --

18             MR. GUTPA:  No.

19             THE COURT:  -- or choosing who to keep and who to

20   select?

21             MR. GUTPA:  Well, I think the bright line -- and

22   it's the one that comes straight from the D.C. Circuit's

23   opinion -- is that the one thing you cannot do is install a

24   board that is majority controlled by the Federal Government

25   because when you do that this is no longer an independent

1    organization.

2              And I don't want to read to you from *Ralis*

3    extensively because you have asked me not to.  But I just

4    want to parse what I think -- the way -- the statutory

5    interpretation in *Ralis* because I think it's very

6    informative here.

7              At page 1125, the Court is contrasting the

8    statutory mandate for independence -- and the words there

9    are independent and independence, the same words that have

10   been continuously reaffirmed by Congress and, then, Congress

11   reaffirmed at the same time that they passed 6209(d).  And

12   what that says is that the law expressly prevents a

13   government takeover of operational control, and that is

14   contrasted.  It says:  To the contrary, the agency's charged

15   with ensuring the continued independence.

16             So I think there -- you know, I could imagine lots

17   of marginal --

18             THE COURT:  You're -- but, Mr. Gupta, can I just

19   interrupt you again.

20             I think this is an important point in terms of the

21   line-drawing you are asking the Court to use.

22             One way to read *Ralis* is to say that -- although

23   the Court didn't really delve into it; they didn't -- they

24   thought that these broadcasting entities could not be

25   government controlled in the day-to-day operations and they

1    didn't really talk about details of how many people could be

2    on the board, and they didn't really talk about the

3    appointment -- at that time it was BIB, as opposed to the

4    CEO --

5                MR. GUTPA:  Right.

6                THE COURT:  -- they really didn't talk about the

7    control or the power that BIB had to appoint or remove

8    boards or officers; but they really focused on the

9    operational control.

10               And as I read *Ralis* -- and tell me why I am

11   wrong -- what the circuit was saying is:  You can't have BIB

12   or now the CEO saying what stories to cover; how to edit a

13   story; what reporters have to cover what stories; what

14   stories to cover or not to cover; you couldn't -- you

15   couldn't -- you can't direct them who to hire and who to

16   fire among the reporters or the employees of the

17   broadcaster, the day-to-day operational control of the

18   organization.  But you could -- the Government agency could

19   exercise control, as authorized by the statute at the

20   highest levels, in the selection of the board and of the

21   officers and could have that level which even the circuit

22   said was substantial -- that level of indirect control over

23   the operations.

24               So I thought the circuit was drawing a fairly --

25   you know, to reconcile the independence of a fully

1    government-funded broadcaster element with, also, the

2    substantial indirect control exercised by the agency by

3    drawing this line over the day-to-day operations which --

4    and if that reading of *Ralis* is correct, then the CEO's

5    removal and appointment of new -- a new board, even if

6    they're all government officials from the same

7    administration, is not the kind of indirect control over the

8    day-to-day operations that runs afoul of the statutory

9    firewall; so what is wrong with that analysis?

10             MR. GUTPA:  So I think that you are right that

11   some of the opinion talks about day-to-day operations, and

12   there are standards that apply to that.  But the offense to

13   the independence requirement here is much starker, the line

14   is much easier to draw because this is not a valid

15   day-to-day control.  This is about what the Court called in

16   *Ralis* an institutional arrangement.

17             Congress thought it was essential that these be

18   nongovernmental entities that are not controlled by the

19   government.  Remember, the ultimate question in *Ralis* was,

20   is this a government-controlled entity?

21             I have never been on a board that doesn't make --

22   doesn't have a say in decisions about, you know, hiring and

23   firing, and all sorts of things; that's what the board does.

24             So if you have a board that is, in effect,

25   specifically the federal government, you no longer have an

1    independent entity in any meaningful sense of the word; and

2    that's what *Ralis* says at the bottom of page 125, and

3    following.  It says, what Congress is concerned about and

4    what it deemed important was the institutional arrangement,

5    right, that these -- this -- nor does independence

6    explicitly preempt -- prevent a takeover.

7          And so I just think that the challenge here for

8    the Court is how do you read all of these statutory

9    understandings in concert with one another.  And I think

10    it's a basic principle of statutory interpretation that you

11    don't read one statute to make another statute effectively

12    superfluous.

13          Here you have a long-standing understanding that's

14    been interpreted by the D.C. Circuit.  Congress has

15    legislated against this backdrop; and to say that these are

16    meaningfully independent entities and yet the Government can

17    take them over without -- not only without any expressed

18    statutory authority for a takeover, but a statute that has

19    long been an understanding to prohibit precisely that.

20          THE COURT:  Just so I am totally clear, Mr. Gupta,

21    is that what you are suggesting is that for this line

22    drawing of where the exercise -- the CEO's exercise of the

23    removal and appointment power over directors and officers

24    runs afoul of the statutory firewall for independence is

25    where the CEO puts in place all members -- all government

1    officials from the same administration?

2              MR. GUTPA:  Well, what matters -- it's not what

3    administration they're from.  What matters is their majority

4    control that now rests in the federal government such that

5    it's no longer meaningfully an independent entity.  And I

6    think --

7              THE COURT:  Well, you're mincing words because

8    that's the same thing, isn't it?

9              I mean, if you are saying no, no, no, I don't mean

10   that he is putting in, you know, a majority of people from

11   the same administration.  But that is what you are saying;

12   the CEO is putting in the position of the board --

13             MR. GUTPA:  Yes.

14             THE COURT:  -- all people who are government

15   officials.

16             MR. GUTPA:  Right.

17             THE COURT:  Well, presumably, it would be current

18   government officials; that would mean the same

19   administration.  Aren't we saying the same thing?

20             MR. GUTPA:  Yes.  We basically are.

21             What I am saying -- and I just want to be really

22   clear about this.  When you install a board that is majority

23   government officials, that organization is now in the

24   control of the Government.

25             We understand this in corporate law.  There is a

1    critical distinction between installing a board that is

2    majority controlled by one entity; we call that a takeover.

3            That is -- there might be harder lines to draw,

4    but that is the easiest line to draw.  It's independent.  If

5    the word "independent" means anything, it means that a

6    government takeover is prohibited.

7            Later in *Ralis*, the Court said, as you said, some

8    of these powers are substantial, but they do not rise to the

9    level of control.  So borrowing from all sorts of bodies of

10   law that are about the way multi-member bodies work or about

11   how corporations work, we understand that that line is easy

12   to draw; there is either control or there isn't.

13           Once you cross that line, the entity has been

14   robbed of the statutory guaranteed independence; that is

15   just not a permissible exercise of the power granted by

16   6209(d).  That means one statute, for all it's worth, and at

17   the cost of all of the other statutory and regulatory

18   understanding that Congress has continuously reaffirmed.

19           THE COURT:  All right.  Well, I mean, I do think

20   that *Ralis* can be read very differently in terms of where

21   they're focusing on -- you know, they looked at the

22   corporate form for what was at issue here, Radio Free Europe

23   or Radio Liberty; they were independently -- independent

24   nonprofits, and that was important for the D.C. Circuit.

25   And then, in terms of the independence, they focused on the

1    fact that the agency itself, BIB, then didn't impose prior

2    constraint on the programming, didn't impose issues on the

3    preparation of broadcast materials, the manner in which the

4    materials were broadcast.  It really looked at -- down the

5    chain operations which was perhaps, in its own way, how the

6    D.C. Circuit drew the line to reconcile independence with

7    the authority to appoint and remove officers and board

8    members.  And that's just -- it's a different way to read

9    *Ralis*.

10          MR. GUTPA:  Well, I don't think our argument only

11   relies on the reading of *Ralis*.  But I think what we're

12   asking -- I think what has happened here is a greater

13   offense to the independence because, as the D.C. Circuit

14   recognized, what matters here is the institutional

15   arrangements.  There are a variety of contexts in which

16   Congress uses the term "independent" to describe independent

17   entities.  For example, there are independent agencies.  I

18   don't think anyone would say that if there were an agency

19   where the president could install people that report to the

20   president directly that that's an independent agency, or if

21   there is -- one corporation installs the board, majority

22   board, of another corporation, we would no longer say that

23   corporation is independent from that corporation.  So

24   "independent" has to mean something.

25          And I think, you know, what is continuously

1    reaffirmed -- not just in the case law like *Ralis*, but every

2    time Congress deals with this statute, is that they are very

3    serious about these institutional arrangements of

4    independence.

5           What has happened here leaves nothing of that

6    independence.  It is not a permissible way of exercising the

7    authority.  If what had happened here was the board had been

8    replaced with a bunch of people that were favorable in

9    policy and ideological grounds to the CEO, this would be a

10   completely different case and we would not have an argument.

11   But that's not what happened here.

12          What happened here is precisely the kind of

13   takeover -- and, you know, day-to-day control follows from

14   board control.  Board control is much more important for

15   structural independence than day-to-day control.  Right.

16          We understand when someone is making a grant; they

17   have substantial power to set the requirements of that

18   grant.  And it's pretty coercive; if they tell you to do

19   something, you are going to do it.  But Congress also wanted

20   these to be state chartered corporations with independent

21   boards governed by state law and not by federal law.

22          THE COURT:  All right.  So let's turn to the

23   firewall regulations that were, I guess, published after the

24   current CEO had already been sworn in; and that final rule

25   suggests a standard as to how to measure whether the CEO of

1    the agency --

2              MR. GUTPA:  Right.

3              THE COURT:  -- has breached the statutory firewall

4    and says, The firewall does not prevent the USAGM CEO or

5    board from undertaking the same type of direction and

6    oversight than those in equivalent leadership positions at

7    an organization overseeing other reputable news

8    organizations may provide in a manner consistent with the

9    highest standards of professional journalism.

10             MR. GUTPA:  Right.

11             THE COURT:  So how am I supposed to use that

12   standard here because I don't have anything in the record

13   about whether this type of action would be considered

14   permissible outside of the Government context?

15             MR. GUTPA:  Right.

16             THE COURT:  So you put forward these firewall

17   regulations, so how precisely am I supposed to use those

18   regulations resolving this?

19             MR. GUTPA:  Well, I think -- the provision that

20   you just read is not a provision that we are relying on;

21   it's not inconsistent with what we're saying.  It's just --

22   I want to be really clear that we're not saying that it's

23   just journalistic standard in some sense that has been

24   violated.

25             What has been violated is the requirement for

1    structural independence.  We're relying principally on the

2    statute, not on the regulations.  But I do think the

3    regulations emphasize how serious of a requirement this is

4    because you have this unusual provision that says that any

5    person within the executive branch may not interfere with

6    the independence of the entities, including leadership,

7    officers, employees, or staff.  Again, I think that has to

8    be read in concert to harmonize with 6209(d).

9            Then you also have the grant provision which binds

10   both entities and incorporates the statutory and regulatory

11   understandings about independence.  And that says that no

12   U.S. Government official -- and that includes the CEO of the

13   agency -- may interfere in a way -- in a manner that is not

14   consistent -- not just with the higher standards of

15   broadcast journalism, but they may not take any action that

16   tends to undermine the independence of the agency.

17           And again --

18           THE COURT:  Well, let me just -- I mean, I have

19   seen that sentence.  And I saw in your briefing you pointed

20   that particular sentence out.  But the sentence that

21   immediately follows that provision explains how violations

22   of that provision are to be remedied.

23           And it goes on -- that same paragraph goes on to

24   say:  In the event that the nonfederal entity reasonably

25   believes that a breach of this article has occurred, then

1    the nonfederal agency -- entity shall report the breach to

2    the chairperson of the USAGM.

3            MR. GUTPA:  Yes.

4            THE COURT:  So it provided, as in the grant

5    agreements, as the sole remedy available for violations of

6    this portion of the agreement reporting to the chairperson

7    of USAGM.

8            MR. GUTPA:  I was with you until the last sentence

9    because I think you are right that there is a reporting

10   provision there.  It doesn't make any sense when the CEO is

11   the person who has breached independence to avail oneself of

12   that process.

13           But I think what was being contemplated here was

14   if anyone -- because independence of a firewall is so

15   essential to the whole operation of all of these entities,

16   if anyone is breaching that firewall the CEO should know

17   about it.  That does not undercut the obligation for the CEO

18   himself to follow the norm of independence.  It is not

19   saying that this is not an enforceable provision in any

20   other way.  So I don't think that that can be read as either

21   an exhaustion requirement or an exclusive remedy provision;

22   it doesn't say that.  And, furthermore, it's just

23   reaffirming, you know, this constellation of statute

24   regulation and contract that has always stood for the

25   principle that you can't have a government takeover; you

1    have got to have independent -- operational independence and

2    structural independence; and that's why these entities are

3    structured not as part of the Government but as outside

4    corporations with independent boards.

5          The Open Technology Fund -- if we do not get the

6    injunctive relief that we are asking for here, if the

7    Government has its way, will no longer be an independent

8    entity; it will be an entity that's taken over by the

9    federal government in direct violation of this long-standing

10   understanding about the structural independence of these

11   organizations.

12         THE COURT:  Okay.  So let me -- let me just turn

13   to some of the defendant's merits arguments that I want to

14   hear your responses to.

15         MR. GUTPA:  Sure.

16         THE COURT:  First, the defendant claims that the

17   CEO's removal determinations and grant reprogramming -- but

18   grant reprogramming is off the table now -- but the removal

19   determinations are unreviewable because they're committed to

20   the agency discretion by law.

21         MR. GUTPA:  Right.

22         THE COURT:  And it is a very broad -- you know, a

23   very broad discretion and authority that's granted to the CEO.

24         MR. GUTPA:  Right.

25         THE COURT:  What makes -- what's wrong with the

1  defendant's argument that it's just unreviewable because the

2  discretion is so broad?

3          MR. GUTPA:  So the exception for agency action

4  that's unreviewable because it's committed to agency

5  discretion -- obviously, it's an extraordinary exception.

6          What the Supreme Court has always said about that

7  is, well, what you are basically asking the Court is, Is

8  there any law to apply?

9          If something that is being balanced is suddenly

10 discretionary and there is no legal standards, then it's

11 committed to agency discretion.  So if we were here and we

12 were just saying, We don't like the person he chose; we

13 don't think, you know, he chose the right kind of person, we

14 would have no case.

15         But the legally enforceable standard that we're

16 asking you to apply is the concept of independence.  You

17 know how to draw -- we know how to draw that line because

18 the D.C. Circuit drew it when it said you can't have a

19 takeover; you can have substantial power, but it can't rise

20 to the level of control.

21         And so what we're saying is there is a statutory

22 obligation, it's not discretionary -- independent.  It says

23 "shall"; that the CEO shall respect the independence of

24 these entities, so that's a mandatory obligation.  It has

25 judicially enforceable content that has, in fact, been

1    interpreted in a D.C. Circuit decision; and all we're saying

2    is that that law should be applied.  So that the Government

3    has not met its burden of showing that this is an area of

4    discretion, like enforcement discretion, for example, where

5    there is no law to apply.

6          And the Supreme Court has said, well, courts are

7    very careful about making a conclusion that there is no law

8    to apply because it's essentially saying that there can

9    never be challenges to anything of this sort.  And I

10    think -- the problem with the Government's argument is that

11    if -- it's focusing only on 6209(d).

12          We're not saying that the CEO has violated that

13    provision; that's not the law we're asking the Court to

14    apply.  The law we're asking the Court to apply is the

15    understanding of -- statutory understanding of independence

16    as it's been interpreted by the D.C. Circuit.

17          THE COURT:  Okay.  Let's turn to irreparable

18    injury.  The individual plaintiffs are claiming that they're

19    going to suffer irreparable injury from the loss of their

20    board seats.  How do you get around *Sampson v Murray*,

21    Supreme Court case, that basically said loss of employment

22    does not constitute irreparable harm?

23          MR. GUTPA:  So *Sampson v Murray* I think is

24    completely inapplicable here.  That's a case about

25    government employment.  It's cited all the time in

1       government employment cases; that's not what this is.

2              This is a case -- this is more like a corporate

3       takeover case with questions, Who gets to control the board?

4       Are these board members going to be able to exercise their

5       control over this organization that they regard themselves

6       as having lawful control over?  And right now, that's the

7       status quo; they are the controlling organization.

8              The only reason I have authority to be here is

9       because I have authority from the board and its general

10      counsel to be here.  And so the question is, Are they going

11      to be yanked out and lose the power to control the

12      organization?

13             And it's commonplace in cases where it's about

14      majority shareholder status or board status.  This usually

15      happens in battles between for-profit corporations, usually

16      not between nonprofits and the Government, but it's the same

17      principle which is we're asserting the legal right to

18      control or to keep the ability to control the organization.

19      And that's irreparable injury because I can't imagine what

20      remedy you can fashion a year from now -- if the Court were

21      to finally conclude that we were right -- you know, all the

22      decisions that have been made over this period of time that

23      they were unable to exercise their control over.  There is

24      no way to fashion a remedy for that, there are no damages

25      for that; and that's why the courts have said this is

1      irreparable harm, when majority shareholders or board

2      members are denied their ability to control an

3      organization -- of a government organization.

4              THE COURT:  So it's not the kind of irreparable

5      harm about loss of income, or anything like that, because --

6      are these board members all unpaid, volunteers essentially?

7              MR. GUTPA:  Correct.  They are not paid.  They are

8      not asking for any money.  They won't ask for any money

9      later.  Money cannot solve the problem.

10             This is just about who gets to run these

11     organizations.  And they believe in the principles of this

12     organization --

13             THE COURT:  So how long -- let's just look at the

14     practical situation, as you said if they're yanked out.

15             MR. GUTPA:  Yes.

16             THE COURT:  So that means, basically, the

17     plaintiffs think that before they leave -- before the ends

18     of their normal terms as board members, the CEO -- they get

19     to engage in some kind of negotiation with the CEO about who

20     he gets to -- who is going to replace them, and if he

21     selects the people who are not members of the Trump

22     administration -- like if he selected Steve Bannon, for

23     example, who all the papers -- the plaintiffs' papers say is

24     a good friend who is not a friend of the Trump

25     administration, or other people who have left the

1   administration that --

2            MR. GUTPA:  Right.

3            THE COURT:  -- then the plaintiffs would not feel

4   that they were being yanked out of their positions, but they

5   would go quietly.

6            MR. GUTPA:  It's much more than that, Your Honor.

7            So OTF is facing a very serious question.  You

8   know, one question is, is it going to continue to be funded

9   by the federal government?

10           As I said earlier, there is no legal statutory

11  requirement that it be funded by the federal government.

12  And there are a lot of people that support its very

13  important anticensorship operations around the word.  The

14  board could decide -- and, in fact, the board was

15  contemplating -- especially until the freeze listings of

16  this morning, you know, just going somewhere else.  And

17  6209(d) does not apply to Open Technology Fund, so they

18  don't have that issue.

19           With respect to the other organizations, I think

20  you're right; that one thing that can happen is a

21  negotiation.  But another thing that can happen is while

22  they have the ability to control this organization, which

23  may go until November or whatever, they can ensure that it's

24  faithful to its principles as an organization and that it is

25  independent and is not becoming a mouthpiece for the

1   Government, which is -- the whole reason why we have the

2   independence requirements is to try to ensure that what is

3   coming out of these organizations is news and is not -- and

4   not perceived as and not, in reality, government propaganda;

5   so they have that ability.  And it's not that different from

6   an asserted right of somebody in any other sort of garden

7   variety corporate takeover case.

8          It's true that there may be some political

9   considerations that wouldn't contain anything like that; but

10  the irreparable harm -- the specious of irreparable harm is

11  the same.

12         THE COURT:  All right.  Mr. Gupta, is there

13  anything further that you want to talk to me about before I

14  turn to the defendant?

15         MR. GUTPA:  I guess the only housekeeping thing I

16  would say is because I just learned this morning about the

17  Radio Free Europe board vote -- if the Court has a

18  preference about how we would do this, I was thinking we

19  would just amend.  But I did want to make sure that the

20  court understood that Radio Free Europe would be joining in

21  the motion.

22         THE COURT:  Okay.  Well, I think you should

23  probably make your appropriate motion promptly.  Confer with

24  defense counsel.  I can't imagine that they would have any

25  objection.  And you can do that.

1              I am not planning on issuing a decision today, so

2     you have time to do that; but I would say no later than

3     Monday.

4              MR. GUTPA:  Okay.  Yes.  Thank you.

5              THE COURT:  Can I turn now to Mr. Ehrlich?

6              MR. EHRLICH:  Yes, Your Honor.

7              THE COURT:  Good.  I can hear you, but I cannot

8     see you.

9              MR. EHRLICH:  Okay.

10             THE COURT:  So, Mr. Gupta, you are still on my

11    screen just so you know.

12             (Whereupon, the Court and staff confer.)

13             THE COURT:  Yes.  All right.  So I am going to be

14    looking at Mr. Gupta but I want to hear from Mr. Ehrlich.

15             MR. EHRLICH:  Sorry about that, Your Honor.

16             THE COURT:  That's all right.

17             So let's turn to the issue that I think Mr. Gupta

18    actually raised which is -- you know, is it the defendant's

19    position that any entity that receives government funds from

20    the agency, from USAGM, automatically is subject to the

21    CEO's removal and replacement authority in Section 6209(d)

22    based on its construction of the language in that provision?

23             MR. EHRLICH:  So I don't think we have to go that

24    far, Your Honor.  I would say that if the CEO is exercising

25    his grant-making authority under 6204(a)(5), I think that is

1   enough to bring a grantee into the provisions for 6209(b).

2   And, you know, something that we didn't emphasize in our

3   briefing, Your Honor, that I would point you to is that the

4   title of 6209(d) is "Leadership of Grantee Organizations."

5            Mr. Gupta put a lot of emphasis on -- he used the

6   word "chartered," and these things aren't incorporated by

7   Congress.  Well, as we point out, no organization is

8   incorporated by Congress.  All of the provisions are merely

9   implementations of the CEO's authority to hand out grants,

10  which is in 6204(a)(5); and that is specifically referenced

11  in those statutes, for example, the Radio Free Europe and

12  the Radio Free Asia statutes specifically reference that

13  grant-making power.

14           I think we're in a weird area here because I

15  don't -- there is no way that -- there is no organization

16  that is authorized, in the words of 6209(d) "authorized

17  under this chapter"; that simply can't be the case.

18           And as Mr. Gupta points out, all of the

19  organizations are chartered under state law.  So Congress is

20  not authorizing in the sense of giving legal authority to

21  any organization.  And once we're outside of that realm,

22  it's looking at the context; it's looking at all of these

23  things that we point out in our briefing, for example, the

24  word "under" instead of "in" we have to title.

25           And something else that I would emphasize, Your

1    Honor, is as we pointed out and as you referenced from the

2    OTF website, OTF was part of Radio Free Asia when 6209(d)

3    was enacted.  It's perfectly reasonable for Congress to

4    expect that OTF falls within that provision under the

5    authority granted to the CEO to hand out grants.

6          So I think that's an important point.  No

7    organization -- this is, of course, all setting aside that

8    we don't believe that there is any private right of action

9    or cause of action or International Broadcasting Act claims

10   here.  But setting that aside, no organization is chartered,

11   in Mr. Gupta's word, and so you are in this realm where

12   you're looking at the context.

13         As we point out, it would be largely useless,

14   Congress can always amend that specific entity into 6209(d).

15   So it has to be getting at something that Congress has not

16   anticipated, and that would fall under the grant-making

17   authority we have here, Your Honor.

18         THE COURT:  All right.

19         MR. EHRLICH:  If that makes sense.

20         THE COURT:  Okay.  So the plaintiffs rely heavily

21   on the provision of the grant provisions that state that no

22   U.S. Government official, including the CEO, may take any

23   action that may tend to undermine the journalistic

24   credibility or independence of USAGM or its broadcasters;

25   that is also very broad language, "may tend to undermine the

1    journalistic credibility."

2            So would the defendant concede that replacing all

3    of the boards and the officers of these international

4    broadcasters, even though they're fully funded by the

5    American taxpayer, with current administration officials

6    could be perceived as undermining the journalistic

7    credibility of the broadcasters themselves?

8            MR. EHRLICH:  I would absolutely not concede that,

9    Your Honor.  And the way you know that is because there is

10   no allegations -- the board members were installed nine days

11   ago; they haven't taken any action.  And there are no

12   allegations in the complaint about anything that the board

13   members have done; and they can't make those allegations, of

14   course, that would endanger the journalistic integrity of

15   the organization.  It's just simply not possible at this

16   point.

17           And there is nothing wrong, as Your Honor pointed

18   out, with appointing government officials; that is in

19   6204(a)(21).  And the idea that Mr. Gupta advanced -- which

20   is now, sort of, conjured from thin air that, oh, it has to

21   be a majority governmental official board in order to

22   violate this; that is nowhere in the statute which Congress

23   could have easily said and did not.

24           They appointed the CEO to appoint officers and

25   directors in his discretion at his pleasure.  I think Your

1      Honor had it exactly right when you said that the remedy for

2      this is in Congress, and that the CEO -- excuse me, Your

3      Honor -- the CEO had full authority in this area to appoint

4      whom he wishes.  And there is no allegations about the

5      people he appointed, as Your Honor pointed out, taking over

6      the day-to-day operations of OTF dictating what would be

7      broadcast, and doing those sorts of things.

8              As we point out in our briefing, Your Honor, there

9      is nothing wrong with having governmental officials.  And as

10     you recognized, Your Honor, that part of the statute

11     commands the views of the United States are presented.  So

12     there is -- the CEO does not --

13             THE COURT:  Well, let me just -- let me just be

14     clear that my personal views on whether there should be

15     government officials on the boards of these international

16     broadcasters and whether or not that undermines their

17     journalistic independence is different from what the statute

18     is; and on that I very much, as a personal matter, share

19     Mr. Gupta's views.  But I am not here to impose my personal

20     views about what is best for journalistic independence of

21     international broadcasters fully funded by American

22     taxpayers to be listened to, to have, you know, the broadest

23     listening audience possible, to be the most persuasive voice

24     that listeners could listen to; so I don't want you to say

25     that I have said that there is nothing wrong with it.

```
 1              I think there is nothing in the statute that bars
 2      it --
 3              MR. EHRLICH:  Understood, Your Honor.
 4              THE COURT:  -- so I just want to be absolutely
 5      clear about that.
 6              MR. EHRLICH:  Understood, Your Honor.
 7              THE COURT:  Okay.  So let me just talk about this
 8      firewall regulation which is basically brand new, and the
 9      plaintiffs claim that this firewall final rule has the force
10      of law.  Based on my review of the defendant's briefing, you
11      don't really deal very much with this firewall regulation or
12      final rule.
13              Do you agree that it has the force of law?  And is
14      there anything about that regulation that you think was
15      violated by the CEO's action in removing and replacing
16      directors at these international broadcasters?
17              MR. EHRLICH:  So to answer your first question,
18      Your Honor, I would say it has the force of law insofar as
19      it does not -- it clearly does not override the specifics of
20      the statute which gives the CEO the power to appoint the
21      officers and directors; so the amorphous standards of the
22      regulation certainly have some weight.
23              To answer your second question, they were
24      absolutely not violated here.  As I said, the board was just
25      installed.  And as Your Honor pointed out, if the
```

1      organization feels that there is some interference with the

2      day-to-day operation, the federal regulations gives them an

3      opportunity to redress that; and it is in the provision that

4      Your Honor quoted.

5              As far as the statute, the CEO did exactly what he

6      is allowed to do under the statute, and there are no

7      allegations -- obviously, plaintiffs can't make those

8      allegations -- that the board is doing anything that would

9      violate this new regulation, even if that somehow has some

10     effect here.

11             THE COURT:  Okay.  So what would be the

12     defendant's view on the appropriate line drawing here

13     between the CEO's removal and appointment power and the

14     statutory firewall requiring no interference with

15     journalistic independence of these broadcasters?

16             We have Mr. Gupta's clear view that you cannot

17     hack the boards and officers with current government

18     officials, certainly not a majority of the board and

19     officers as government officials.

20             What's the defendant's view on that?

21             Where -- what's the line?

22             MR. EHRLICH:  I think I would say exactly what you

23     said, Your Honor, which is you can't have -- what these

24     provisions are getting at is day-to-day control over the

25     type of decisions that the organization is in place to do.

1          So what to broadcast, who to broadcast to, and

2    those type of things I think is what these provisions, these

3    quote/unquote firewall provisions, are all sort of getting

4    at.  In terms of appointing people, there is no line to draw

5    there.  And the statute is crystal clear, of course assuming

6    that the CEO has authority to appoint them; that he does it

7    at his pleasure, and there is no line to draw.  It does not

8    matter if there are federal officials or not federal

9    officials; and there is no allegation that the federal

10   officials would subvert journalistic integrity or anything

11   close to that.

12          Again, we're nine days in and there is no possible

13   way they could know that yet; so that's what I would say,

14   Your Honor.  I think all of these things are going to the

15   day-to-day operations and really granular control of what

16   the organization is doing.

17          THE COURT:  And is that how you read the D.C.

18   Circuit's decision in *Ralis*?

19          MR. EHRLICH:  That's right, Your Honor.

20          THE COURT:  All right.  Is there anything further,

21   Mr. Ehrlich, that you would like to say or add to your

22   argument?

23          MR. EHRLICH:  I would just like to point out a

24   couple of things on the first point in terms of the 6209(d)

25   authority.

1          Mr. Gupta brought up the subsequent legislative

2    history, as we cite in our footnote 2; as the Supreme Court

3    just noted in the *Bostock* decision, that's not something you

4    really look at in statutory interpretation; it's broad.

5    Basically, we have no idea, just as this Court has said, as

6    to why Congress is doing what it's doing to a statute that a

7    different Congress passed.

8          And the only thing I would add on this point, Your

9    Honor, is I think you were exactly right when you were

10   talking about how the by-laws would be rendered with empty

11   words if the authority did not reside in the CEO to appoint

12   OTF directors and board members.  So I think those were just

13   a couple of points I wanted to make on that, Your Honor; I

14   think that is a closer question in this case.

15         And in terms of the allegations of the complaint,

16   there is really no -- there can be no allegation that the

17   board is violating any firewall provision or anything of

18   that nature.  I just want to flag for Your Honor that we do

19   have some threshold issues with a private cause of action

20   which we don't believe there is, of course, and things of

21   that nature.  So I just wanted to flag that for Your Honor.

22         THE COURT:  Yes.

23         No.  I have seen those arguments; and I will

24   address them in my written opinion.

25         If that's it for you, Mr. Ehrlich, I am going to

1   turn back to Mr. Gupta for any reply.

2           MR. EHRLICH:  Yes.  Thank you, Your Honor.

3           MR. GUTPA:  Your Honor, I would just -- I don't

4   have much to say, unless Your Honor has specific questions,

5   because I think we were up there for a long time earlier;

6   and you had a lot of very specific questions, and I got my

7   points out.

8           I would just emphasize that it's true that the

9   day-to-day control was one of the concerns about

10  independence; but the principal question has always been

11  whether these are operationally and structurally independent

12  entities.  You know, the D.C. Circuit described Radio Free

13  Europe as a separate, noncontrolled corporate entity, and

14  that that judgment specifically demanded judicial respect.

15          And I think -- Your Honor mentioned earlier that

16  there is a sensitivity about foreign relations and a

17  sensitivity about how -- the role of the courts here.  But I

18  think what that means is that the courts should defer to the

19  congressional judgment, that is the much more

20  lawful-standing congressional judgment that has been

21  reaffirmed, which is that these are meaningful -- they have

22  to be meaningfully independent entities; and the principal

23  question is ultimately one of control.  But control of

24  day-to-day operations is not nearly as significant as

25  actually taking over the entity because that means that the

1    entity is effectively not an independent entity anymore, and

2    that is the line that the D.C. Circuit drew.  I think it is

3    a much easier line to draw than the courts getting into the

4    policing of all of these other standards about journalistic

5    integrity which, while they're reflected in the legislation

6    and the statutes, would be a lot harder to enforce.

7         So I think this is the case where you have such an

8    extreme action that it is obvious that what has happened

9    here is a government takeover of a private -- of a set of

10   private nonprofit entities that Congress has protected the

11   independence.  There is just no way, I think, to read the

12   action that has taken place here consistent with that

13   long-settled congressional understanding that these are

14   independent entities, not ultimately controlled.  The

15   question of ultimate control is a lot more important when

16   you are talking about structural independence; and we have

17   recognized that in all sort of other contexts.  Whether it

18   has to do with corporate takeover or independent agencies, I

19   think it's always understood that "independence" means

20   independence from ultimate control.

21        THE COURT:  Mr. Gupta, can I just -- not that I

22   need to have the last word.  I usually like to have the

23   plaintiffs in situations like this have the last word.

24        But this is a peculiar statute in terms of

25   evaluating government control when you have, as the

1    outstanding principles and standards that these entities, in

2    addition to providing, you know, balanced, comprehensive,

3    authoritative, objective views are also supposed to be

4    providing -- presenting the policies of the United States

5    clearly and effectively --

6              MR. GUTPA:  Right.

7              THE COURT:  -- will represent America, it's not

8    just a single segment of American society; projection of

9    significant American thought and institutions.  And, you

10   know, these other directions about effectively presenting

11   the policies of the United States Government, meaning the

12   current United States Government, and responsible discussion

13   and opinion on those policies --

14             MR. GUTPA:  Right.

15             THE COURT:  -- presenting the views of the United

16   States Government.  I mean, this is -- this is a direction

17   about the goal, the purpose, the operations, how these

18   entities are supposed to be operating that, you know, is --

19   severely restricts at the outset what their independence is.

20             MR. GUTPA:  Well, remember that this is not the

21   Voice of America, right.  This is not -- Voice of America is

22   a government entity.  These are not entities that claim that

23   they are part of the Government.  And this is why

24   Congress -- Congress doesn't have to go to one extreme; it

25   did something in the middle.  It has all of these -- it did

1    all of those things that you just said, but also insisted --

2    and repeatedly insisted that these not be house organs; and

3    that's important because they have to be perceived as and be

4    independent in order to perform their role properly, and

5    that is why Congress has continuously reaffirmed what the

6    D.C. Circuit calls these "institutional arrangement"; that

7    they do not have an official status; they are not house

8    organs; and the D.C. Circuit has repeatedly talked about

9    control when it quotes its legislative history.

10           When Congress enacted this statute it said what it

11   was establishing was, quote, funding without government

12   control.  So it's true that when the Government gives

13   thought to a private nonprofit organization, it attaches

14   conditions to those funds; and that's -- it can be very

15   coercive about that, and they can yank the funding.

16           But what Congress has repeatedly said -- it's

17   probably the one thing that Congress has been the most

18   consistent about in this whole statutory scheme -- is that

19   you have to respect the operational independence of these

20   entities; and that was an obligation that was specifically

21   in mandatory language from this CEO.

22           Another way of saying this, this CEO did the one

23   thing that is the most clear that you cannot do with respect

24   to these institutional arrangements, which is to take what

25   was an independent entity and transform it into a

1    government-controlled entity.  So if the statutory

2    requirement for independence is to have any meaning, that is

3    not a permissible exercise of power under the statute.

4              THE COURT:  All right.  Thank you very much.

5              I will look forward to getting your filing,

6    hopefully, by Monday.  And I am reserving decision; and it

7    will likely be issued next week.

8              MR. GUTPA:  Okay.  Thank you.

9              THE COURT:  Thank you.

10              MR. EHRLICH:  Thank you, Your Honor.

11              (Whereupon, the proceeding concludes, 4:03 p.m.)

12                        * * * * *
                         **CERTIFICATE**

13

14              I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
15    transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
16    ability.

17              PLEASE NOTE:  This hearing was held telephonically
     in compliance with the COVID-19 pandemic stay-at-home orders
18    and is therefore subject to the limitations associated with
     the use of technology, including but not limited to
19    telephone signal interference, static, signal interruptions,
     and other restrictions and limitations associated with
20    remote court reporting via telephone, speakerphone, and/or
     videoconferencing.

21              **This certificate shall be considered null and void
     if the transcript is disassembled in any manner by any party
22    without authorization of the signatory below.**

23         Dated this 29th day of June, 2020.

24

25         /s/ Elizabeth Saint-Loth, RPR, FCRR
           Official Court Reporter