IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OPEN TECHNOLOGY FUND, et al.
                    Plaintiffs,
        v.

MICHAEL PACK, in his official capacity
as Chief Executive Officer and Director of the
U.S. Agency for Global Media,
                    Defendant.

Case No. 1:20-cv-1710

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

If Congress passed a law tomorrow giving the Secretary of Health & Human Services the power to replace the board of Planned Parenthood or the NRA with a controlling majority of government officials, there'd be no question—that law would be obviously unconstitutional. The First Amendment protects "the right to associate with others." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000). "Government actions that may unconstitutionally burden this freedom may take many forms, one of which is intrusion into the internal structure or affairs of an association, like a regulation that forces the group to accept members it does not desire." *Id.*

On the other hand, if Congress allows the Secretary of Transportation to replace Amtrak's board, there's no such issue. In keeping with the long history of "Government-created and –controlled corporations over the years," dating back to the first Bank of the United States, when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation," as it did with Amtrak, it is effectively part of the government for First Amendment purposes. *Lebron v. Nat'l R.R. Passenger Corp.*, 115 S. Ct. 961, 972, 974 (1995).

This basic background distinction—between an impermissible government takeover of a private organization and the permissible government control of an entity that is the government's

own creature—is crucial to the statutory-interpretation issues in this case. When Congress gives the government the power to name the directors of "any organization" that is "authorized under" a statute, what do those words mean? Do they refer to organizations created by Congress or the Executive Branch, with specific statutory authorization? Or do the words sweep much more broadly, converting the government's mere authority to grant funding to an entity into the power to commandeer or nationalize that entity? If it's fairly possible to do so, statutes should always be interpreted to avoid constitutional problems. The judiciary should not lightly assume that Congress has allowed the involuntary federal takeover of a private organization—especially when government officials clash with the organization over its expressive mission. Here, that result can be avoided through the straightforward use of ordinary tools of statutory construction.[1]

## I. Open Technology Fund is likely to succeed on its claim that the U.S. Agency for Global Media's CEO lacks authority to remove its officers or directors.

### A.  The CEO lacks statutory authority.

The International Broadcasting Act allows the U.S. Agency for Global Media's CEO, subject to other statutory constraints, to name the officers or directors of "any organization . . . authorized under this Chapter." 22 U.S.C. § 6209(d). The threshold question here is what those words mean: What does it mean for an "organization" to be "authorized under" the Act? The government argues (at 4) that Open Technology Fund (OTF) is "authorized under" the Act simply because § 6204(a)(5) gives the CEO the "authorit[y]" to "make and supervise grants." This reading not only invites serious constitutional problems. It also asks the Court to effectively rewrite the statute, to cover "any organization provided authorized funding by the agency." And it elides the fundamental difference between "authorize," a term of art used by Congress to

---

[1] The plaintiffs are filing this reply under Local Rule 7(d). Becaue the hearing has already taken place, the plaintiffs would not object if the Court were inclined to allow the government to respond—provided it does not compromise their urgent need for relief. The plaintiffs do not seek to amend their complaint to add any new party.

establish an entity that can later be funded through appropriations bills, and "authority," a mere grant of power to an officer to do something.

Generally, Congress authorizes the expenditure of public funds in a two-part process known as authorization and appropriation. In the first step, Congress enacts an "authorization" measure that may establish or continue an agency, program, or activity. *See* Bill Heniff Jr., Cong. Research Serv., RS20371, *Overview of the Authorization-Appropriations Process* 1 (2012). In the second step, Congress enacts appropriations to provide funds for the authorized agency, program or activity. *Id.* Authorization laws can establish, continue, or modify an agency, program, or activity for a fixed or indefinite period of time. *See* 1 U.S. Gov't Accountability Office, GAO-04-261SP, Principles of Federal Appropriations Law 2-41 (2004). There are many examples of Congress authorizing the establishment of private corporations to further public purposes. *See, e.g.*, 47 U.S.C. § 396(b) (authorizing the Corporation for Public Broadcasting, a private nonprofit organization); Rail Passenger Service Act of 1970, Pub. Law. No. 91-518, § 310, 84 Stat. 1327, 1330 (1970) (authorizing Amtrak). And Congress sometimes gives agency heads the power to authorize entities themselves. *See, e.g.*, 38 U.S.C. § 7361 ("The Secretary may authorize the establishment at any Department medical center of a nonprofit corporation to provide a flexible funding mechanism for the conduct of approved research and education at the medical center.").

Congress followed this common pattern in the International Broadcasting Act. The Act itself expressly authorizes the establishment of numerous entities—to be subsequently funded through congressional appropriations. These include entities authorized both before and after the enactment of 22 U.S.C. § 6209(d), such as Radio Free Asia (*id.* § 6208), and Radio Free Afghanistan (*id.* § 6215). It also "authorize[s]" the CEO of the U.S. Agency of Global Media "to incorporate a grantee" himself—in other words, to establish a government-created corporation. *Id.* § 6209(a)(1). Either source of authorization—whether by Congress or the CEO—could be sufficient to "authorize" the establishment of an organization "under" the Act. Indeed, the

3

proposed "Open Technology Fund Authorization Act" would do precisely that. *See* H.R. 6621, 116th Cong. (2020) (legislation "[t]o amend the United States International Broadcasting Act of 1994 to authorize the Open Technology Fund of the United States Agency for Global Media.").

But, as things stand, Open Technology Fund was never authorized through either—or indeed, *any*—mechanism. Open Technology Fund is not even mentioned, let alone authorized, anywhere within the Act. *Cf. Denkler v. United States*, 782 F.2d 1003, 1005 (Fed. Cir. 1986) (observing that "[a] search of the statute reveals no authorization" of the kind "usually found in the statutory charters of governmental entities"). And Open Technology Fund was not incorporated by the CEO: It was incorporated solely by its founder, Libby Liu, without any "permission or authorization from Congress or from any part of the Executive Branch." Liu Decl. ¶¶ 2, 3. "OTF was incorporated as, and remains, an independent organization. It was not established as a government-created or government-controlled entity." *Id.* ¶ 3. In a recent report to Congress, the Agency acknowledged OTF's status "as an independent non-profit organization." ECF No. 10-3 at 6. The government has now conceded as much in this litigation. *See* ECF No. 12 at 1-2 (acknowledging that OTF was *not* "established by or under the authority of Congress or the U.S. Agency for Global Media" but arguing that it nevertheless "should be considered 'authorized under this chapter'" because it receives grant funding from the agency).

Nor is it relevant, as the government argues (at 6), that the staff and operations of OTF were at one time housed within Radio Free Asia. It's hard to see how the fact that staff and operations were previously located within another organization is of any legal significance when the statutory question here is whether the "organization"—that is, the organization incorporated by Libby Liu in the District of Columbia in 2019—has been "authorized" under the Act. "[I]t is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations." *Agency for Int'l Dev. v. All. for Open*

*Soc'y Int'l, Inc.*, 591 U.S. __, 2020 WL 3492638, at *4 (June 29, 2020). A prior affiliation between OTF staff members and Radio Free Asia cannot defeat this "bedrock principle." *Id.*

The contrary reading advanced by the government ignores the structure of § 6209(d), which covers any "*organization* that is . . . authorized under this chapter." The adjective, "authorized," modifies the noun, "organization": It is the organization itself that must be authorized under the Act. And the "neighboring words" give this provision "more precise content." *United States v. Williams*, 553 U.S. 285, 294 (2008). The authorization clause is the final element in a list consisting exclusively of corporate entities: "RFE/RL Inc., Radio Free Asia, and the Middle East Broadcasting Networks." *Id.* And the parallel grammatical structure of the immediately preceding element in the list, "an organization that is *established* through the consolidation of such entities," emphasizes that the provision is concerned with the formation, incorporation, or establishment of an entity—not its funding. *Id.* § 6209(d) (emphasis added).

The government's reading—wherein *any* grant recipient is "authorized" under § 6204(a)(5) and subject to government takeover—sweeps far too broadly. Section 6204(a) gives the CEO "authorit[y]" to take a wide range of actions, including the "authorit[y]" to "procure, rent, or lease supplies" through "multiyear contracts." § 6204(a)(10). Under the government's logic, parties to these contracts would be "authorized" under the Act in the same way that grantees are—making their officers and directors subject to CEO's appointments and removal power. That cannot be right. The government's reading also fails to explain the distinct statutory language in § 6209(c), which covers "Radio Free Europe, Radio Free Asia, or the Middle East Broadcasting Networks *or any other grantee or entity provided funding by the agency*." If Congress had wanted to give the government the power to fire and appoint officers and directors of any organization that receives Agency funding—the interpretation the government prefers—"it knew how to do so." *Curtis v. United States*, 511 U.S. 485, 492 (1994). Congress's omission of similar language in § 6209(d) indicates that it did not intend this result. This distinct language, in the

neighboring statutory provision, cannot be dismissed as "inartful drafting." Opp at 6 n.5. *See Russello v. United States*, 464 U.S. 16, 23 (1983).

The government offers three arguments against the common sense understanding of the statutory text. None stand up to scrutiny. *First*, the government contends (at 5) that the provisions permitting the CEO to award the grant to another entity if the authorized grantee fails to carry out its functions effectively, *see, e.g.*, § 6207(d); § 6208(g), entails that authorization must follow funding: "By Plaintiffs' logic, if the CEO were to exercise this power to renounce Radio Free Asia and Radio Free Europe in favor of new, better-performing grantees, he could not name the officers and directors of those new grantees because they are not specifically identified in Chapter 71." But there is nothing "odd" about this result at all. The ability to appoint or remove a private entity's officers and directors is an extraordinary—and potentially unconstitutional—one. Congressional authorization is not just a formality; it marks a greater level of government involvement in the entity's creation and control than a mere receipt of funding.

*Second*, the government argues (at 5) that this reading renders § 6209(d)'s reference to organizations "authorized under this chapter" superfluous, because Congress could simply amend the list of enumerated entities within § 6209(d) each time it authorizes a new entity under the Act. But, the government acknowledges (at 5 n.4) Congress has already chosen not to do so— Radio Free Afghanistan, authorized by the Radio Free Afghanistan Authorization Act, Pub. Law. No. 107-148, 116 Stat. 64 (2002), is now encompassed within § 6209(d) despite not having been added to its list. That Congress wanted a mechanism to incorporate organizations within the ambit of § 6209(d) without being required to continually update the provision's text is well within its authority.

*Third*, the government gives great significance to Congress's use of the word "under" rather than "in" in § 6209(d). Organizations incorporated by the CEO (as permitted by § 6209(a)(1)) may not have been included within the ambit of § 6209(d) had Congress used the

word "in" rather than "under." Thus, to the extent that this word choice is significant, it supports the reading advanced here.

### B. The statute must be interpreted to avoid unconstitutional intrusion into the internal affairs of a private, non-profit organization engaged in expressive activity.

Under the canon of constitutional avoidance, courts are "obligated to construe the statute to avoid" constitutional concerns where an alternative interpretation that would avoid those concerns is "'fairly possible.'" *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001). In this case, the question is whether to read a statute to give the federal government the awesome power to make critical decisions that it may not constitutionally make—decisions about who is in charge of a private, non-profit association engaged in expressive activity. There are two ways to read this statute. One way naturally limits the statute's reach to entities whose establishment has at least been specifically *authorized* by Congress or the Executive Branch. The other way allows an unprecedented level of government intrusion into private organizations merely because they receive government funds.

**1.** The constitutional concerns raised here are serious, and they are apparently unprecedented. Under the First Amendment to the U.S. Constitution, it is well established that "the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed." *Knox v. Service Employees Intern. Union, Local 1000*, 567 U.S. 298, 309 (2012). But that "[f]reedom of association would prove an empty guarantee if associations could not limit *control over their decisions* to those who share the interests and persuasions that underlie the association's being." *California Democratic Party v. Jones*, 530 U.S. 567, 574–75 (2000) (emphasis added). Thus, "a corollary of the right to associate is the right not to associate." *Id.*

"Government actions that may unconstitutionally burden this freedom may take many forms, one of which is intrusion into the internal structure or affairs of an association, like a regulation that forces the group to accept members it does not desire." *Boy Scouts of America v. Dale*,

530 U.S. 640, 647 (2000). As the government interprets it, the statute at issue here is just such a regulation. "Forcing a group to accept certain members"—which is what the federal government has unquestionably sought to do here by firing and replacing OTF's board of directors—"may impair the ability of the group to express those views, and only those views, that it intends to express." *Id.* at 647-48 (internal quotation marks and citations omitted). These constitutional protections are at their apex when the government seeks to intrude into the affairs of private organizations engaged in expressive activity or advocacy. *See Nat'l Ass'n. for Advancement of Colored People v. Button*, 83 S. Ct. 328, 340 (1963). And it is well established that such organizations do not lose all First Amendment protections merely by taking government funds. *Agency for Intern. Dev., v. Alliance for Open Soc'y Intern., Inc.*, 570 U.S. 205, 214–15 (2013).

The Open Technology Fund and its board of directors and officers thus have the constitutional right to associate with each other through their independent non-profit organization for the common purpose of expressing and promoting their common views and mission—including their commitments to "advance Internet freedom in repressive environments" worldwide; "counter attempts by authoritarian governments" to "control the Internet and restrict freedom of information and association online"; and "protect journalists, sources, and audiences from repressive surveillance and digital attacks." Turner Decl. ¶ 2-3. They also have the right *not* to associate with others, including those they justifiably perceive as philosophically opposed to their mission and views.

Under these circumstances, it should be obvious that, as the Supreme Court has held, "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association." *Dale*, 530 U.S. at 648. But this case is not just about who may *join* the group; here, the affront to associational freedom is much greater—an attempt by the federal government to "control" the organization's "decisions" by firing the organization's entire executive leadership and replacing its board of directors with a board consisting of a majority of

federal-government officials. *Jones*, 530 U.S. at 574–75. It is hard to conceive of a government action more hostile to associational freedom than a "hostile takeover" of a nonprofit organization engaged in expressive activity, especially when the government seeks to obtain majority control "to distort or destroy their missions." *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 692-93 (2010). The government's reading thus raises "serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381-382 (2005).

It is worth pausing to appreciate how truly extraordinary the government's position is here. A hostile takeover is a "takeover that was not approved or recommended by the management or directors of the target company." Matthew Bender & Co., 1-2 *Corporate Acquisitions and Mergers* 1-app. 5E (2006). Although typically associated with for-profit corporations, hostile takeovers can occur in nonprofits too. Although this is surely a historical first—the first attempted federal-government takeover of a non-profit organization whose mission is dedicated to expressive and associational freedom—a few scholars have taken note of the constitutional associational-freedom concerns implicated by even garden-variety disputes between rival nonprofit leaders. Even in more typical scenarios, judicial protection of incumbent boards is considered essential "to permit associations to define and limit their membership in order to control the organization's expression." Reiser, *Nonprofit Takeovers: Regulating the Market for Mission Control*, 2006 B.Y.U. L. Rev. 1181, 1184–85 (2006) (citing *Dale*, 530 U.S. at 648); *see also* Evelyn Brody, *Entrance, Voice, and Exit: The Constitutional Bounds of the Right of Association*, 35 U.C. Davis L. Rev. 821, 900 (2002).

"Directors, officers, and managers of a targeted nonprofit often will be genuinely afraid that their organization's mission will be impaired, if not betrayed, by a takeover." Reiser, *Nonprofit Takeovers*, 2006 B.Y.U. L. Rev. at 1184–85. "[T]he fact that a takeover may be a means by which to transform a nonprofit's mission illegitimately poses a significant risk beyond the bounds of the affected organization. It also raises concerns for the nonprofit sector's role in

society." *Id.* at 1185. "On the most practical level, incumbents may fear that after a takeover, resources of the organization will be used by insurgents to advance goals different from, or even adverse to, the goals for which those resources were originally earned or donated." *Id.* at 1186. "The nonprofit corporation is granted perpetual existence, with its purposes to be advanced in the ways directed by its fiduciaries. The value inherent in a respected nonprofit's reputation will be at the disposal of any validly selected new board—and this value may be substantial. If the target nonprofit's incumbents believe the programmatic or policy changes advocated by insurgents are in conflict with its mission, they have real reason to fear the appropriation of their nonprofit's name and reputation by insurgents. Finally, as the most identifiable leaders of their nonprofit organization, nonprofit fiduciaries may feel personal responsibility to protect the ideological territory the group has staked out for itself, and insurgents' plans may threaten the ability of the nonprofit to play this role." *Id.* at 1186.

None of those concerns are hypothetical here. As detailed in the various declarations filed by the plaintiffs, the actions taken by CEO Michael Pack in just the past few days imperil Open Technology Fund's ability "to chart [its] own course as an organization"; its ability "to stay true to [its] mission and principles"; its "essential day-to-day corporate functions, such as hiring and maintenance of [its] office space"; and its "ability to protect the vulnerable communities facing repressive regimes" that trust it "to safeguard their entities and enable their important work around the world." First Turner Decl. ¶ 15. His actions also imperil Open Technology Fund's "reputation and goodwill" and its "ability to retain [its] valued staff"—ultimately imperiling its "continued existence as an independent organization. *Id.*

Finally, to the extent that Mr. Pack and the U.S. Agency for Global Media are attempting to severely burden the plaintiffs' associational freedom as a condition of government funding, without having defined such a burden as a necessary component of the program for which the funding was given, they are imposing an unconstitutional condition on the plaintiffs.

*Agency for Intern. Dev.*, 570 U.S. at 214–15. Indeed, the program for which the funding is designed is defined by a mandate to respect the *independence* of the grantees. The First Amendment does not permit a federal agency to impose "conditions that seek to leverage funding" by restricting protected expression or association in ways that fall "outside the contours of the program." *Id.*

**2.** To the extent that 22 U.S.C. § 6409(d) is interpreted to permit Pack's purported terminations and appointments of directors and officers—including what is, in effect, a hostile federal-government takeover of an independent non-profit organization—the statute as applied is an unconstitutional intrusion into the affairs of the organization without adequate justification. "Under our legal system," such decisions are "left to private organizations." Evelyn Brody, *Entrance, Voice, and Exit*, 35 U.C. Davis L. Rev. at 865. As a matter of constitutional avoidance, the statute should be interpreted to avoid that result. It should also be harmonized with longstanding legal protections for organizational independence, as discussed further below.

Because the government's reading presents a "substantial constitutional question," there must be "clear evidence that Congress actually intended" this result. *Peretz v. United States*, 501 U.S. 923, 930 (1991); *see* Scalia & Garner, *Reading Law* 247–48 (2012) (explaining that the constitutional-doubt canon "militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality"). Where, as here, "an alternative interpretation of the statute"—one that limits the statute's reach to organizations authorized by Congress—"is 'fairly possible,'" St. Cyr, 533 U.S. at 300, the courts are "obligated" to adopt that construction. *St. Cyr*, 533 U.S. at 299-300.

### C. The corporate bylaws do not give the CEO legal authority that he lacks under the statute.

Ordinary tools of statutory interpretation compel the conclusion that the U.S. Agency for Global Media's CEO lacks any statutory power to appoint or remove officers or directors of the Open Technology Fund. The government, however, argues (at 7) that its reading of § 6209(d) is

"reinforced by the Open Technology Fund's bylaws," which "contemplate removal under the International Broadcasting Act." But absent specific statutory authorization, the government must show that the bylaws provide independent authority for appointment and removal—not merely that the bylaws "contemplate" that such powers would exist in the future, after congressional authorization. The government cannot clear that high hurdle.

*First*, where the bylaws do refer to the Act, they do so *in its entirety*—not singling out § 6209(d), but referring generally to 22 U.S.C. 6203 *et seq.*, as it may be "applicable to the Corporation's affairs." ECF No. 4-8 at § 2.3. And portions of the Act *are* applicable to Open Technology Fund's affairs as a private grantee organization—including affairs that concern its officers and directors. Section 6209(c), for example, forbids Open Technology Fund "[e]mployees or staff" from being "Federal employees." And § 6204(b) requires the Secretary of State and CEO to "respect the professional independence and integrity of . . . grantees" when "carrying out their functions." The mere incorporation of the Act simply does not speak to whether or not § 6209(d) applies to Open Technology Fund.

*Second*, the bylaws leave open the possibility that Open Technology Fund's officers or directors may, in the future, "serve at the pleasure of [or be] named by" the CEO. § 6209(d). At the time of its incorporation, Open Technology Fund was aware of the fact that Congress may someday choose to authorize it under the Act, bringing it within the ambit of § 6209(d). Rather than require its bylaws to be amended upon its authorization, Open Technology Fund chose to enact bylaws flexible enough to withstand this—or other—statutory changes. That kind of future-oriented drafting is commonplace, and consistent with best practices, in corporate documents. Corporations do not want to have to constantly modify their articles or bylaws.

But even given this flexibility, Open Technology Fund's bylaws do not permit Mr. Pack's actions. In Section 5.1, the bylaws provide that the "initial Board of Directors," which consists "of the persons who are named in the Articles of Incorporation of the Corporation," "shall hold

office *until the installation of the Directors elected in accordance with the provisions herein.*" ECF No. 4-8 at §
5.1; *see also* ECF No. 10-2 at 7 (provision of Articles of Incorporation naming initial directors).
While this provision acknowledges the potential for a vacancy on the initial board, it does not
provide for removal of the initial board members—under the Act or otherwise. Further, Mr.
Pack failed to comply with the bylaws' clear command that appointed directors—even those
appointed "as may be authorized by 22 U.S.C. 6203 *et seq.*"—can only be appointed "with notice
and in consultation with the USAGM Advisory Board." ECF No. 4-8 at § 5.2. This provision
provides an essential check on any potential government interference with Open Technology
Fund's board: The Advisory Board, designed to be a bipartisan body, has an oversight role to
play in the appointment of directors. *See* § 6205(d) (describing the makeup of the Advisory Board).
Mr. Pack did not notify or consult with the USAGM Advisory Board before attempting to
appoint new directors on the basis of nonexistent legal authority. Accordingly, the plaintiffs are
likely to succeed on the merits.

## II. Where it applies, the CEO's power under Section § 6209(d)—like all powers under the International Broadcasting Act—must be exercised in a manner consistent with the statutory protection for grantee organizations' "independence."

Section 6209(d) grants the CEO the power to appoint and remove officers of certain
entities. But each of these entities "operates under an express statutory mandate" that protects
their "independence." *Wood ex rel United States v. Am. Inst. in Taiwan*, 286 F.3d 526, 531 (D.C. Cir.
2002) (describing broadcasting entities like Radio Free Europe/Radio Liberty). The CEO "shall
respect" that "independence." 22 U.S.C. § 6204(b). "The courts are not at liberty to pick and
choose" among these sources of federal law; where, as here, "two statutory provisions are capable
of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to
the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Here, it is
easy to read § 6209(d) in harmony with the statutory firewall, § 6204(b).

Each organization's board consisted of a majority of nongovernmental members at the time of Pack's takeover attempt. So the question now is whether, consistent with the statutory requirement to "respect" their "independence," § 6204(b), Pack had the power to effect a "governmental takeover" of the organizations, *Ralis v. RFE/RL*, 770 F.2d 1121, 1125 (D.C. Cir. 1985). Nothing in the two provisions taken together compels that unprecedented result. Section 6209(d) grants the CEO significant discretion to appoint and remove officers and directors of the relevant entities. He can choose individuals from a range of backgrounds and political affiliations. He can even appoint some full-time government officials. But the one thing he cannot do is appoint a board where government officials constitute a voting majority, as he did here. Reading the Act to permit such a result raises similar constitutional-avoidance concerns to those discussed above, turning on whether these entities are truly "government-created and -controlled corporations" where the government has "retain[ed] for itself permanent authority to appoint a majority of the directors of that corporation," as it has with Amtrak and other government corporations. *Lebron*, 513 U.S. at 398. There is no indication that the government ever acquired or "retain[ed]" such "permanent authority." Absent a specific statutory command conferring such authority—particularly in light of the D.C Circuit's longstanding interpretation of statutory "independence" as "expressly prevent[ing] a governmental takeover"—this Court should not read one statute, § 6209(d), to repeal a core protection of another, § 6204(b).

The government barely addresses this argument, not once citing *Ralis*, the D.C. Circuit's authoritative case on the Act's firewall. Instead, the government (at 8) focuses on the requirements of § 6202(b)—requirements that plaintiffs do not allege have been violated. To be clear: plaintiffs are not resting on a claim that the purported board members are taking ongoing actions in violation of the firewall. The charge is against the CEO alone, who violated the

statutory firewall by impermissibly attempting to alter the "institutional arrangements" of the broadcast organizations by installing a government-controlled board. *Ralis*, 770 F.2d at 1125.[2]

Finally, the government argues that installing government officials on the boards of these organizations is necessary to meet the requirements of § 6202(b)(3), which commands that international broadcasting shall include "clear and effective presentation of the policies of the United States Government and responsible discussion and opinion on those policies . . . which present the views of the United States Government." But this requirement could easily be met by maintaining the long-standing tradition, permissible under the Act, of placing the Secretary of State on the boards of the broadcast entities. In no way does this or any other statutory provision within the Act *require*—or permit—the forced installation of a government-controlled board over the vociferous objections of the organizations' leadership.

## III. The Agency's unilateral actions to withhold agreed-upon grant funding from OTF violate the Administrative Procedure Act.

Within days of taking office, Michael Pack swiftly ordered an immediate freeze on OTF's funds, without any explanation. *See* ECF No. 4 at 6. But faced with a TRO motion seeking to enjoin those actions, the government abruptly reversed course, issuing a notice to this Court that it was lifting the freeze. *See* ECF No. 8. It told the Court that the agency had "informed its grantees, including the Open Technology Fund, that there is no freeze in funding, including funding for obligations for new contracts or extensions to any contract." ECF No. 8 at 1. The agency specifically stated that "grantees may continue making obligations for new contracts or

---

[2] The government argues (at 9 n.7) that plaintiffs lack standing because "any injury arising from such a breach [of the firewall] . . . is pure conjecture." But this argument misunderstands the plaintiffs' claim. The injury to the individual director plaintiffs is "actual," not "hypothetical": If upheld, Mr. Pack's decision to remove them from their board seats has already deprived them of the opportunity to manage the organizations. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). And with respect to OTF, a governmental takeover obviously injures the organizations' operations and statutory right to structural independence from the government.

extension of any contracts pursuant to terms of their respective grant agreements, notwithstanding the instructions in USAGM's email of June 9, 2020." ECF No. 8 at 1.

The government also re-affirmed that representation to the Court and plaintiffs at the TRO hearing that day. Third Turner Decl. ¶ 3. Upon questioning from both plaintiffs' counsel and the Court, the government confirmed that it was "correct" that OTF's 2020 $11 million "grant is going to be active and will not be frozen" and that the "signed and executed version" of the grant, offered by USAGM and accepted by OTF, "would be operative." ECF No. 14 at 4. Based on that specific representation, the plaintiffs informed the Court that the plaintiffs would not "press[] the claim regarding the freeze for purposes of this motion." The Court and the parties then proceeded based on that representation. That was on Friday.

Then, on Monday, the government reversed course yet again. It directly undercut its previous representations by issuing a "unilateral amendment"—with "no explanation for this abrupt change"—reducing OTF's disbursement from $11 million to $1.6 million, which represents just one month's funds. Third Turner Decl. ¶ 5.

Although the plaintiffs were willing to credit the agency's representation in open court that its decision to lift the freeze had mooted some of their claims, it is now clear that the claims are not moot. "Mere voluntary cessation of allegedly illegal conduct does not moot" a claim unless "a defendant can demonstrate that there is no reasonable expectation that the allegedly unlawful conduct will recur." *People for the Ethical Treatment of Animals v. United States Dep't of Agric. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, 157 (D.C. Cir. 2019). But the defendant has a "heavy burden of persuading" the court that it is "absolutely clear" that "the challenged conduct cannot reasonably be expected to start up again." *Id.* Here, the agency's second course reversal makes that showing impossible. It cannot be "absolutely clear" that—as to *all* funding that was subject to the freeze—the agency is committed not to "return to [its] old ways." *Id.* at 157–58 (agency's "incomplete" commitment to reverse challenged decisions did not moot the case).

OTF's General Counsel has submitted a declaration this morning, describing how the agency's "pattern of disingenuous behavior towards OTF" regarding its funding is already causing "major disruption to [OTF's] operations" and raises a concern that it is "acting intentionally to cause maximum disruption to [OTF's] operations." Third Turner Decl. ¶¶ 3, 10. The agency's actions here have violated the Administrative Procedure Act in two ways—a breach of a contractual commitment that is arbitrary and capricious, and an imposition of an "additional condition" that is not in accordance with law. *See* 5 U.S.C. § 706(2)(A).

*First*, USAGM's abrupt decision to disburse only one month's funds to OTF represents an arbitrary and capricious breach of its contract with OTF, thereby violating the APA. *See Lion Raisins, Inc. v. U.S.*, 51 Fed. Cl. 238 (Fed. Cl. 2001) (holding that a federal agency's poorly reasoned decision to suspend a contract was arbitrary and capricious under the APA). Its decision departed from their longstanding agreement to quarterly drawdowns. Where a contract's terms are not unambiguous, "the parties' own course of performance is highly relevant" to that interpretation. *Metro. Area Transit, Inc. v. Nicholson*, 463 F.3d 1256, 1260 (Fed. Cir. 2006); *see* Restatement (Second) of Contracts, ch. 9 § 202 (explaining that in interpreting contracts, "any course of performance accepted or acquiesced in without objection is given great weight"); Williston on Contracts § 32:14 (4th ed.) ("[C]ourts give great weight to the parties' practical interpretation."). OTF's prior grant agreements do not expressly specify the schedule of disbursements, rendering past practice highly relevant: Its FY19 agreement contains boilerplate language that disbursements will be monthly or on any "other basis as may be consistent with the Approved Financial Plan." OTF FY19 Grant Agreement.

That past practice establishes that the agency and OTF had a well-understood agreement—confirmed in writing just months ago—that disbursements will be quarterly, not monthly. From its start as a project under Radio Free Asia in 2012 to its independent status today, OTF has *always* enjoyed at least quarterly, if not annual, drawdowns. Third Turner Decl.

17

¶ 6. USAGM's switch to monthly disbursements is therefore a "total aberration from [OTF's] regular course of dealing with USAGM" that cripples its ability to plan and budget its disbursements, given the way that OTF extends funding to its clients. Turner Decl. ¶ 6.

Just a few months ago in an e-mail dated April 3, 2020, OTF CEO Libby Liu memorialized a prior agreement with the agency's CFO and then-acting CEO to quarterly drawdowns. Third Turner Decl. ¶¶ 7-8. Specifically, Liu confirmed that "per [OTF's] *agreement* with CEO Grant Turner and CFO John Barkhamer, OTF is submitting *quarterly financial plans rather than monthly plans*," and further confirmed that CFO Barkhamer had "advised [her]" on a call that he was "working on amending the OTF grant agreement to allow for this next drawdown request—which will be in the amount of $5,349,551." *Id.* (emphasis added). She further explicitly informed USAGM's budget office that OTF would be "drawing down the remainder of the FY2020 allocation at the start of Q4" due to "anticipati[on] of several large contracts to be awarded." *Id.* The agency never contradicted Liu's written confirmation of this "agreement" between the parties regarding the quarterly drawdown, and in fact issued a quarterly disbursement consistent with this agreement—just  as it has done in every other quarter of FY2020, until now. Third Turner Decl. ¶ 8.

*Second*, for similar reasons to those discussed in our original motion, the agency's unilateral amendment is the equivalent of an "additional condition" on OTF that it lacks the authority to enact, rendering its action unlawful under the APA as "not in accordance with law." 5 U.S.C. § 706(2)(A); *see* ECF No. 4 at 30-31. An awarding agency can impose additional conditions only if a funding recipient "fails to comply with Federal statutes, regulations or the terms and conditions of a Federal award." 2 C.F.R. § 200.338. No such non-compliance has occurred here. But even if it had, regulations prescribe only three possible actions in response, *see* ECF No. 4 at 30, and USAGM's action here—freezing already-distributed funds—fall outside those options. As explained in our opening brief and unanswered by the government, regulations explicitly

prohibit federal awarding agencies from "impos[ing] additional or inconsistent requirements" unless "required" by law. 2 C.F.R. § 200.100(a)(1). Having assured plaintiffs and the Court that it would honor the signed 2020 agreement, the agency must now clarify whether it will do so without imposing "additional or inconsistent requirements."

## IV.   The government's remaining arguments all lack merit.

The government also offers a grab bag of threshold procedural objections, none of which provide a sound basis for precluding this Court's consideration of the merits.

**A.**  First, the government argues (at 10–11) that Congress has not created a "right of action under the International Broadcasting Act." The plaintiffs never argued otherwise. Nor do they need to, because "federal action is nearly always reviewable for conformity with statutory obligations without any such 'private right of action.'" *N.A.A.C.P. v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 152 (1st Cir. 1987) (Breyer, J.). The APA "embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action.'" *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702). It broadly grants a cause of action to any person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, to challenge not only "[a]gency action made reviewable by statute," but any "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704. When Congress "intends to permit only declaratory and injunctive relief," it thus has "no need to provide for a cause of action that is independent of the APA." *SAI v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 114 (D.D.C. 2015).

**B.**  The government next argues (at 11) that review is precluded here because the challenged actions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). But that exception to judicial review under the APA is "very narrow," applying only where "there is no law to apply." *Gresham v. Azar*, 950 F.3d 93, 98 (D.C. Cir. 2020). This is not one of those "rare instances." *Id.* As to the agency's decision to fire OTF's directors and officers, Congress could not have committed the decision to the agency's discretion because it did not give the

agency authority to make that decision at all. Whether Congress did so—that is, whether the agency had the legal authority to carry out a certain action—is a pure question of law that is obviously suited to judicial resolution. As to the other decisions, the standards are supplied by the statutes and regulations protecting the "independence" of the organizations, the regulations governing grant funds, and the contractual commitments between the parties. None of those things are committed to agency discretion. Although agencies of course have discretion in making personnel and funding decisions, those decisions are not committed to "the agency's judgment *absolutely.*" *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (emphasis added). This Court may review whether the decisions are consistent with law.

**C**. Finally, the government (at 13) makes a cursory argument that its withholding of grant funds from OTF is not "final agency action" under APA, 5 U.S.C. § 704, even though the withholding is *already* actually affecting OTF's operations, because it is just a "tentative or interlocutory," *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), measure taken "while the agency reevaluates grant making priorities." But that argument confuses action that is *tentative* with action that is *temporary*. Even a temporary, "interim agency [action] counts as final … despite the potential for a different permanent decision, so long as the interim decision is not itself subject to further consideration by the agency." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). Here, there is no potential for further consideration of the agency's action to freeze, suspension, or withhold funds—it is already in effect and already depriving the plaintiffs of their funding right now. *See Int'l Union, United Mine Workers of America v. Mine Safety & Health Admin.*, 823 F.2d 608 (D.C. Cir. 1987) (holding that a temporary suspension of safety standards while the agency considered a permanent modification was "final agency action"). The freeze is thus final agency action, even if it may be "displaced by another [policy] at some point." *Wheeler*, 955 F.3d at 78. A policy memo discussing a future freeze or a request to impose an amendment may

framed as "tentative," but an actual freeze, suspension, or withholding of funds, when it is already operative, is not.

## V.   The government cannot deny the plaintiffs' obvious irreparable harm.

The government cannot deny that, in the D.C. Circuit, the imposition of "obstacles" that "make it more difficult" for a nonprofit organization "to accomplish their primary mission" constitutes irreparable harm. *See League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). That is not a difficult bar to clear and the extraordinary actions challenged here—withholding awarded grant funds and purporting to terminate an organization's senior leadership and boards of directors wholesale—easily meet that standard.

In an effort to downplay the harm, the government argues (at 16) that any harm resulting from the withholding of grant funds is simply an economic loss, which cannot constitute irreparable harm. But the unlawful withholding of funds here does more than simply harm the financial position of OTF as an organization—it has "threaten[ed] [OTF's] ability to carry out [its] mission" and "impedes [OTF's] ability to disburse these funds in line with congressional intent to support internet freedom." Third Turner Decl. ¶ 9. Further, the dismissal of Open Technology Fund's senior management imperils OTF's "reputation and goodwill" and its "ability to retain [its] valued staff." ECF No. 4-12 at ¶ 15. All of these harms are "beyond remediation" and therefore constitute irreparable injury justifying a temporary restraining order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

The government's arguments fare no better with respect to the challenged attempt to remove the director plaintiffs from the boards of directors of Open Technology Fund, Radio Free Europe, Radio Free Asia, and the Middle East Broadcasting Networks. The government (at 18) relies on a body of case law concerning irreparable harm in garden-variety government employment disputes. But the director plaintiffs aren't challenging their attempted removal as an unlawful termination of employment; indeed, plaintiffs do not receive any compensation for their

service as board members. Rather, plaintiffs are asserting their statutory right to "participate in the management of" these organizations. *Wisdom Import Sales Co., LLC v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003). The correct analogy, then, is to suits where shareholders or directors are denied their ability to control an organization. In such situations, courts consistently find irreparable harm, *see, e.g.*, *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, 2003 WL 22909149, at *4 (S.D.N.Y. Dec. 10, 2003), and the government does not even attempt to show otherwise.

## CONCLUSION

The plaintiffs' motion for a temporary restraining order and preliminary injunction should be granted. Specifically, until such time as the Court disposes of this case on the merits, the defendant should be temporarily and preliminarily enjoined as follows:

a.      The Chief Executive Officer of the U.S. Agency for Global Media—and his agents, officers, subordinates, successors, or any persons acting in concert with them—shall refrain from taking any action or giving effect to any action that purports to exercise authority on behalf of the federal government or the U.S. Agency for Global Media to remove any officers or directors of the Open Technology Fund, a private non-profit corporation incorporated in the District of Columbia.

b.      The Chief Executive Officer of the U.S. Agency for Global Media—and his agents, officers, subordinates, successors, or any persons acting in concert with them—shall refrain from taking any action or giving effect to any action that purports to exercise authority on behalf of the federal government or the U.S. Agency for Global Media to replace the boards of directors of Open Technology Fund, Radio Free Europe/Radio Free Liberty (RFE/RL, Inc.), Radio Free Asia, or the Middle East Broadcasting Networks with boards effectively controlled by the federal government through a majority of federal officials, or to give effect to any personnel decisions (such as removal of officers) that must be taken by the organization's board of directors.

c.      The Chief Executive Officer of the U.S. Agency for Global Media—and his agents, officers, subordinates, successors, or any persons acting in concert with them—shall refrain from taking any action or giving effect to any action to freeze, suspend, or otherwise withhold previously obligated grant funds in violation of the Administrative Procedure Act and 2 C.F.R. § 200.100(a)(1).

Respectfully submitted,

*/s/Deepak Gupta*
DEEPAK GUPTA
GUPTA WESSLER PLLC
1900 L St NW, Suite 312
Washington, DC 20036
202-888-1741

*Counsel for Plaintiffs*

July 1, 2020