**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OPEN TECHNOLOGY FUND, *et al.*, | |
| Plaintiffs, | Civil Action No. 20-1710 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| MICHAEL PACK, in his official capacity as Chief Executive Officer and Director of the U.S. Agency for Global Media, | |
| Defendant. | |

**<u>MEMORANDUM OPINION</u>**

For nearly 80 years, international broadcasting sponsored by the United States has served as a trusted and authoritative global news source, a forum for the expression of diverse viewpoints on the most pressing topics of the day, a model of journalistic excellence and independence, and a beacon of hope for those trapped within authoritarian regimes. Despite being funded by American taxpayers, U.S. international broadcasting has typically remained free of governmental interference. Indeed, its autonomy and its commitment to providing objective news coverage has often been viewed as key to its ability to advance the interests of the United States abroad. Our country's commitment to this model of cultural export has largely been viewed as a rousing success, helping to undermine and topple some of history's most oppressive regimes—including Nazi Germany and the Soviet Union—by spreading freedom and democracy around the globe.

The current Chief Executive Officer ("CEO") of the United States Agency for Global Media ("USAGM")—the defendant, Michael Pack—is accused of putting this legacy at serious risk. Since taking office less than a month ago, Pack has upended U.S.-sponsored international broadcasting. Most relevant to the current dispute, on June 17, 2020, Pack unilaterally removed

the operational heads and directors of four USAGM-funded organizations—Open Technology
Fund ("OTF"), Radio Free Europe ("RFE"), Radio Free Asia, and the Middle East Broadcasting
Networks (collectively, "Networks")[1]—and replaced the directors with five members of the
current Trump Administration as well as an employee of Liberty Counsel Action, a conservative
advocacy organization.

The backlash was instantaneous.  Certain members of the press dubbed the event a
"Wednesday night massacre."  *E.g.*, Julian Borger, *Voice of America: independence fears after
Trump ally purges senior officials*, THE GUARDIAN (June 18, 2020, 1:37 pm EDT),
https://www.theguardian.com/media/2020/jun/18/voice-of-america-independence-fears-after-
trump-ally-purges-senior-officials; Jennifer Hansler and Brian Stelter,  *'Wednesday night
massacre' as Trump appointee takes over at global media agency*, CNN BUSINESS (June 18,
2020, 12:20 PM ET), https://www.cnn.com/2020/06/17/media/us-agency-for-global-media-
michael-pack/index.html.  Members of Congress from both sides of the political aisle expressed
serious concern about the terminations.  *See* Press Release, Congressman Michael McCaul and
Senator Blackburn, McCaul, Blackburn Statement on OTF Firings, Organization's Future (June
19, 2020), *available at* https://perma.cc/TLR8-A36P; Sarah Ellison, *How Trump's obsessions
with media and loyalty coalesced in a battle for Voice of America*, WASH. POST (June 19, 2020,
4:52 PM EDT), https://www.washingtonpost.com/lifestyle/media/how-trumps-obsessions-with-
media-and-loyalty-coalesced-in-a-battle-for-voice-of-america/2020/06/19/f57dcfe0-b1b1-11ea-
8758-bfd1d045525a_story.html [hereinafter Ellison, *A battle for Voice of America*] (quoting
statement from Representative Eliot Engel, Chair of the Foreign Affairs Committee of the House
of Representatives).  Senator Robert Menendez, Ranking Member of the Senate Committee on

---

[1]      OTF is not a broadcaster.  Rather, OTF "advance[s] Internet freedom in repressive environments by
supporting the applied research, development, implementation, and maintenance of technologies that provide secure
and uncensored access to the Agency's content and the broader Internet."  Compl. ¶ 17, ECF No. 1.  The Court,
however, refers to these USAGM grantees as the "Networks" for the sake of convenience.

Foreign Relations, sent a letter to the Department of State's acting inspector general asking for a "review" of "whether Mr. Pack's wholesale firing of the leadership of [USAGM] networks violated" USAGM's regulations.  Letter from Senator Robert Menendez to Acting Inspector General Stephen Akard (June 23, 2020), *available at* https://perma.cc/ZE9N-6XBD.

Widespread misgivings about Pack's actions raise troubling concerns about the future of these great institutions designed to advance the values and interests of the United States by providing access to accurate news and information and supporting freedom of opinion and expression in parts of the world without a free press.  Plaintiffs—OTF and four of the individuals whom Pack removed from the Networks' boards—claim that Pack's actions violate the International Broadcasting Act ("IBA"), 22 U.S.C. §§ 6201–16, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*  Compl. ¶¶ 47–60.[2]  They seek an order enjoining Pack "from taking any action or giving effect to any action purporting . . . [(1)] to remove any officers or directors of [OTF]," (2) to "replace the boards of directors of [the Networks] with a board effectively controlled by the federal government, or [(3)] to give effect to any personnel decisions (such as removal of corporate officers) that must be taken by the organization's board of directors."  Pls.' Motion for a Temporary Restraining Order and Preliminary Injunction ("Pls.' Mot."), at 33–34, ECF No. 4.  For his part, Pack defends his action as authorized by 2016 amendments to the IBA, which amendments, despite being buried without fanfare in a brief 6-page section of a 970-page enacted bill, made profound structural changes in the management of the agency tasked with overseeing the funding and operations of the affected Networks.

---

[2]     Individual plaintiffs Ambassador Ryan Crocker, Ambassador Karen Kornbluh, and Michael Kempner were members of the boards of directors of plaintiff OTF, RFE, Radio Free Asia, and the Middle East Broadcasting Networks, Compl. ¶¶ 4, 5, 7, and individual plaintiff Ben Scott was a member of the board of directors of plaintiff OTF, *id.* ¶ 6.

Plaintiffs seek extraordinary relief but have fallen short of making the requisite showings. Consequently, as explained in more detail below, plaintiffs' motion is denied.

## I.     BACKGROUND

### A.     History of the USAGM

"Modern U.S. government-funded international broadcasting began during World War II with the creation of the Voice of America," CONG. RESEARCH SERV., RL 43521, U.S. INTERNATIONAL BROADCASTING: BACKGROUND AND ISSUES FOR REFORM 1 (2016) [hereinafter CRS INT'L BROADCASTING REP.], which, "[s]ince its first transmission in Germany in 1942, . . . has served as the official news outlet of the United States government in foreign lands during wars both hot and cold," *Namer v. Broad. Bd. of Governors*, 628 Fed. App'x 910, 911 (5th Cir. 2015).  Voice of America was such a success that U.S. international broadcasting "continued throughout the Cold War period with Radio Free Europe broadcasting behind the Iron Curtain, and Radio Liberty [('RL')] targeting populations in the former Soviet Union."  CRS INT'L BROADCASTING REP. at 1.  Yet, unlike Voice of America, RFE and RL "were technically independent services, each overseen by a private U.S. corporation."  *Id.* at 2.  "In 1973, Congress formally created the Board of International Broadcasting (BIB)," a nine-member "independent bipartisan board," "to oversee and fund both RFE and RL under the International Broadcasting Act of 1973 (P.L. 93-129)."  *Id.* at 3.  Notwithstanding oversight from and American taxpayer funding through BIB, RFE and RL—now combined to form a single corporation—remained separate from the government, and "provid[ed] an example of an independent broadcaster promoting journalistic integrity and democratic principles of a free media."  *Id.*  Over the decades, this model was expanded around the globe, including through the creation of Radio Free Asia and the Middle East Broadcasting Networks, *see id.* at 4, and Radio Free Afghanistan, *see* 22 U.S.C. § 6215.

"For almost as long as these services have been in existence, debates over the effectiveness, strategic direction, and necessity of U.S. international broadcasting have persisted." CRS INT'L BROADCASTING REP. at 1. "It was deemed important by Congress that institutional arrangements be such that the stations not lose their 'non-official status'; to transform [them] from independent broadcasters into house organs for the United States Government was seen as inimical to [their] fundamental mission." *Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1125 (D.C. Cir. 1985). The method for achieving this independence, however, evolved over time. BIB itself adopted regulations that, *inter alia*, ensured broadcasters would operate "as independent broadcast media with professional independence." *Id.* (internal quotation marks omitted) (quoting 22 C.F.R. § 1300.1(b) (1985)). 1994 amendments to the IBA placed similar language into the IBA itself, creating the so-called "statutory firewall." *See* CRS INT'L BROADCASTING REP. at 3–4. Simultaneously, "Congress abolished the BIB and reorganized all existing U.S. international broadcasting services under a new Broadcasting Board of Governors [('BBG')]." *Id.* at 3. The BBG was largely structured along the same lines as the BIB, made up of (1) eight presidentially appointed, senate-confirmed governors, "no more than four of whom [could] be from the same political party," and (2) the Secretary of State, who "serve[d] as the ninth voting member ex officio." *Id.* at 5. "By ensuring broadcasting independence while at the same time institutionalizing guidance from the Secretary of State," the 1994 law "aimed to produce U.S. international broadcasting that is both credible and supportive of U.S. foreign policy objectives." *Id.* at 3–4. Continuing this trend, in 1999, Congress made BBG an independent agency. *See id* at 4.

By 2016, "[m]any observers perceive[d] flaws in the BBG's structure" that were believed to produce, *inter alia*, "weak leadership from the Board" and "inefficient administrative and personnel management of the agency." *Id.* at 1. The criticisms were bipartisan. *See id.* at 12

(citing testimony of former Secretary of State Hillary Clinton); *id.* at 17 (noting that reform

legislation had co-sponsors from both major political parties).  To address these issues, Congress

considered various legislative changes "intended, in large part, to address these perceived

shortcomings."  *Id.* at 1.  The 113th Congress, for instance, considered the creation of a new

"Freedom News Network," formed from a combination of RFE, Radio Free Asia, and the Middle

East Broadcasting Networks, which would have had a "completely private" board.  Report 113-

541, House Comm. on Foreign Affairs, at 25 (July 18, 2014).  Similar legislation was introduced

in 2015.  *See* CRS INT'L BROADCASTING REP. at 1, 19–25.  In December 2016, Congress finally

acted by including, within the almost thousand-page National Defense Authorization Act for

Fiscal Year 2017, amendments to the IBA that imposed a fundamentally new structure on the

agency.  Most notably, Congress created a presidentially appointed CEO of the BBG and granted

the new CEO expansive, unilateral powers.  *See* 22 U.S.C. §§ 6203, 6204(a)(1)–(22).  Congress

retained, however, the statutory firewall, demanding "respect [for] the professional independence

and integrity of the Board, its broadcasting services, and the grantees of the Board."  *See id.*

§ 6204(b).

On December 23, 2016, President Obama signed into law the National Defense

Authorization Act, which included the provisions amending the IBA.  He contemporaneously

issued a statement explaining that his Administration "strongly support[ed] the bill's structural

reform of the [BBG], which streamlines BBG operations and reduces inefficiencies, while

retaining the longstanding statutory firewall, protecting against interference with and maintaining

the professional independence of the agency's journalists and broadcasters and thus their

credibility as sources of independent news and information."  President Obama's Statement on

Signing the National Defense Authorization Act for Fiscal Year 2017, 2016 DAILY COMP. PRES.

DOC. 863, at 3 (Dec. 23, 2016).  Noting that these amendments "elevate the current Chief

Executive Officer of the Broadcasting Board of Governors to the head of the agency and reduce the current members of the Board, unless on expired terms, from serving as the collective head of the agency to serving as advisors to the Chief Executive Officer," he stressed that "my Administration supports the empowerment of a Chief Executive Officer with the authority to carry out the BBG's important functions."  *Id.*

In 2018, the agency itself changed its name to the United States Agency for Global Media.  *Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36,150, 36,150 n.1 (June 15, 2020) [hereinafter *Firewall* Rule].  No substantive changes occurred alongside the name swap.  *See id.*  On June 12, 2020, the agency put into effect a new rule interpreting the "statutory firewall."  *See generally id.* at 36,150–53.

### B.    The Present Dispute

In 2018, President Trump—the first president with the authority granted by the 2016 IBA amendments to select the single individual vested with authority to run USAGM—nominated Michael Pack to serve as the USAGM CEO.  Pack's nomination was strongly supported by conservative commentator Steve Bannon, *see, e.g.*, Ellison, *A battle for Voice of America* (quoting Bannon as saying: "He's my guy, and I pushed him hard."), who previously served as a presidential advisor and was perceived to have influence with the White House.  Nevertheless— or perhaps due to public support from a controversial figure—for approximately two years, Pack's nomination languished in the Senate.  In April 2020, President Trump placed renewed effort behind achieving Pack's confirmation, holding a news conference to draw attention to the issue.  At the conference, President Trump stated: "If you hear what's coming out of the Voice of America, it's disgusting.  The things they say are disgusting toward our country.  And Michael Pack would get in and do a great job."  Catie Edmondson and Edward Wong, *With Push From Trump, Senate Moves to Install Contentious Filmmaker at U.S. Media Agency*, N.Y. TIMES (May

8, 2020), https://www.nytimes.com/2020/05/08/us/politics/michael-pack-voa.html; *see also*

Cong. Research Serv., IN11365, President Trump Criticizes VOA Coverage of China's

COVID-19 Response 1 (2020) [hereinafter 2020 CRS Report] (noting that the White House

issued a statement on April 10, 2020 critical of VOA for running an Associated Press article on

its website on April 7, 2020 that the White House asserted "amplified Beijing's propaganda").[3]

The President's push worked.  On June 4, 2020, Pack's appointment was confirmed by

the Senate and, on June 8, 2020, he was sworn in as the CEO of USAGM.  After a week on the

job, on June 17, 2020, Pack removed the Networks' heads and the members of their boards of

directors, including the individual plaintiffs in this lawsuit, explaining that he acted "pursuant to

[his] authorities as [CEO] of [USAGM], including under 22 USC 6209(d) and [the Networks']

bylaws."  *E.g.*, Turner Decl., Ex. B, at 1, ECF No. 4-14.  As noted, Pack replaced the former

board members with five members of the current Administration as well as an employee of

Liberty Counsel Action, a conservative advocacy organization.  *Id.*[4]

On June 23, 2020, OTF and the individual plaintiffs brought the instant suit, claiming that

Pack's actions violate the IBA and the APA.  Compl. ¶¶ 47–60.  On June 25, 2020 they filed the

pending motion for a temporary restraining order and preliminary Injunction.  *See generally* Pls.'

Mot.  The morning of June 26, 2020, Pack filed, in accordance with a scheduling order entered

by the Court, *see* Min. Order (June 25, 2020), his opposition, *see* Def.'s Opp'n to Pls.' Mot.

---

[3]     Notably, VOA Mandarin's service has extensive reach.  Its "audience has continued to grow, particularly for its YouTube programs, which have reached roughly 100 million viewers.  During the past year, VOA Mandarin reported on numerous topics that are sensitive to the [People's Republic of China ('PRC')] government and generally banned, including Chinese dissident views, the mass detention of Uyghurs, political protests in Hong Kong, politics in Taiwan, and PRC 'misinformation' efforts. VOA also published articles in English and Chinese questioning China's COVID-19 numbers and timeline of events. VOA Mandarin's website received over 68 million visits from April 2019 to April 2020, including 4.5 million article views related to COVID-19 coverage."  2020 CRS Report at 2.

[4]     Specifically, Pack appointed, in addition to himself: Jonathan Alexandre, Senior Counsel to Liberty Counsel Action; Robert Bowes, Senior Advisor to the Secretary of Housing and Urban Development; Bethany Kozma, Deputy Chief of Staff at the United States Agency for International Development; Rachel Semmel, Communications Director at the Office of Management and Budget; and Emily Newman, Chief of Staff at USAGM.  Turner Decl., Ex. B, at 1.

("Def.'s Opp'n"), ECF No. 7, and, later that afternoon, also submitted a Notice of Supplemental Authority, ECF No. 8, while plaintiffs filed a Motion to File Supplemental Declarations, ECF No. 9, which was granted, *see* Min. Order (June 26, 2020).   A hearing was held the same day. *See* Min. Entry (June 26, 2020).   On June 29, 2020, plaintiffs filed an additional supplemental declaration, concerning the incorporation of OTF, *see* Pls.' Notice of Suppl. Auth. Supp. Pls.' Mot., ECF No. 10, to which Pack filed a response the same day, *see* Def.'s Resp. to Pls.' June 29, 2020 Notice of Suppl. Auth., ECF No. 12.   Also, on June 29, 2020, plaintiffs filed a notice with the Court regarding the status of its 2020 operational grant.   *See* Pls.' Notice to the Court and Request for a Status Conf. ("Pls.' June 29 Notice"), ECF No. 13.   Pursuant to the Court's order, *see* Min. Order (June 30, 2020), Pack addressed plaintiffs' notice the following day, *see* Def.'s Resp. to Pls.' June 29 Notice ("Def.'s June 29 Resp."), ECF No. 16.   The morning of July 1, 2020, plaintiffs filed yet another supplemental declaration, *see* Pls.' Notice of Suppl. Auth. in Supp. Pls.' Mot. ("Pls.' July 1 Notice"), ECF No. 17, to which the government responded that afternoon, *see* Def.'s Resp. to Pls.' July 1 Notice ("Def.'s July 1 Resp."), ECF No. 19.   Also, on the afternoon of July 1, 2020, plaintiffs submitted a reply brief.   *See* Pls.' Reply in Supp. of Pls.' Mot., ECF No. 19.   Plaintiffs' motion for a temporary restraining order and preliminary injunction is now ripe for resolution.[5]

## II.    LEGAL STANDARD

In evaluating a motion for both a temporary restraining order and preliminary injunctive relief, generally the same standard is applied.   *See Sampson v. Murray*, 415 U.S. 61, 86 (1974) (confirming that "a temporary restraining order continued beyond the time permissible under Rule 65 must be treated as a preliminary injunction, and must conform to the standards

---

[5]      At the hearing on June 26, 2020, plaintiffs reported that "[RFE] would be joining in the motion."  Hr'g Tr. at 45:20–21.  The Court informed plaintiffs' counsel that, if that were the case, plaintiffs should amend their complaint "no later than Monday," June 29, 2020.  *Id.* at 46:2–3.  In their July 1, 2020 reply brief, plaintiffs stated that they "do not seek to amend their complaint to add any new party." Pls.' Reply at 2 n.1.

applicable to preliminary injunctions"); *Nat'l Mediation Bd. v. Air Line Pilots Ass'n, Int'l*, 323 F.2d 305, 305 (D.C. Cir. 1963) (per curiam) (noting that "[a]n order extending a temporary restraining order beyond the 20 days allowed by Civil Rule 65(b) is tantamount to the grant of a preliminary injunction").  To obtain either form of relief, plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.  *See Winter v. Natural Res. Def. Counsel*, 555 U.S. 7, 20 (2008).  The first factor is the "most important factor."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, 'a likelihood of success on the merits.'" (quoting *Gonzales v. O Centro Espirita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006)).[6]

A temporary restraining order or a preliminary injunction "is an extraordinary . . . remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" on each of the factors.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted) (quoting 11A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2948, pp. 129–30 (2d ed. 1995)).  When the requested preliminary relief would alter the status quo, the standard the movant must satisfy is especially "demanding." *Archdiocese of Wash.*, 897 F.3d at 319; *see also Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'" (quoting 7 J.W. Moore, Federal Practice P65.04(1), p. 1627 (2d ed. 1968))).

---

[6]       The D.C. Circuit has previously followed a "sliding scale" approach to evaluating preliminary injunctions, but that approach is likely inconsistent with *Winter*, *see Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf*), and therefore will not be employed here, *see Singh v. Carter*, 185 F. Supp. 3d 11, 16–17 (D.D.C. 2016).

## III.    ANALYSIS

The four-factor test plaintiffs must satisfy to obtain the preliminary injunctive relief they

seek is addressed below, with the final two factors considered together.

### A.    Plaintiffs Fail To Establish A Likelihood Of Success On The Merits

As to the first factor, plaintiffs contend that Pack's removal and replacement of the

officers and directors of the Networks violate the IBA for two reasons.[7]  First, they argue that the

USAGM CEO lacks authority to remove and replace OTF's officers and directors.  Pls.' Mot. at

16–21.  Second, they contend, with respect to both OTF and the remaining Networks, that Pack's

actions violated the IBA's "statutory firewall."  *Id.* at 21–24.  These arguments are addressed

*seriatim*.[8]

---

[7]      Initially, plaintiffs also argued that Pack "ordered an immediate 'freeze' on the use of the federal grant funds on which these private organizations depend," Pls.' Mot. 1, and that this "freeze" was "'arbitrary, capricious,' and 'otherwise not in accordance with law,' in violation of the APA."  Pls.' Mot. at 3 (quoting 5 U.S.C. § 706(2)(A)).  On June 26, 2020, however, USAGM advised its grantees, via an email, that "[t]here is no freeze in funding," and grantees "may continue taking" actions that had previously been put on hold.  Def.'s Notice of Suppl. Auth., Ex. A at 1, ECF No. 8.  At the hearing held the same day, government counsel representing Pack confirmed that no "freeze" remains in effect, and that the grant providing OTF's operational funding—of particular importance to OTF—is active.  *See* Hr'g Tr. at 3:13–5:7.  Plaintiffs thus maintained that they "are not pressing the claim regarding the freeze for purposes of this motion."  *Id.* at 4:17–18; *see also id.* at 5:4–7 (confirming the same).  On June 29, 2020, however, plaintiffs notified the Court that "[e]ven though the 2020 grant agreement had already been offered by USAGM and accepted by OTF, USAGM is now attempting to withhold funds through an 'amendment' to the grant" under which USAGM "intends to approve funding only in the amount of $1,619,926."  Pls.' Notice at 2 (internal quotation marks omitted).  Plaintiffs requested a status conference to address the issue.  *Id.*  In response, Pack maintained that "[c]ontrary to Plaintiffs' assertions, USAGM is not 'withhold[ing]' anything; it is simply disbursing fourth-quarter funds on a monthly basis, subject to negotiations between USAGM and OTF."  Def.'s Resp. to Pls.' Notice.  The morning of July 1, 2020, plaintiffs moved for a status conference, *see* Mot. for Hearing Status Conference, ECF No. 18, and, as noted, submitted yet another supplemental declaration, further detailing why OTF believes USAGM's new funding-disbursement plan will disrupt its actions, *see* Pls.' July 1 Notice, and to which Pack responded that afternoon, *see* Def.'s July 1 Resp.  Finally, plaintiffs' reply brief submitted on July 1, 2020 also addressed this issue.  *See* Pls.' Reply at 15–19.  Plaintiffs have unnecessarily spilled much ink.  The legality of disbursing funds to plaintiffs on a monthly basis is not within the scope of plaintiffs' complaint—which the plaintiffs opted not to amend, despite an invitation from the Court to do so, *see supra* note 5—and is also outside the scope of their pending motion for injunctive relief.  Plaintiffs attempt to change this state of affairs in their reply brief, but resolution of the question of the legality of Pack's removals and appointments will not be further delayed.  Accordingly, a status conference is unnecessary and plaintiffs' motion for this Court to hold one is denied.  This issue is not further addressed in this Memorandum Opinion.

[8]      Pack raises two threshold issues.  First, he argues that plaintiffs "lack a private right of action under the [IBA]."  Def.'s Opp'n at 10.  This argument is beside the point, as plaintiffs have also alleged an APA claim, asserting that Pack's "attempted appointment and removal of officers and directors of the [Networks] [and] his violation of the statutory firewall . . . are all agency actions that are arbitrary and capricious, abuses of discretion, and violations of law."  Compl. ¶ 59.  Plaintiffs have been adversely affected by final agency action, and thus they may proceed under the APA.  5 U.S.C. §§ 702, 704.  Implicitly recognizing this, Pack further maintains, second, that his removal determinations "are unreviewable [under the APA] because they are committed to agency discretion by

---

11

>    1.    **The USAGM CEO Has Authority To Remove And Replace OTF Directors And Officers**
>
>        a.    **Section 6209(d) Grants The CEO Broad Remove-And-Replace Authority Only As To Organizations Expressly Authorized In Chapter 71 Of The U.S. Code**

As noted, in removing and replacing the directors and officers of all four Networks—OTF, RFE, Radio Free Asia, and the Middle East Broadcasting Networks—Pack purported to act, in part, pursuant to his authority under § 6209(d) of the IBA. Yet, in the case of OTF, plaintiffs maintain that Pack has no § 6209(d) authority. Analyzing the text of § 6209(d), plaintiffs observe, correctly, that the USAGM CEO's authority to appoint or remove officers and directors extends to only two types of organizations: (1) "RFE/RL Inc., Radio Free Asia, and the Middle East Broadcasting Networks or any organization that is established through the consolidation of such entities," and (2) "any organization . . . authorized under [the IBA]." 22 U.S.C. § 6209(d); *see* Pls.' Mot. at 16–17. In plaintiffs' view, OTF fits into neither category. *See* Pls.' Mot. at 17. Pack, on the other hand, insists that OTF fits neatly into the second. *See* Def.'s Opp'n at 4. Resolution of this dispute regarding Pack's treatment of OTF thus turns on the scope and proper construction of the clause "any organization . . . authorized under this chapter," in § 6209(d).

To fit within the second category, plaintiffs posit that OTF "would need to have been specifically 'authorized' under the Act." Pls.' Mot. at 17. Plaintiffs contend that no such

---

law." Def.'s Opp'n at 11. He focuses on the language found in IBA's § 6209(d), which provides that "[o]fficers and directors of . . . any organization . . . authorized under this chapter, shall serve *at the pleasure of*" the USAGM CEO. 22 U.S.C. § 6209(d) (emphasis added). Plaintiffs' argument, however, also turns on application of § 6204(b)—the so-called "statutory firewall,"— directing that the CEO "shall respect the professional independence and integrity of . . . the grantees of the board." *Id.* § 6204(b). Further, plaintiffs maintain that Pack did not have "authority to make [his] decision at all," which plaintiffs appropriately point out "is a pure question of law." Pls.' Reply at 19–20. The APA's exception to judicial review for actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), is "'very narrow,' barring judicial review only in those 'rare instances' where 'there is no law to apply.'" *Gresham v. Azar*, 950 F.3d 93, 98 (D.C. Cir. 2020) (citations omitted) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). Here, § 6204(b) contains a command regarding what the CEO *shall* do, and alleged violation of that command is at issue, and, further, § 6209(d) presents legal questions about its scope, thereby avoiding application of the very narrow exception urged by Pack.

authorization has occurred.  In fact, legislation that would "authorize" OTF is pending before Congress, *see id.* at 17 (citing H.R. 6621, 116th Cong. (2020)), but unless and until that legislation is passed, OTF "is just like any a [sic] private, nonprofit corporation that receives funds from the U.S. government," *id.* at 18.

Pack counters that plaintiffs read § 6209(d) too parsimoniously.  In his view, § 6209(d) does not limit the USAGM CEO's authority only to organizations "expressly and specifically identified in [the IBA]," Def.'s Opp'n at 5, as that reading would essentially transmute the key clause "authorized *under*" to "authorized *in"* the IBA, *see id.* at 6.  Instead, "*under* this chapter" must be read more broadly "to capture organizations funded pursuant to (*i.e.,* 'under') the CEO's § 6204 grant-making 'authorit[y].'"  *Id.* (alteration in original) (quoting 22 U.S.C. § 6204). Thus, the fact that OTF is not expressly mentioned in chapter 71 of the U.S. Code, which is where the IBA is codified, is of no matter, according to Pack, because Congress could not have intended, as plaintiffs argue, to extend the USAGM CEO's remove-and-replace power only to those organizations expressly authorized *in* chapter 71, either by virtue of an explicit reference in the IBA, as in a standalone provision establishing the organization, or because the organization was incorporated by the CEO, pursuant to powers granted by the IBA.  *Id.*

Adoption of Pack's interpretation would mean that any grantee of the USAGM—no matter the size of the grant or independence of the grantee from the government—would, as a statutory matter, forfeit control over its board and officers to the whim of the CEO, even if such a condition for receipt of the grant funds is nowhere made apparent in the grant funding agreement or sanctioned by the grantee's foundational or governing documents.  Pack assumes that his remove-and-replace power extends over all grantees, despite their otherwise independent status

13

from USAGM.  The question before this Court is whether the statutory language supports this assumption.[9]

Pack backs up his construction with "at least three reasons," *id*. at 4, but none is ultimately persuasive to overcome the plain text of the statute.  First, he relies on the definition of "authorize" as meaning to "'give legal authority; to empower,'" *id*. at 4 (quoting *Authorize*, BLACK'S LAW DICTIONARY (11th ed. 2019)), and asserts that since the CEO, *not* any specific organization, is provided with legal authority under chapter 71, this phrase must refer to any organization, such as OTF, that has been funded "under" the CEO's "authority," *see id.*  The logic of this argument is flawed, however, because it ignores the full text of the key clause, which plainly refers to "any *organization*," not any *action* by the CEO, "authorized under this chapter."  22 U.S.C. § 6209(d) (emphasis added).  Thus, plaintiffs are correct that organizations "authorized under" the IBA "include entities authorized both before and after the enactment of 22 U.S.C. § 6209(d), such as Radio Free Asia (*id.* § 6208), and Radio Free Afghanistan (*id.* § 6215)," as well as organizations incorporated by the CEO, pursuant to his authority in § 6209 (a)(1).  Pls.' Reply at 3.  "Either source of authorization—whether by Congress or the CEO—could be sufficient to 'authorize' the establishment of an organization 'under' the Act."  *Id.*  Yet,

---

[9]     Congress considered enacting legislation that would have defined "grantee" to mean "the non-Federal organization described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such code as of day before the date of the enactment of this Act that receives Federal funding from the Broadcasting Board of Governors, and includes Radio Free Asia, RFE/RL, Incorporated, and the Middle East Broadcasting Networks, Incorporated."  H.R. REP. NO. 113-541, at 4.  That broad definition would have simplified matters greatly, in Pack's favor, but that language is *not* what Congress enacted.  The few definitions contained in the current IBA's § 6213 provide no help.  Indeed, only four terms are defined in § 6213, and one of them, "RFE/RL, Incorporated," is defined by reference to a section of the IBA, § 6206, that has been *repealed*.  This is emblematic of an undeniable fact: the IBA, as currently written, is a mess.  Many provisions overlap substantively with others, key definitions are nowhere to be found, and choices as to how the statute is organized are puzzling, to say the least.  Perhaps this is a product of the fact that the most recent IBA amendments were determined by a conference committee tasked with finalizing a nearly thousand-page bill of which the IBA amendments were only a minuscule part, *see generally* H.R. REP. NO. 114-840, at 1209–10 (2016) (Conf. Rep.), or that the statute has been modified by accretion over time.  Regardless, U.S.-sponsored international broadcasting would likely benefit from additional attention by Congress to the IBA.

as, plaintiffs emphasize, OTF "is not even mentioned, let alone authorized, anywhere within the Act," nor was it "incorporated by the CEO." *Id*. at 4.[10]

Second, Pack contends that "§ 6209(d)'s 'authorized under this chapter' clause is mostly superfluous unless it captures organizations that Congress does not specifically contemplate, such as those funded as 'authorized under' the CEO's § 6204 grant-making power." Def.'s Opp'n at 6. Not so. As plaintiffs observe, rather than requiring that the language of § 6209(d) be updated upon the establishment of a new organization in a standalone IBA provision or when incorporated by the CEO, this catchall clause accommodates such additions within the purview of the subsection. *See* Pls.' Reply at 6 ("That Congress wanted a mechanism to incorporate organizations within the ambit of § 6209(d) without being required to continually update the provision's text is well within its authority."). The "[e]stablishment of Radio Free Afghanistan," in § 6215, provides a clear example of this use of the clause, since this organization is not expressly named in § 6209(d) but is nonetheless an organization authorized under chapter 71 to receive grants. *See* 22 U.S.C. § 6215(b) (authorizing, in subsection titled "Grant authority," BBG "to make grants to support Radio Free Afghanistan"); *see also* Radio Free Afghanistan Act, Pub. L. No. 107-148, 116 Stat. 64 (2002) (legislation amending IBA with § 6215, entitled "An act to *authorize* the establishment of Radio Free Afghanistan" (emphasis added)).

---

[10]       At the hearing, the Court queried plaintiffs' counsel about the origin of OTF since entities incorporated by USAGM also fall "under" the IBA for purposes of § 6209(d), *see, e.g.*, 22 U.S.C. § 6209(a)(1) (noting that the USAGM CEO "is authorized to incorporate a grantee"). At the time of the hearing, OTF's website indicated that OTF "was created in 2012 as a program of Radio Free Asia," and that "[i]n 2019, the USAGM, with the help of Congress, *created* a new, restructured OTF—making OTF an independent Internet freedom non-profit organization." *OTF's History*, OPEN TECH. FUND, https://www.opentech.fund/about/our-history/ (visited June 28, 2020) (emphasis added). Plaintiffs' counsel acknowledged that: "Yes, [USAGM] supported—it's a time when nobody was disagreeing. So [USAGM] supported the decision it was funding all of these entities. But, as a legal matter, this is a private, independent nonprofit organization . . . ." Hr'g Tr. at 13:4–7. Plaintiffs subsequently alerted the Court, on June 29, 2020, that the website description regarding the incorporation of OTF had been modified and OTF was, in fact, independently incorporated as a non-profit. *See* Decl. of Libby Liu ¶ 3, ECF No. 10-1.

Finally, Pack attempts to bolster his broad reading of § 6209(d) as capturing all agency-funded organizations by comparing § 6209(d)'s "authorization" language to the text in § 6204(a)(5), "which gives the CEO the 'authorit[y]' to 'make and supervise grants and cooperative agreements.'"  Def.'s Opp'n at 4 (alteration in original) (quoting 22 U.S.C. § 6204(a)(5)).  "The parallel language employed in both provisions," he argues, "confirms that an organization falls within § 6209(d)'s appointment-and-removal provision when it is authorized to receive funding under the CEO's grant-making authority."  *Id.*  Pack's reading requires a logical leap too far.  These are two wholly separate CEO powers and the use of a variation of the same word "authority" simply does not operate to conflate them, particularly when two other CEO "authorities" enumerated in § 6204(a) actually address the CEO's removal-and-replacement power while the grant-making subsection on which Pack relies, § 6204(a)(5), does not.  *See* 22 U.S.C. §§ 6204(a)(20), (21).[11]

Moreover, Pack's insistence on reading §§ 6209(d) and 6204(a)(5) together is inconsistent with other subsections in § 6209.  *See Ardestani v. INS*, 502 U.S. 129, 135 (1991) (explaining that "[t]he word 'under'" must "draw its meaning from its context").  Section 6209—

---

[11]     Specifically, § 6204(a)(20) authorizes the CEO "to condition" any grant "to RFE/RL, Inc., Radio Free Asia, or the Middle East Broadcasting Networks, or any organization that is established through the consolidation of such grantee entities, on [(1)] authority to determine membership of their respective boards, and [(2)] the consolidation of such grantee entities into a single grantee organization under terms and conditions established by the Board," 22 U.S.C. § 6204(a)(20), while § 6204(a)(21) authorizes the CEO "[t]o redirect or reprogram funds within the scope of any grant . . . or between grantees . . . and to condition grants . . . on such grants . . . including authority to name and replace the board of any grantee authorized under this chapter, including with Federal officials, to meet the purposes of this chapter," *id.* § 6204(a)(21).

The two enumerated CEO powers in §§ 6204(a)(20) and (21) have significant overlap but also some significant differences.  Both authorize the conditioning of grants to three named organizations (and their consolidated organization) on the CEO's authority to determine the membership of their boards, but subsection (a)(21) adds the CEO's authority to re-direct and reprogram funds between all grantees and to condition grants to "any grantee authorized under this chapter" on providing the CEO authority "to name and replace the board" with federal officials.  While subsection (a)(20) is limited to the three explicitly named organizations (and any consolidated entity from those three), paragraph (21) applies to "any grantee authorized under this chapter," using closely analogous language to § 6209(d).

Construing subsection (a)(21) in the same way as § 6209(d) to apply only to grantees "authorized under" chapter 71, either by explicit reference, including in a standalone provision, or by CEO incorporation, means that other grantees—omitted from such reference and independently incorporated, such as OTF—are not covered by the grant-condition language in either subsections (a)(20) or (21).  This leaves the CEO's power to set conditions on funding to such grantees to his general grant-making power, under § 6204(a)(5).

which is entitled "Broadcast entities reporting to Chief Executive Officer"—contains five

subsections principally focused on three named broadcast networks—RFE/RL, Radio Free Asia,

and the Middle East Broadcasting Networks—and any consolidated grantee formed from them.

The first subsection sets out the CEO's authority "to incorporate a grantee" and to condition

annual grants to these three named grantees on their consolidation "into a single, consolidated

private, non-profit organization."  22 U.S.C. § 6209(a)(1).[12]  The remaining four subsections go

on to provide that (1) the consolidated grantee would have a specified mission, *id*. § 6209(b); (2)

like the named grantees "or any other grantee or entity provided funding by the agency," the

consolidated grantee would not be considered "a Federal agency," *id*. § 6209(c); (3) also like the

named grantees or other organization "authorized under this chapter," the consolidated grantee

would be subject to the CEO's remove-and-replace authority, *id*. § 6209(d); and (4) the

consolidated grantee, despite now being a single entity, would continue to disseminate content

under the "brand names" of the three named grantees, *id*. § 6209(e).  Thus, taken as a whole,

§ 6209 reveals its over-arching purpose is to empower the CEO to combine RFE, Radio Free

Asia, and the Middle East Broadcasting Networks into a single entity, and then to provide how

that consolidated entity would function, with the three named organizations reduced to "brand

names," and to clarify that the CEO's authority over the consolidated grantee is essentially the

same as over the named grantees.[13]  In this context, the critical clause "organization . . .

authorized under this chapter," *id*. § 6209(d), is best understood to cover grantees similarly

---

[12]        This subsection is broadly titled "Consolidation of grantee organizations," which seemingly encompasses
all organizations receiving USAGM grants.  Similarly, the title of § 6209(d) is "Leadership of grantee
organizations."  22 U.S.C. § 6209(d).  These titles, however, are of minimal interpretive value, and the statutory text
contradicts the broad application that these titles imply.  *See Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331
U.S. 519, 528–29 (1947) (noting "the wise rule that the title of a statute and the heading of a section cannot limit the
plain meaning of the text").
[13]        In fact, certain parts of § 6209 are repetitive of provisions already set out in standalone sections for the two
named organizations, RFE and Radio Free Asia.  *See, e.g*., 22 U.S.C. §§ 6207(e), (f), 6211 (providing that RFE is
not a federal agency and setting out its functions and mission); *id.* § 6208(a)(1), (b), (h) (same as to Radio Free
Asia).

named in chapter 71, or consolidated from such entities and/or incorporated by the CEO, per § 6209(a)(1).

Without concrete textual support, Pack would read the critical clause § 6209(d) as if it were written "to cover 'any organization provided authorized funding by the agency.'"  Pls.' Reply at 2.  Such a reading is especially unwarranted given that the immediately preceding subsection, § 6209(c), *does* refer to funding, providing that "[n]othing in this chapter or any other Act . . . shall be construed to make . . . Radio Free Europe, Radio Free Asia, or the Middle East Broadcasting Networks or any other grantee or entity provided *funding* by the agency a Federal agency or instrumentality."  22 U.S.C. § 6209(c) (emphasis added).  Subsection 6209(c) thus shows that Congress had text available to cover all USAGM grantees, but declined to use that text in the very next subsection, § 6209(d).

Pack asserts that "'merely because a statute contains "examples of inartful drafting" does not mean courts are incapable of discerning its meaning, particularly with the aid of broader statutory context.'"  Def.'s Opp'n at 6 n.5 (quoting *United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016)).  Here, though, *plaintiffs'* reading comports with the broader statutory context.  "Congress's intent has been manifest" that U.S.-funded international broadcasters—when not government operated, such as in the case of VOA—"are to enjoy independence in programming and broadcasting decisions, subject to the sensible limitation that their programming and broadcasting be consistent with the foreign policy of the United States."  *Ralis*, 770 F.2d at 1125; *see also* H.R. REP. NO. 113-541, at 21 (explaining that "credible and accurate news funded by the United States government is not an oxymoron").  Adopting a limited ruling of § 6209(d), and requiring that the CEO acquire remove-and-replace authority via the grant-making process, *see* 22 U.S.C. § 6204(a)(5), (21), through which grantees can manifest their assent to the CEO's

acquisition of that authority, helps ensure that USAGM "respect[s] the professional independence and integrity of . . . the grantees of [USAGM]," *id.* § 6204(b).

In short, the clause in § 6209(d) "authorized *under* this chapter" may be interpreted as "*in* this chapter."[14]  Consequently, given the absence of any mention of OTF in chapter 71 and the fact that this organization was not incorporated by the CEO under authority provided in the IBA, plaintiffs are correct: the USAGM CEO's § 6209(d) remove-and-replace authority does not extend to OTF by virtue of the operation of the IBA alone.  This does not end the analysis, however, since the CEO may nonetheless have remove-and-replace authority over OTF's officers and directors pursuant to his grant-making authority under § 6204(a)(5), in combination with OTF's consent under the organization's grant agreement and/or bylaws.  *See* Pls.' Reply at 12 (acknowledging that OTF's bylaws can "provide independent authority for appointment and removal").

### b.   OTF's Grant Agreement And Bylaws Authorize USAGM's CEO To Remove And Replace OTF Officers And Directors

As the CEO's authority to remove and replace OTF's officers and directors turns on whether OTF's grant agreement with USAGM or its bylaws provide such authority, these documents are examined in turn.  One sentence from OTF grant's agreement is most relevant: "[OTF's] articles of incorporation, by-laws or other constitutional documents shall provide that the Board of the Directors of [OTF] may consist of some or all of the current members of the USAGM established under the International Broadcasting Act and other technical experts, as

---

[14]      Interestingly, both sides appear to agree that the clause in § 6209(d) "authorized under this chapter" should not be interpreted as "*in* this chapter."  *See* Def.'s Opp'n at 6; Pls.' Reply at 6–7.  Plaintiffs contend that "had Congress used the word 'in' rather than 'under' in § 6209(d)," this subsection would not have covered "[o]rganizations incorporated by the CEO (as permitted by § 6209(a)(1))."  Pls.' Reply at 6–7.  This conclusion is incorrect since CEO-incorporated organizations authorized in § 6209(a)(1) are thereby also authorized under the IBA, which comprises "this chapter," 71, referenced in § 6209(d).

appropriate."  Gupta Decl., Ex. A, OTF Grant Agreement art. IV(b), at 4, ECF No. 4-4

[hereinafter OTF Grant Agreement].[15]

      This sentence is ambiguous.  This language could be read to mean, simply, that OTF

must not enact a *prohibition* on USAGM officials serving as OTF officers or directors, without

mandating their inclusion on OTF's board.  For example, by contrast to the OTF agreement

language, the grant agreement language for Radio Free Asia—which incubated OTF before the

latter organization was spun off into an independent non-profit fully funded by USAGM—more

firmly requires its "articles of incorporation, by-laws or other constitutional documents [to]

provide that the Board of Directors of the Non-Federal Entity *shall* consist of the current

members of the USAGM established under the International Broadcasting Act and of no other

members."  Gupta Decl., Ex. B, Radio Free Asia Grant Agreement art. IV(b), at 4, ECF No. 4-5

[hereinafter Radio Free Asia Grant Agreement] (emphasis added).  Yet, while certainly not as

express as Radio Free Asia's grant agreement, the relevant sentence in OTF's grant agreement

could also be read as requiring that, whatever OTF's governing documents might otherwise say

about selection of OTF's board, USAGM members must be put on OTF's board.  The grant

agreement provides no additional detail about how USAGM members would join OTF's board.

In any event, the parties devote little attention to the OTF grant agreement.  *See* Pls.' Mot. at 20;

Def.'s Opp'n at 3–8 (addressing the CEO's authority over OTF without addressing OTF's grant

agreement).  Instead, they focus on the terms of OTF's bylaws, *see* Pls.' Mot. at 19–20; Def.'s

Opp'n at 7–8, which the Court turns to next.

---

[15]    At least one other provision in the OTF grant agreement confirms contemplation that USAGM members would serve on OTF's board.  *See* OTF Grant Agreement art. IV(c)(4), at 5 (making certain OTF reporting requirements to USAGM inapplicable "to any communications or outreach activities of any Director of the Board of Directors of [OTF] who is a Governor of the USAGM at the time such communication or outreach activity is undertaken").

The parties' dispute over OTF's bylaws turns on four key provisions.  First, § 2.3 of OTF's bylaws provides that OTF "shall at all times select and provide for the election, resignation or removal of the members of its Board of Directors, and appoint and provide for the resignation or removal of its Officers, *pursuant to and in compliance with the provisions of the Act*, as it may be amended from time to time."  Gupta Decl., Ex. E, Bylaws of OTF § 2.3, at 2, ECF No. 4-8 [hereinafter OTF Bylaws] (emphasis added).  Second, pursuant to § 5.2, "[i]ndividuals shall be elected by the Board of Directors for three-year terms upon majority vote of the Board of Directors, *or as may be authorized by 22 U.S.C. 6203 et seq*., with notice to and in consultation with the USAGM Advisory Board."  *Id.* § 5.2, at 3 (emphasis added).  Third, in accordance with § 7.0, "[t]he Officers of [OTF] shall be the Chair of the Board of Directors, Chief Executive Officer . . . , President, Vice President/Treasurer, and General Counsel/Secretary . . . , and such other officers as the Board of Directors, *or the USAGM Chief Executive Officer in accordance with the Act*, may appoint."  *Id.* § 7.0, at 7 (emphasis added).  Fourth, under § 7.1, "[a]ll other Officers shall be elected by majority vote of the Board of Directors at a duly called meeting at which a quorum is present *or as may be authorized by 22 U.S.C. 6203 et seq.*" and "shall hold office until his or her successor is elected and qualified or his or her earlier resignation or removal *or as may be authorized by 22 U.S.C. 6203 et seq*."  *Id.* § 7.1, at 8 (emphases added).

In plaintiffs' view these bylaw provisions referencing the IBA, its statutory sections, and the USAGM CEO have essentially no meaning.  They contend that the bylaws "do not confer any additional authority upon" the USAGM CEO not already found in the IBA, and "since the [IBA] does not grant Mr. Pack the authority to appoint or remove [OTF]'s officers or directors, these bylaw provisions do not enable him to do so, either."  Pls.' Mot. at 20.  Put another way, by plaintiffs' circular reading, if OTF is not authorized "under" the IBA, then OTF is not subject to

21

whatever the CEO "may be authorized" by the IBA to do.  Pack, by contrast, maintains that these bylaws "reinforce[]" the conclusion that the IBA grants the USAGM CEO remove-and-replace authority.  Def.'s Opp'n at 7.

Although plaintiffs' reading is plausible, Pack has the better argument, for his interpretation both gives the bylaws some meaning and ensures that the bylaws are interpreted in the context in which they were adopted, namely, consistent with the grant agreement requirement that OTF's bylaws allow OTF's board to be taken over by USAGM officials.  Plaintiffs' circular reading would, as do its papers, brush off the grant agreement language.  Recall that, to comply with its grant agreement, OTF was required to adopt bylaws that "provide that the Board of the Directors of [OTF] may consist of some or all of the current members of the USAGM established under the International Broadcasting Act and other technical experts, as appropriate." OTF Grant Agreement art. IV(b), at 4.  This sentence means that OTF was required to adopt bylaws either (1) permitting USAGM officials and employees to serve on the OTF board, or (2) allowing USAGM officials to be placed on the OTF board, presumably by the USAGM CEO, who is acknowledged to be vested with authority "[t]o make and supervise grants for broadcasting and related activities."  *Id.* Attachment A ¶ 5.  As noted, this second meaning amounts to granting the CEO remove-and-replace authority.  The test of whether OTF understood the grant agreement to have the second meaning is answered by looking at how OTF satisfied the grant agreement's Article IV(b) requirement.  It did *not* enact a bylaw provision concerning *who* may serve as its officers and directors.  Rather, the bylaws include terms that explain *how* officers and directors are selected and removed.[16]  Indeed, OTF even went so far as

---

[16]     Plaintiffs claim that § 5.1 of OTF's bylaws "does not provide for removal of the initial board members [of OTF]—under the Act or otherwise."  Pls.' Reply at 13.  That may be true, but plaintiffs overlook § 2.3, which states that OTF "shall *at all times* select and provide for the election, resignation, or *removal* of the members of its Board of Directors . . . pursuant to and in compliance with the provisions of the [IBA]."  OTF Bylaws § 2.3, at 2 (emphases added).

to write into its bylaws that the USAGM CEO "may appoint" OTF officers, so long as he does so "in accordance with the [IBA]."  OTF Bylaws § 7.0, at 7.  That decision makes sense only if OTF understood Article IV(b) of its grant agreement to be a condition requiring OTF to give the USAGM CEO remove-and-replace authority.  In turn, to ensure that OTF's bylaws comply with the grant agreement, §§ 2.3, 5.2, and 7.1 of the bylaws must be interpreted as affirmative grants of authority to the CEO.[17]

This reading is confirmed by comparing OTF's bylaws to those that plaintiffs concede grant the CEO remove-and-replace authority.  RFE's bylaws, for instance, provide, *inter alia*, that "[t]he members of the Board of Directors shall be elected by the affirmative vote of a majority of the then members of the Board of Directors, even if less than a quorum, *or as may be authorized in 22 U.S.C. §§ 6204 and 6209*."  Gupta Decl., Ex. F, RFE Bylaws § 2.3, at 2, ECF No. 4-9 (emphasis added).  This language tracks OTF's bylaws almost exactly.  OTF's bylaws provide, in relevant part, that "[i]ndividuals shall be elected by the Board of Directors for three-year terms upon majority vote of the Board of Directors, *or as may be authorized by 22 U.S.C. 6203 et seq.*"  OTF Bylaws § 5.2, at 3 (emphasis added).  Given that "as may be authorized" confers remove-and-replace authority on the USAGM CEO in the RFE bylaws, it does so in the OTF bylaws as well.  Plaintiffs' claim that this comparison favors their position—because the RFE bylaws single out § 6209, while OTF's refer only generally to the IBA, *see* Hr'g Tr. at 17:20–24, ECF No. 14 (arguing that bylaws such as RFE's "incorporate 6209(d)")—fails to grapple with the OTF grant language.  When the OTF bylaws state that directors shall be elected "as may be authorized by 22 U.S.C. 6203 et seq.," OTF Bylaws § 5.2, at 3, that language

---

[17]     In the alternative, plaintiffs assert that under § 5.2 of OTF's bylaws, new directors "can only be appointed 'with notice and in consultation with the USAGM Advisory Board,'" Pls.' Reply at 13 (quoting OTF Bylaws § 5.2, at 3), and "Pack failed to comply" with this command, *id*.  This argument fails for two reasons.  First, it does nothing to establish that Pack's *removal* of OTF directors violated the bylaws.  Second, § 5.2 says nothing about *when* notice and consultation must occur, *i.e.*, before or *after* appointment occurs.

*includes* § 6209(d), as well as § 6204(a)(5) and other relevant sections of the IBA.  These are not, as OTF would have it, merely empty references, given OTF's grant language requiring placement of USAGM officials on the board, at the agency's discretion.

*  *  *

The OTF bylaws, in conformance with Article IV(b) of the OTF grant agreement, confer remove-and-replace power on the USAGM CEO over OTF's officers and directors.  Thus, although plaintiffs advance the proper interpretation of § 6209(d) of the IBA, their claim that Pack exceeded his authority when he removed OTF's directors and chief executive officer ultimately fails.[18]

### 2.   The USAGM CEO Did Not Violate The Statutory Firewall By Exercising His § 6209(d) Authority

Plaintiffs' second merits argument fares no better than their first.  They argue that the CEO's removal and replacement of the Networks' boards of directors violated the IBA's "statutory firewall" found in § 6204(b), *see* Pls.' Mot. at 21–24, which provides that the USAGM CEO "shall respect the professional independence and integrity of the Board, its broadcasting services, and the grantees of the Board," 22 U.S.C. § 6204(b).  They acknowledge—at least in the case of the Networks other than OTF—that their officers and directors "serve at the pleasure of and may be named by" the CEO.  *Id.* § 6209(d); *see* Pls.' Mot. at 21.  They contend, however, that the CEO may not exercise his § 6209(d) authority in a way that "is in irreconcilable conflict with the firewall."  Hr'g Tr. 23:17–18.

---

[18]    Plaintiffs, in their reply brief, raise a host of constitutional arguments.  *See* Pls.' Reply at 1–2, 7–11, 13. Those arguments, however, presume that this case concerns "the *involuntary* federal takeover of a private organization."  *Id.* at 2 (emphasis added).  In fact, OTF's bylaws and grant agreement evince OTF's consent to the USAGM CEO's assumption of remove-and-replace authority over the OTF officers and directors.  *See id.* at 12 (acknowledging that OTF's bylaws can "provide independent authority for appointment and removal") Accordingly, Pack's actions raise no constitutional issue.

Undoubtedly, a tension exists within the statute between the control that the government must necessarily exert over its own messaging, and the independence that U.S. international broadcasters must maintain to accomplish their mission.  Yet, as the D.C. Circuit explained when analyzing the structure of U.S.-funded international broadcasting that Congress has erected and interpreting BIB regulations that preceded but were similar to the statutory firewall, Congress has ultimately struck a balance.  USAGM is "given evaluative and review responsibilities"; "day-to-day control" is "left to the stations themselves."  *Ralis*, 770 F.2d at 1125.  Accordingly, only when the USAGM CEO engages in day-to-day control is the statutory firewall violated.  The CEO may not, for example, tell broadcasters what stories to cover or how to cover them.  Nor may the CEO fire a particular staff member or command that a piece be assigned to a specific reporter.  He may and must, however, oversee the operations of the Networks by exercising the statutory powers Congress gave him, including his § 6209(d) authority.  *See id.* at 1126 (explaining that while USAGM does not have "control of [the Networks'] operations," it is "obviously an important and powerful actor on this stage," and its "powers and duties" are "substantial").

Notably, plaintiffs themselves advance only a very narrow argument.  They do not claim that the CEO is prohibited from removing and replacing a named grantee's board in its entirety.  Nor do they claim that the makeup of the Networks' boards must be bipartisan.  *See* Pls.' Reply at 14.  They do not even contend that the CEO is prohibited from putting *some* government officials on a grantee's board, *see id.*—a wise concession, given that § 6204(a)(21) provides that the CEO may "condition grants or cooperative agreements" on their "including authority to name and replace the board of any grantee authorized under this chapter, *including with Federal officials*," 22 U.S.C. § 6204(a)(21) (emphasis added).  Rather, plaintiffs assert that "the one thing [the CEO] cannot do is install a board that is majority controlled by the Federal Government

because when [the CEO] do[es] that [a grantee] is no longer an independent organization."  Hr'g Tr. at 27:23–28:1.

Plaintiffs' argument does not hold water.  In reality, the CEO has "substantial" control over the Networks, *Ralis,* 770 F.2d at 1126, and part of that control stems from the CEO's power *to appoint*, not his power to appoint *government officials*.  As much as plaintiffs protest otherwise, an appointee's federal employment status has no apparent bearing on whether she will oversee the Networks in the way that the CEO expects her to.  Thus, a rule preventing the CEO from creating a board whose members are primarily federal officials would do nothing to help preserve the Networks' independence.  Furthermore, and more importantly, such a rule would be unmoored from the statutory text, which expressly contemplates the appointment of federal officials to the Networks' boards, 22 U.S.C. § 6204(a)(21), requires that the Networks include "clear and effective presentation of the policies of the United States Government" in their broadcasting, *id.* § 6202(b)(3), and provides that the officers and directors of the Networks (other than OTF) serve "at the pleasure of" the CEO, *id.* § 6209(d).

Plaintiffs nevertheless insist upon their bright-line rule.  They point to the D.C. Circuit's observation in *Ralis* that "[relevant] regulations expressly prevent a governmental *takeover* of the stations' operational control," 770 F.2d at 1125 (emphasis added), and they analogize to corporate law, in which context, plaintiffs claim, a "takeover" occurs when one corporation installs a majority of its chosen directors on another corporation's board, *see* Hr'g Tr. at 32:25–33:2 ("There is a critical distinction between installing a board that is majority controlled by one entity; we call that a takeover.").  Plaintiffs, however, focus on the wrong words from their cherrypicked sentence from *Rali*s.  What the CEO may not do is "take[ ]over . . . *operational* control," *i.e.*, management of the Networks' "day-to-day" operations.  *Ralis,* 770 F.2d at 1125

(emphasis added).[19]  Exercise of the CEO's statutory appointment power is no such takeover, even where, as here, the CEO has largely selected board members from the current Administration and uniformly from one political party.  The 2016 amendments to the IBA authorized precisely this outcome.

* * *

Assessing, as a policy matter, whether Congress erred in 2016 by transferring the bipartisan BBG's powers to a single presidentially appointed CEO is not properly an issue before this Court.  Common sense could lead to the conclusion that a bipartisan board, by its nature, may be less efficient than a single executive, while inherently more balanced.  Given that U.S. international broadcasting must simultaneously advance the foreign policy objectives of the United States, present a diversity of viewpoints, and model independent journalism for the world, these IBA goals may be better served by a more balanced approach.  *See* 2020 CRS REPORT at 2 ("While Congress did not alter the principles that apply to U.S. international broadcasting, the changes left the authority to direct U.S. international broadcasting in the hands of a singular agency head appointed by and answerable to the President, and required to 'consult regularly' with the Secretary of State for 'foreign policy guidance,' possibly weakening the structural

---

[19]      The plaintiffs also point to a regulation of the BBG that went into effect "as of June 11, 2020" that interprets § 6204(b), *see Firewall* Rule, 85 Fed. Reg. 36,150, and to a companion provision in the grant agreements that the CEO may not "attempt to influence the content or editorial choices of one of the broadcasting entities in a manner that is not consistent with the highest standards of professional broadcast journalism or take any other action that may tend to undermine the journalistic credibility or independence of USAGM or its broadcasters," *e.g.* Radio Free Asia Grant Agreement art. VIII(c), at 10; *see, e.g.*, Pls.' Mot. at 2, 9–10.  The *Firewall* rule does not expressly embrace a bar on placement of a majority of government officials on the Networks' boards but does cabin the CEO's exercise of "direction and oversight" to that which "those in equivalent leadership positions in an organization overseeing other reputable news organizations may provide, in a manner consistent with the highest standards of professional journalism." *Firewall* Rule, 85 Fed. Reg. at 36,152.  Nothing in the record here would enable evaluation of Pack's actions in this case against that "equivalen[cy]" standard.  In any event, for purposes of this motion, plaintiffs rely solely on the statute, making minimal effort to tie the *Firewall* rule and the grant provisions to their "majority-control" interpretation of the text.  *See* Hr'g Tr. at 36:19–25, 37:1–2 ("[T]he [firewall regulation] . . . is not a provision that we are relying on; it's not inconsistent with what we're saying.  It's just—I want to be really clear that we're not saying that it's just journalistic standard in some sense that has been violated.  What has been violated is the requirement for structural independence.  We're relying principally on the statute, not on the regulations."); *see also id.* at 38:22–25 (explaining plaintiffs' position that the grant provision "[is] just reaffirming . . . this constellation of statute regulation and contract that has always stood for the principle that you can't have a government takeover").

independence of the broadcasters.").  As the D.C. Circuit has cautioned, however, "[i]n a sensitive area directly affecting the foreign relations of the United States, we in the 'least dangerous branch' should not and will not compromise a structure carefully erected by the political branches."  *Ralis*, 770 F.2d at 1126.  Plaintiffs have not established a likelihood of success on the merits, and thus this most important factor weighs against them.

### B.    Plaintiffs Have Not Demonstrated Irreparable Harm

Turning next to the second factor, plaintiffs have failed to establish they are likely to suffer irreparable harm absent preliminary injunctive relief.  To demonstrate irreparable harm, the moving party must satisfy two requirements.  "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  "Second, the harm 'must be beyond remediation.'"  *Id.* at 8 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).

Here, the organizational plaintiff, OTF, and the individual plaintiffs have different theories of harm.  OTF argues that it will suffer irreparable harm because Pack "has imperiled [OTF's] ability to achieve its mission by . . . attempting to fill its board with political allies who have publicly aligned themselves with causes in direct conflict to the Fund's mission."  Pls.' Mot. at 27.  The individual plaintiffs, for their part, assert that their "'right to participate in the management of' the [Networks] 'has intrinsic value,'" and thus "Pack's attempt to 'destroy [the plaintiffs'] voice in management' . . . constitutes irreparable harm."  *Id.* at 31 (second alteration in original) (first quoting *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003); and then quoting *Street v. Vitti*, 685 F. Supp. 379, 384 (S.D.N.Y. 1998)).  Each contention is taken in turn.

### 1.   *Pack's Actions Neither Impair OTF's Programs Nor Conflict With Its Mission*

An organization seeking to establish a likelihood of irreparable harm must demonstrate that the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs." *League of Women Voters*, 838 F.3d at 8 (alterations in original) (internal quotation marks omitted) (quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)).  "If so, the organization must then also show that the defendant's actions 'directly conflict with the organization's mission.'" *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).  OTF satisfies neither step, for substantially the same reasons that its case fails on the merits.  *See, e.g.*, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 116 (D.D.C. 2017) ("Since the Court has concluded that plaintiff's constitutional and statutory rights have not been violated, plaintiff has failed to demonstrate that it would suffer irreparable harm in the absence of relief.").  The CEO's exercise of his "evaluative and review responsibilities," *Ralis*, 770 F.2d at 1125, *enhances* OTF's programs and *comports* with OTF's mission, for it is the CEO who is ultimately accountable for ensuring that U.S.-funded international broadcasting functions in accordance with its standards and principles, *see* 22 U.S.C. § 6204(a)(3), as acknowledged in OTF's bylaws, *see* OTF Bylaws Attachment A ¶ 3.  OTF thus has failed to demonstrate a likelihood of irreparable harm.

### 2.   *Individual Plaintiffs' Loss Of Board Positions Does Not Constitute Irreparable Harm*

As for the individual plaintiffs, their claim of harm runs headlong into the well-worn rule from *Sampson v. Murray* that loss of employment is not irreparable harm except in a "genuinely extraordinary situation."  415 U.S. at 92 n.68; *see Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006) ("[C]ases are legion holding that loss of employment does not constitute irreparable

injury."). Nothing about the individual plaintiffs' alleged harms are "genuinely extraordinary." True, unlike in the typical case involving loss of employment, here no loss of income is on the line, *see* Hr'g Tr. at 43:7–11, but in *Sampson* itself, the Supreme Court established that the possibility of non-monetary harm is not, alone, sufficient to justify deviation from the *Sampson* rule, as the Court rejected a claim that humiliation and damages to reputation associated with loss of employment justified preliminary relief. *See* 415 U.S. at 91. Nor does it matter that the individual plaintiffs held high-level positions, sitting on the boards of directors at the Networks. Courts have consistently applied the *Sampson* rule regardless of the type of employment at issue. *See, e.g.*, *English v. Trump*, 279 F. Supp. 3d 307, 334 (D.D.C. 2018) (Acting Director of Consumer Financial Protection Bureau); *Burns v. GAO Empl. Fed. Credit Union*, No. 88-3424, 1988 WL 134925, at *1–2 (D.D.C. Dec. 2, 1988) (President of Board of Directors of U.S. General Accounting Office Employees Federal Credit Union); *EEOC v. City of Janesville*, 630 F.2d 1254, 1256 (7th Cir. 1980) (Chief of Police); *Levesque v. State of Maine*, 587 F.2d 78, 79 (1st Cir. 1978) (Maine Commissioner of Manpower).

To avoid the *Sampson* rule, plaintiffs continue to cite to the corporate law context, *see* Hr'g Tr. at 42:2 ("This is more like a corporate takeover case . . . ."), pointing to out-of-jurisdiction cases in which courts have held that "'a party's loss of control' of a corporation 'constitutes irreparable harm,'" Pls.' Mot. at 31 (alteration omitted) (quoting *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, 2003 WL 22909149, at *4 (S.D.N.Y. Dec. 10, 2003)) (also citing *Wisdom Import Sales Co.*, 339 F.3d at 114–15; *Street*, 685 F. Supp. at 384). These non-binding decisions are inapposite, as they turned on the need to preserve bargained-for rights that, once lost, could never be restored. *See, e.g.*, *Wisdom Import Sales Co.*, 339 F.3d at 114 ("We hold only that the denial of bargained-for minority rights, standing alone, may constitute irreparable harm for purposes of obtaining preliminary injunctive relief where such rights are

30

central to preserving an agreed-upon balance of power (*e.g.*, preserving the management role of the minority directors) in corporate management.").  Here, by contrast, the individual plaintiffs never secured a right to manage the affairs of the Networks on which they served "at the pleasure of" the USAGM CEO, 22 U.S.C. § 6209(d) (authority over Networks other than OTF); *see also* OTF Bylaws at 2–3 (granting the USAGM CEO power to determine OTF board members), and even if they had any right to be reinstated to their positions by virtue of *the Networks*' right to have their "professional independence and integrity" "respect[ed]," *id.* § 6204(b), that right could be vindicated at a later date.[20]

The more apt comparison is to *English v. Trump*, which addressed whether the President could appoint an Acting Director to head the Consumer Financial Protection Bureau ("CFPB"), or instead whether only CFPB's Deputy Director could fill that role.  *See* 279 F. Supp. 3d at 311.  As here, the Deputy Director advanced a theory of irreparable harm "bas[ing] her alleged injury . . . on 'the loss of a "statutory right to function" in a position directly related to a federal agency's "ability to fulfill its mandate."'"  *Id.* at 334 (quoting the plaintiff's motion (quoting *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983))).  *English*, however, determined that the Deputy Director's claim fit neatly within the *Sampson* rule.  *See id.*

This Court reaches the same conclusion with respect to the former members of the Networks' board of directors.  Indeed, the case for irreparable harm was stronger in *English* than here, for in *English*, the position of acting director was set to "expire when the President nominate[d] and the Senate confirm[ed] a new Director for the CFPB," *id.* at 335 (internal

---

[20]     The other cases upon which the individual plaintiffs rely, *see* Pls.' Mot. at 32, are similarly distinguishable because they arose in different legal contexts where the alleged harms extended beyond loss of employment, *see Pa. Prof'l Liab. Joint Underwriting Ass'n v. Wolf*, 328 F. Supp. 3d 400, 411 (M.D. Pa. 2019) (finding irreparable harm in takings case where state action would force the plaintiff "to transfer *all* of its assets to the Commonwealth" (emphasis in original)); *Atl. Coast Airlines Holdings v. Mesa Air Group*, 295 F. Supp. 2d 75, 95–96 (D.D.C. 2003) (finding irreparable harm in antitrust case where there was a "realistic chance of harm to *competition*," and explaining that "[t]he identity of the members of the [plaintiff's board of directors] is *not* the issue" (emphases added)).

quotation mark omitted) (quoting the plaintiff's motion), which could have occurred before the case was resolved.  Here, by contrast, the individual plaintiffs point to no imminent risk that their former board positions will disappear—only that their replacements will assume their former positions.  Should plaintiffs ultimately prevail, they can be restored to the Networks' board of directors, and thus they will not suffer irreparable harm in the absence of preliminary relief.  *See Murray*, 415 U.S. at 90 ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

### C.      The Balance Of Equities And Public Interest Weigh Against Injunctive Relief

Finally, the third and fourth factors may be easily dispatched.  The parties agree, *see* Pls.' Mot. at 32; Def.'s Opp'n at 32 n.11, that because the government is the non-movant, the balance of the equities and the public interest "merge into one factor," *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 32 (D.D.C. 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Further, plaintiffs acknowledge that "the balance of the equities and the public interest here are 'essentially derivative of the parties' arguments on the merits of the case.'"  Pls.' Mot. at 33 (quoting *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 83 (D.D.C. 2013), *judgment reinstated*, 760 F.3d 18 (D.C. Cir. 2014)).  "[T]hus, 'it follows that the public interest factor of the preliminary injunction test should weigh in favor of whoever has the stronger arguments on the merits,'" *id.* (quoting *Am. Meat Inst.*, 968 F. Supp. 2d at 83), *i.e.*, Pack.

Indeed, thwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest.  Setting USAGM's priorities and managing, at a broad level, U.S. international broadcasting is the prerogative of the USAGM CEO—not that of plaintiffs, and certainly not of this Court.  Moreover, Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making and oversight of USAGM grantees is itself "a

declaration of public interest and policy which should be persuasive in inducing courts to give relief." *Va. Ry. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937).  Meanwhile, plaintiffs, as discussed above, will suffer no irreparable harm from the denial of their motion.

Accordingly, the balance of the equities and the public interest, just like the first two factors, weigh against granting the requested relief.

## IV.    CONCLUSION

Pack's actions have global ramifications, and plaintiffs in this case have expressed deep concerns that his tenure as USAGM CEO will damage the independence and integrity of U.S.-sponsored international broadcasting efforts.  If they are correct, the result will be to diminish America's presence on the international stage, impede the distribution around the world of accurate information on important affairs, and strengthen totalitarian governments everywhere.  Yet, Congress has decided to concentrate unilateral power in the USAGM CEO, and the Court cannot override that determination.  If Pack's actions turn out to be misguided, his appointment by the President and confirmation by the Senate points to where the accountability rests: at the ballot box.  Based on an evaluation of plaintiffs' likelihood of success on the merits, the solution is likely not in this Court.

For the foregoing reasons, plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 4, is denied.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

DATE: July 2, 2020

_____

BERYL A. HOWELL
Chief Judge