IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OPEN TECHNOLOGY FUND, et al.<br>                    Plaintiffs,<br><br>        v.<br><br>MICHAEL PACK, in his official capacity<br>as Chief Executive Officer and Director of the<br>U.S. Agency for Global Media,<br>                    Defendant. | Case No. 1:20-cv-1710 |

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF DENIAL OF
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND,
IN THE ALTERNATIVE, FOR AN INJUNCTION PENDING APPEAL**

This Court denied the plaintiffs' motion for a temporary restraining order and preliminary injunction on the afternoon of July 2. Two hours later, the plaintiffs noticed their appeal, followed by a request for an expedited appeal in the D.C. Circuit. In this motion, the plaintiffs respectfully seek (1) reconsideration of the Court's decision to deny their motion for a temporary restraining order and preliminary injunction or (2) in the alternative, an injunction pending appeal. *See* Fed. R. App. P. 8 ("A party must ordinarily move first in the district court for . . . an order . . . granting an injunction while an appeal is pending.").

The plaintiffs recognize that they are effectively asking this Court to acknowledge the strength of the opposite view on issues that it has just decided. As one judge of this Court recently observed, the party seeking such relief risks being in the "near impossible position" of "convinc[ing] a judge who had just ruled against it that the party is likely to succeed on appeal." *Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 561 & n.4 (D.D.C. 2018) (granting injunction pending appeal on the grounds that the plaintiffs were "entitled to a full hearing before an appellate court" before implementation of agency decisions that "might ultimately be found to run afoul of the First Amendment"); *see Rostker v. Goldberg*, 448 U.S. 1306, 1309 (1980) (Brennan, J., in chambers) (granting relief because "[m]y task . . . is not to determine my own view on the

merits, but rather to determine the prospect of reversal by this Court as a whole"). To grant such relief, however, "the Court need not determine that it erred and will likely be reversed—an acknowledgment one would expect few courts to make." *Loving v. I.R.S.*, 920 F. Supp. 2d 108, 110 (D.D.C. 2013). Instead, relief pending appeal may be warranted where, as here, "the issue is one of first impression and raises serious and difficult legal questions." *Id.*

Because the rationale for the Court's denial of relief (unlike the parties' briefing) places greatest reliance on the interpretation of the bylaws of a nonprofit corporation chartered under the D.C. Nonprofit Corporation Act, this motion addresses the interpretive principles applicable under that Act and offers additional factual material and context. The District of Columbia's Attorney General plays a central role in the Act's enforcement and interpretation and may intervene in proceedings over contested corporate actions, which by statute are channeled to the D.C. Superior Court. As required in such proceedings, the plaintiffs have given notice to the Attorney General. *See* D.C. Code §§ 29–401.60; 29–401.23. The court may wish to reconsider its decision in light of the additional legal and factual material presented here.

If this Court is inclined to deny this motion, however, the plaintiffs respectfully request that the Court do so promptly, even summarily without written opinion, to facilitate expedited appellate review by the D.C. Circuit. The urgency of the need for injunctive relief has only increased in the past few days. Notwithstanding the plaintiffs' appeal, Michael Pack has escalated his attempts to accomplish a federal-government takeover of the independent Open Technology Fund while this case remains pending. At 8 p.m. on Friday, July 3, Pack issued a letter stating that "Open Technology Fund is hereby on notice" that "[e]ffective immediately," Pack is appointing a new "Acting CEO" for OTF. Turner Decl., Exh. A. Over the July 4th weekend, the New York Times reported this purported appointment as if it were a fait accompli. Pranshu Verma & Edward Wong, *New Trump Appointee Puts Global Internet Freedom at Risk, Critics Say*, New York Times, July 4, 2020, https://nyti.ms/3dTME29.

Yesterday evening, Pack escalated matters even further. He sent an email to OTF announcing that the "Acting CEO," James M. Miles "will arrive at OTF's offices at Noon tomorrow, July 7th, 2020. Please ensure someone is present to meet him at the office at Noon, to begin his onboarding paperwork. Pursuant to Judge Howell's memorandum opinion of July 2, I trust there will be no issues with this transition." Turner Decl., Exh. B. Building security was instructed not to admit Mr. Miles. Turner Decl., Exh. C.

This morning, at 11:13 a.m., the Agency followed up with yet another email. Despite that fact that this litigation remains pending in this Court and on appeal, the email insisted that the Court's order denying preliminary relief requires that OTF "provid[e] your new CEO with a key to the office" and "grant[] him immediate access" to the building. Turner Decl., Exh. E.

This situation—two rival CEOs and boards of directors—is untenable and exacerbates the irreparable harm to OTF. OTF's ability to fulfill its critical mission depends on maintaining the trust of journalists and activists in repressive regimes around the world, who view its independence from the government as essential to their personal safety. An injunction to facilitate orderly appellate review is warranted. OTF is "entitled to a full hearing before an appellate court" before the implementation of such drastic, harmful actions that "might ultimately be found" unlawful. *Cigar Ass'n*, 317 F. Supp. 3d at 561.

## STANDARDS

***Motion for Reconsideration***. Any order or decision that is not a final judgment "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). District courts have "broad discretion to hear a motion for reconsideration brought under Rule 54(b)," *Isse v. Am. Univ.*, 544 F. Supp. 2d 24, 29 (D.D.C. 2008), and grant such motions "as justice requires." *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011). A court may grant a motion to reconsider when "the movant presents either newly discovered evidence or errors of law that need correction."

*Davis v. Joseph J. Magnolia, Inc.*, 893 F. Supp. 2d 165, 168 (D.D.C. 2012). "The burden is on the moving party to show that reconsideration is appropriate and that harm or injustice would result if reconsideration were denied." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893 F. Supp. 2d 258, 268 (D.D.C. 2012).

***Motion for Injunction Pending Appeal.*** Federal Rule of Civil Procedure 62(c) authorizes a district court to issue an injunction pending appeal. A motion brought under Rule 62(c) is subject to the same four criteria as a motion for preliminary injunction. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842–43 (D.C. Cir. 1977). Thus, to obtain an injunction pending appeal, the moving party "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam).

## ARGUMENT

### I.     The plaintiffs are likely to succeed on the merits

#### A.     Plaintiffs are likely to succeed on their lead statutory and constitutional-avoidance arguments.

**1.** As this Court already recognized, the plaintiffs are very likely to succeed on their lead claim: Mr. Pack lacked any statutory authority to remove OTF's officers and directors. The government justified Pack's attempted removal of OTF's officers and directors under 22 U.S.C. § 6209(d), and its briefing claimed only the statute as an independent source of authority. But, as this Court recognized, "the USAGM CEO's § 6209(d) remove-and-replace authority does not extend to OTF" under the plain language of the statute. ECF No. 22 at 19. On appeal, the D.C. Circuit is likely to agree with this Court's statutory interpretation, for the reasons given in the Court's opinion. *See* ECF No. 22 at 12-19.

This Court also held that, despite lacking any statutory authority to replace the board and officers, Mr. Pack could do so anyway based on OTF's bylaws and the grant agreement between OTF and USAGM. But the government did not rely on the grant agreement or bylaws as an independent basis for Mr. Pack's actions. Indeed, the government did not rely on the grant agreement at all. It contended only, in a single paragraph, that the bylaws "reinforced" the CEO's statutory authority—the statutory authority this Court held does not exist. ECF No. 7 at 7. As explained below, the plaintiffs are likely to succeed in their appeal on this issue as well.

**B.   The bylaws do not give USAGM's CEO remove-and-replace authority that he lacks by statute.**

OTF's bylaws provide no independent authority for Pack's removals or appointments of OTF's officers or directors. This Court's conclusion that the bylaws "must be interpreted as affirmative grants of authority to the CEO" to remove and replace Open Technology Fund's officers and directors cannot be reconciled with the plain text of the bylaws or the relevant interpretive principles. The bylaws limit the government's role in appointment or removal of officers and directors to that provided by the International Broadcasting Act, which, as this Court correctly held, does not provide any such authority.

**1.** In keeping with a correct understanding of the statute, the bylaws permit "the appointment of a Federal official as Director or Officer by the USAGM Chief Executive Officer," but only "*provided that* such appointment . . . [is] *authorized* under the Act." ECF No. 4-8 at § 9.0 (emphasis added). As the Court has already concluded, "such appointment" is *not* currently "authorized under the Act" with respect to OTF. So this proviso demonstrates that the bylaws' drafters understood a future congressional authorization—that is, the anticipated congressional authorization of OTF that would trigger § 6209(d)—to be a contingent future fact.

At the time its bylaws were enacted, Open Technology Fund was "hopeful that [it] would one day get express authorization from Congress that would put Open Technology Fund on the

same footing as congressionally-authorized grantees like Radio Free Europe and Radio Free Asia." Liu Decl. ¶ 6. Open Technology Fund included this and similar provisions within its bylaws to ensure that, *if* OTF received that congressional authorization (as the bylaws put it, "provided that" OTF were "authorized under the Act"), its bylaws would be in compliance with the Act—including § 6209(d). Rather than require its bylaws to be amended upon its authorization, in other words, OTF chose to enact bylaws flexible enough to withstand this—or other—statutory change. That kind of future-oriented drafting is commonplace, and consistent with best practices, in corporate documents, particularly when the drafters anticipate a future statutory change. Indeed, Libby Liu, Open Technology Fund's sole incorporator, explains that this future possibility—"authorization from Congress that would put Open Technology Fund on the same footing as congressionally-authorized grantees like Radio Free Europe"—"guided our intent in both the bylaws and the articles." Liu Decl. ¶ 6. Liu "never understood either the grant agreement or the bylaws to give the CEO of USAGM the power to remove or replace [OTF's] officers or directs absent congressional authorization of OTF." *Id.* ¶ 7.

**2.** Even assuming counterfactually that the bylaws on their own atextually conferred on Pack the extraordinary authority to replace OTF's board without any action by Congress, they expressly foreclose the manner in which Pack tried to do so here. The bylaws state that directors appointed "as may be authorized by 22 U.S.C. 6203 *et seq.*" can only be appointed "with notice and in consultation with the USAGM Advisory Board." ECF No. 4-8 § 5-2. The Advisory Board, a bipartisan body, *see* 22 U.S.C. § 6205(d), thus acts as an essential check on any potential government interference with Open Technology Fund's board.

It is undisputed that Mr. Pack did not notify or consult with the USAGM Advisory Board before attempting to appoint new directors. The Court dismissed this binding requirement, arguing that the provision "says nothing about *when* notice and consultation must occur, *i.e.*, before or *after* appointment occurs." ECF No. 22 at 23 n.17. But, as courts have recognized, such

consultation requirements would be meaningless if "notice and consultation" could occur after the relevant appointment or action. *See, e.g.*, *Cal. Wilderness Coal v. U.S. Dep't of Energy*, 631 F.3d 1072, 1087 (9h Cir. 2010) ("[T]he ordinary meaning of consult involves conferring with an entity before taking action."); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 720 (8th Cir. 1979) (holding that required consultation with respect to a removal must be made before the removal); *cf.* U.S. Const., Art. II, sec. 2, cl. 2 (The President "by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States"). While it is possible that *notification* could occur after the appointment of a director, it is difficult to imagine how the CEO could *consult with* the USAGM Advisory Board about his appointment *after* it occurred. Such a reading is contrary to law and fails to give meaning to this check on government power.

**3.** OTF's bylaws must be interpreted as required by applicable provisions and principles of D.C. law. Even if the bylaws did not manifestly foreclose Pack's actions, the District of Columbia Nonprofit Corporation Act of 2010, D.C. Code Ann. § 29-401.01 *et seq.*, provides a series of background rules that govern D.C. nonprofits and compel that conclusion.

D.C. law establishes a presumption that the appointment and removal of nonprofit officers and directors will be determined by the board, if no alternate procedure is clearly provided for in the articles of incorporation or bylaws. Thus, the default rule is that a director of a nonprofit corporation may be removed only by the board of directors. D.C. Code Ann. § 29-406.08(b) (West 2020). Additionally, "[a] director who is designated in the articles of incorporation . . . may be removed by an amendment to the articles . . . deleting or changing the designation." *Id.* § 29-406.08(d). With respect to appointments, a vacancy on the board "may be filled by a majority of the directors remaining in office." *Id.* § 29-406.10(a).

Similar default rules govern the appointment and removal of nonprofit officers. Unless the articles of incorporation or bylaws provide explicit appointment or election mechanisms, "[t]he officers of a nonprofit corporation shall be the individuals who . . . are appointed or

elected . . . as authorized by the board of directors." *Id.* § 29-406.40(a). Officers may be removed by "[t]he board of directors; [t]he officer who appointed the officer being removed . . .; or [a]ny other officer authorized by the article, the bylaws, or the board." *Id.* § 29-406.43(b).

An entity incorporated under the Act, like Open Technology Fund, can of course override statutory defaults through clear and unambiguous language to that effect in their articles of incorporation or bylaws. But, in the absence of such language, the statutory defaults prevail.

**4.** Courts' enforcement of corporate law in the case of nonprofit takeover attempts must also be informed by background First Amendment principles of associational freedom, particularly when the nonprofit in question is engaged in express activity. When an incumbent board defends against an attempted takeover of a nonprofit organization, "[d]eferential review of defenses is appropriate to permit associations to define and limit their membership in order to control the organization's expression." Reiser, *Nonprofit Takeovers: Regulating the Market for Mission Control*, 2006 B.Y.U. L. Rev. 1181, 1251 n.244 (2006) (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000)). "Directors, officers, and managers of a targeted nonprofit often will be genuinely afraid that their organization's mission will be impaired, if not betrayed, by a takeover." *Id.* at 1184–85. "[T]he fact that a takeover may be a means by which to transform a nonprofit's mission illegitimately poses a significant risk beyond the bounds of the affected organization. It also raises concerns for the nonprofit sector's role in society." *Id.* at 1185.

This Court dismissed Open Technology Fund's freedom-of-association arguments in a footnote, stating that Mr. Pack's actions with respect to Open Technology Fund "raise no constitutional issue" because "OTF's bylaws and grant agreement evince OTF's consent to the USAGM CEO's assumption of remove-and-replace authority over the OTF officers and directors." ECF No. 22 at 24 n.18. That was error. These constitutional issues are not just relevant to the interpretation of the statute; they are relevant to the interpretation of the bylaws and grant agreement as well. The question here is whether the federal government—whether

8

purportedly justified by bylaw or statute—can take an action that would otherwise constitute a serious intrusion into OTF's associational freedom protected by the First Amendment.

Such constitutional protection may be waived via contract only upon clear and convincing evidence that the waiver is "voluntary, knowing, and intelligently made." *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185, 187 (1972); *Leonard v. Clark*, 12 F.3d 885 (9th Cir. 1993); *DNC v. RNC*, 673 F.3d 192, 205 (3d Cir. 2012). Here, there was no such waiver, as all the evidence cuts the other way. First, OTF never understood the language in the grant agreement or the bylaws in the way that the Court reads them. And it appears from its filing that the government did not either. Any waiver, by definition, could not have been voluntary, knowing, and intelligently made. *See* Declaration of Libby Liu ¶¶ 3-4, 7 (explaining that Liu and OTF "never understood either the grant agreement or the bylaws to give the CEO of USAGM the power to remove or replace [OTF's] officers or directs absent congressional authorization of OTF. If we had been asked by USAGM to waive our right to govern ourselves as an independent organization in this manner, we would have declined."); ECF No. 7 at 7-8 (government brief failing to even once mention the grant agreement as authority supporting Mr. Pack's actions). Second, as the Court acknowledged, the "most relevant" sentence in the grant agreement is "ambiguous." ECF No. 22 at 19, 20. Third, as explained below, the articles of incorporation, bylaws, and grant agreement read together all demonstrate that OTF complied with the relevant provision of the grant agreement by appointing USAGM Board Members to its initial board, upon incorporation, and nothing in the bylaws conflicts with that provision.

Under the First Amendment to the U.S. Constitution, it is well established that "the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed." *Knox v. Service Employees Int'l Union, Local 1000*, 567 U.S. 298, 309 (2012). But that "[f]reedom of association would prove an empty guarantee if associations could not limit *control over their decisions* to those who share the interests and persuasions that underlie the

association's being." *Cal. Democratic Party v. Jones*, 530 U.S. 467, 574-75 (2000) (emphasis added). "Government actions that may unconstitutionally burden this freedom may take many forms, one of which is intrusion into the internal structure or affairs of an association, like a regulation that forces the group to accept members it does not desire." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000). USAGM seeks to exercise "control over" all of OTF's decisions and the greatest possible "intrusion in the internal structure or affairs" of the organization. These constitutional protections are at their apex when the government seeks to intrude into the affairs of private organizations engaged in expressive activity or advocacy. *See Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 436-37 (1963). And it is well established that such organizations do not lose all First Amendment protections merely by taking government funds. *Agency for Int'l Dev.v. Alliance for Open Soc'y Intern., Inc.*, 570 U.S. 205, 214–15 (2013).

Against the backdrop of these concerns and constitutional principles, OTF's bylaws should not be read to override the statutory defaults of D.C. law absent clear and unambiguous language to the contrary. There is no such clear and unambiguous language. Any ambiguity in Open Technology Fund's bylaws, then, should be resolved to rest appointment and removal authority squarely in the hands of OTF's directors rather than in the federal government. For these reasons too, the plaintiffs are likely to succeed on appeal.

## C. The quoted sentence in the 2019 grant agreement cannot change the meaning of the bylaws.

The plaintiffs are also likely to succeed in showing that the 2019 grant agreement does not alter the correct reading of the bylaws. Unfortunately, the Court's conclusion that Mr. Pack had remove-and-replace authority over OTF rests heavily on a misreading of a single sentence in OTF's 2019 grant agreement. Because the Court lacked the benefit of any briefing, evidence, or input from the parties on this sentence, the Court's reasoning relies on some false steps.

For starters, the Court's opinion misreads the key term: "current members of the USAGM." The grant agreement provides that OTF's "articles of incorporation, by-laws or other constitutional documents shall provide that the Board of Directors of [OTF] *may consist of some or all of the current members of the USAGM* established under the International Broadcasting Act and other technical experts, as appropriate." ECF No. 22 at 19 (quoting ECF No. 4-4 at art. IV(b)) (emphasis added). Although the Court found this sentence "ambiguous," *id.* at 20, it ultimately concluded that the sentence is best read as "allowing USAGM officials to be placed on the OTF board, presumably by the USAGM CEO," *id.* at 22.

That reading is wrong. As Libby Liu, CEO and incorporator of Open Technology Fund, has explained, "the phrase 'current members of the USAGM' was intended to refer to the current members of the USAGM Board of Governors at the time" of incorporation. Liu Decl. ¶ 3. The confusion resulted from the renaming of the agency, as is apparent when compared with prior and future versions of the agency's standard grant agreements. Prior grant agreements referred to "the current members of the BBG established under the International Broadcasting Act," *see* Liu Decl. Exhibit A, a reference to the "Broadcasting Board of Governors"—the agency now known as the U.S. Agency of Global Media. After the agency was renamed to USAGM, the term "BBG" in the grant agreements "was automatically replaced" with the new agency name, USAGM. Liu Decl. ¶ 3; *see* Liu Decl. Exhibit A. This replacement generated potential confusion because USAGM did not have any "members"; only its board did.

This typo was fixed in the now-operative 2020 grant agreement between Open Technology Fund and the Agency, which reads: "The Non-Federal Entity's articles of incorporation, by-laws, or other constitutional documents shall provide that the Board of Directors of the Non-Federal Entity *may consist of some or all of the current members of the USAGM Board of Governors* established under the International Broadcasting Act and other technical experts, as appropriate." ECF No. 16-1 at 19 (emphasis added). This provision—requiring that "some or

11

all" USAGM board members "may" sit on Open Technology Fund's board—was satisfied by OTF's articles of incorporation, which "provide[d] that the Board of Directors of Open Technology Fund shall consist of Leon Aron, Ambassador Ryan Crocker, Michael Kempner, Ambassador Karen Kornbluh, Ben Scott, and Kenneth Weinstein." Liu Decl. ¶ 5; *see* ECF No. 10-2 at 7. Five of these six directors were members of the USAGM Board of Governors at the time that Open Technology Fund's articles of incorporation and bylaws were adopted. *See* Liu Decl. ¶ 5. The sixth, Ben Scott, was a "technical expert." *Id.* The grant agreement provision, then, was satisfied by OTF's articles of incorporation.

In any event, the 2019 grant agreement cannot (and did not) alter OTF's bylaws. Though the Court seeks to discern the intent of the bylaws' drafters "by looking at how OTF satisfied the grant agreement's Article IV(b) requirement," ECF No. 22 at 22, there is no evidence that the bylaws were drafted with this grant provision in mind, or that anybody thought that the grant provision meant what the Court has interpreted it to mean. The organization's Founder, Libby Liu, explains that she "never understood either the grant agreement or the bylaws to give the CEO of USAGM the power to remove or replace our officers or directors absent congressional authorization of OTF." Liu Decl. ¶ 7. The bylaws cabin any additional removal or appointments procedures not explicitly specified to those that "may be authorized by 22 U.S.C. 6203 *et seq.*" ECF No. 4-8 at §§ 5.2, 7.1. In other words, the meaning of these references in the bylaws all turn on the meaning of the statute. And, as this Court has recognized, that statute does not authorize Pack to make removals or appointments of OTF's officers or directors in the absence of congressional authorization.

Even assuming that the sentence in the grant agreement "means that OTF was required to adopt bylaws . . . allowing USAGM officials to be placed on the OTF board . . . by the USAGM CEO," as the Court held, at worst, OTF would be in breach of its grant agreement by

failing to include the requisite provision. The remedy for that breach cannot be the wholesale government takeover of the organization.

### D. Where it applies, the CEO's power under § 6209(d)—like all powers under the International Broadcasting Act—must be exercised in a manner consistent with the statutory protection for grantee organizations' "independence."

The Court held that the CEO's power to appoint officers and directors in general cannot be distinguished from its power—or lack thereof—to appoint a majority of sitting federal-government officials to the board of a statutorily independent organization. As the Court reasoned, "a rule preventing the CEO from creating a board whose members are primarily federal officials would do nothing to help preserve the Networks' independence." ECF No. 22 at 26. "Furthermore," the Court held, "such a rule would be unmoored from the statutory text." *Id.*

Each of the entities at issue here "operates under an express statutory mandate" that protects their "independence." *Wood ex rel United States v. Am. Inst. in Taiwan*, 286 F.3d 526, 531 (D.C. Cir. 2002). D.C. Circuit precedent interprets statutory "independence," in this precise context, as "expressly prevent[ing] a governmental takeover." *Ralis v. RFE/RL*, 770 F.2d 1121, 1125 (D.C. Cir. 1985). And the provisions in the statutory text that the Court cited as "expressly contemplat[ing] the appointment of federal officials to the Networks' board," ECF No. 22 at 26, including 22 U.S.C. § 6209(d), *id.* § 6202(b)(3), and *id.* § 6204(a)(21), must be read in harmony with the statutory firewall, *id.* § 6204(b). "The courts are not at liberty to pick and choose" among these sources of federal law; where, as here, "two statutory provisions are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974).

Section 6209(d) grants the CEO significant discretion to appoint and remove officers and directors of the relevant entities. He can choose individuals from a range of backgrounds and political affiliations. He can even appoint some full-time government officials. But reading the

Act to permit the appointment of a board where government officials constitute a voting majority raises constitutional-avoidance concerns and allows one of the two statutory provisions to impermissibly trump the other. The entities here are not "government-created and -controlled corporations" for which the government has "retain[ed] for itself permanent authority to appoint a majority of the directors of that corporation," as it has with Amtrak and other government corporations. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 398 (1995). There is no indication that the government ever acquired or "retain[ed]" such "permanent authority." Absent a specific statutory command conferring such authority, it is improper to read the statutory provision enabling the appointment of officials, 22 U.S.C. § 6209(d), to trump the specific statutory guarantee of institutional independence, *id.* § 6204(b).

## II.   The plaintiffs will suffer irreparable harm absent an injunction and remaining factors also favor an injunction.

**1.** The Court ruled that Open Technology Fund failed to show irreparable harm "for substantially the same reasons that its case fails on the merits." ECF No. 22 at 29. But, under D.C. Circuit precedent, "irreparable harm analysis . . . assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006). Assuming Pack's actions to be unlawful, as the standard requires, those actions impose "obstacles" that "make it more difficult" for Open Technology Fund "to accomplish [its] primary mission." *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). That is irreparable harm. *Id.* "The actions taken by Mr. Pack in the past few days imperil virtually every aspect of Open Technology Fund's operations and existence," including its ability "to chart [its] own course as an organization"; its ability "to stay true to [its] mission and principles"; its "essential day-to-day corporate functions, such as hiring and maintenance of [its] office space"; and its "ability to protect the vulnerable communities facing repressive regimes" that trust it "to safeguard their entities and enable their

important work around the world." First Declaration of J. Lauren Turner ¶ 15. All these harms are "beyond remediation" and constitute irreparable injury justifying a temporary restraining order. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

**2.** The Court was also wrong to dismiss the serious irreparable harm to the ousted directors of a nonprofit organization based on cases involving garden-variety federal-government employment cases, which rest on the principle that "the [g]overnment has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Sampson v. Murray*, 415 U.S. 61, 83 (1974). This isn't an employment case. This case is about the government's intrusion into the internal affairs of private nonprofit organizations—not its management of "its own internal affairs." As the Supreme Court has held, "there can be no clearer example of an intrusion into the internal structure or affairs of an association" than the government's attempt to "force[] the group to accept members it does not desire." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). And, while the individual plaintiff-directors could be reinstated at a later date, any actions taken by the purported board in the interim could never fully be unwound. "Money damages will not compensate for [the directors'] loss of the opportunity to continue to manage" the organizations. *Davis v. Rondina*, 741 F. Supp. 1115, 1125 (S.D.N.Y. 1990). Pack's attempt to "destroy [the plaintiffs'] voice in management" thus constitutes irreparable harm. *Street v. Vitti*, 685 F. Supp. 379, 384 (S.D.N.Y. 1998); *see also Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, 2003 WL 22909149, at *4 (S.D.N.Y. Dec. 10, 2003) ("[A] party's loss of control" of a corporation "constitutes irreparable harm.").

## CONCLUSION

The plaintiffs respectfully request that the court reconsider its denial of their motion for a temporary restraining order and preliminary injunction. In the alternative, the plaintiffs request that this Court grant an injunction pending appeal.

Respectfully submitted,

*/s/Deepak Gupta*
DEEPAK GUPTA
GREGORY A. BECK
GUPTA WESSLER PLLC
1900 L St NW, Suite 312
Washington, DC 20036
202-888-1741

*Counsel for Plaintiffs*

July 7, 2020